**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATEK, INCORPORATED, | |
| Plaintiff, | |
| v. | Case No. |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Defendant. | |

**EXHIBIT A
SUPERIOR COURT PLEADINGS**

Civil Actions

# Case Summary

### Case No. 2023-CAB-002097

| | |
|---|---|
| **Matek, Incorporated v. International Business Machines Corporation** | § Location |
| | § **Civil Actions** |
| | § Judicial Officer |
| | § **Ross, Carl E** |
| | § Filed on |
| | § **03/31/2023** |

---

## Case Information

Case Type: Contract

Subtype: Breach of Contract

Case Status: **03/31/2023   Open**

---

## Assignment Information

**Current Case Assignment**

Case Number    2023-CAB-002097

Court    Civil Actions

Date Assigned    03/31/2023

Judicial Officer  Ross, Carl E

---

## Party Information

*Lead Attorneys*

**Plaintiff**    **Matek, Incorporated**

10320 Little Patuxent Parkway
Suite 200
Columbia, MD 21044

**Perry, Chalfrantz E**
*Retained*
301-560-5750(F)
202-506-8122(W)
505 Capitol Court NE
Suite 100
WASHINGTON, DC 20002
chalfrantz@perrypllc.com

**Defendant**   **International Business Machines Corporation**

1015 15th ST Northwest
Washington, DC 20005

---

## Events and Orders of the Court

---

03/31/2023     
Complaint Filed
     Docketed on:   04/13/2023
     Filed by:   Plaintiff Matek, Incorporated

04/13/2023     
Initial Order [Remote]      (Judicial Officer: Ross, Carl E)

04/13/2023     Notice

06/11/2023     
Affidavit/Declaration of Service of Summons and Complaint
     Docketed On:   06/14/2023
     Filed By:   Plaintiff Matek, Incorporated
     Served On:   Defendant International Business Machines Corporation

06/30/2023     
**Remote Initial Scheduling Conference**   (9:30 AM)   (Judicial Officer: Ross, Carl E)

---

## Financial Information

---

**Plaintiff**     Matek, Incorporated
Total Financial Assessment                                      120.00
Total Payments and Credits                                      120.00
**Balance Due as of 06/20/2023**                                **0.00**

eFiled
03/31/2023 1:12:22 PM
Superior Court
of the District of Columbia

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

MATEK, INCORPORATED                                  )
10320 Little Patuxent Parkway                        )
Suite 200                                            )
Columbia, MD 21044                                   )
                                                     )
                    Plaintiff,                       )
                                                     )        Case No.:    2023-CAB-002097
          v.                                         )
                                                     )
INTERNATIONAL BUSINESS MACHINES                      )
       CORPORATION                                   )
2455 South Road                                      )
Poughkeepsie, NY  12603                              )
                                                     )
                    Defendant.                       )
                                                     )
SERVE:                                               )
                                                     )
C T CORPORATION                                      )
1015 15th Street, NW                                 )
Washington, DC  20005                                )
                                                     )
_____           )


**COMPLAINT OF MATEK, INCORPORATED**

COMES NOW, Plaintiff, by and through its undersigned Counsel, and alleges, *inter alia*, the following claims against Defendant.

**I.**

**INTRODUCTION**

1.      Plaintiff brings these claims for damages and other relief against Defendant International Business Machines Corporation ("IBM") or ("Defendant") for breach of contract.   Defendant has engaged in multiple material breaches of the agreement between the parties as described below.

## II.

## JURISDICTION

2.      The Court has subject matter jurisdiction over these claims pursuant to DC

Code, Section 11-921, *et seq*.

3.      Personal jurisdiction over Defendant in this Court is proper pursuant to

DC Code, Section 13-423 *et seq*.

## III.

## PARTIES

4.      Plaintiff is a corporation formed in the State of Maryland with its principal

offices located in Columbia, Maryland.

5.      IBM is a foreign corporation formed in the State of New York and doing

business in the District of Columbia.

## IV.

## <u>FACTUAL ALLEGATIONS</u>

6.      Prior to June 27, 2017, IBM began pursuing a contractual relationship with

Howard University ("Howard" or "the University") to provide certain telecom services to

the University.  Much of the planning and strategy to capture Howard's work occurred in

the IBM offices located in Washington, DC.  Among those potential subcontractors

enlisted by IBM to assist in its efforts was Matek.

7.      Prior to June 27, 2017, IBM and Matek met regularly to plan on how best

to service the Univserity's contractual needs.  Thereafter, IBM began negotiating an

agreement with Howard University to provide certain telecom services to the University.

8.      On or about June 27, 2017, Matek executed a Supplier Relationship

Agreement with IBM to provide certain telecom services to Howard University.

Thereafter, Matek executed a "SRA Statement of Work" with IBM providing that Matek would  provide IBM the Voice Communications Services and other services described in the Statement of Work # 4917011866.000 ("SOW") which adopts and incorporates by reference the terms and conditions of Supplier Relationship Agreement # 4917011615.000 # 4917011617 between International Business Machines Corporation and Matek, Inc., in support of project for Howard University (Customer).

9.      The Agreement's term is through the later of 06/30/2024 or until Deliverables and Services are completed (the "Term").

10.     In exchange for the provision of these services, IBM promised to pay Matek compensation as outlined in the Agreement.

11.     The parties agreed that Matek would subcontract with RCN to provide Howard University all of the telecom services, and telephone hardware, required to replace the telephones and services that had been provided to the University by Verizon prior to that time.

12.     The Agreement provides that Matek can only be terminated for cause by the University and only after an opportunity to remedy an alleged Matek default.  It states at page 24 of the Agreement as follows:

> "**Termination by Howard.**
> (a) Termination for Cause Generally. Howard may terminate this Agreement (including any affected or all Service Areas) for any of the following, by providing notice to Supplier within three hundred sixty-five (365) days of the time when it first becomes aware of the occurrence that gave rise to such termination right."

13.     The SOW delineates the bases for termination of the Agreement between the parties. Pursuant to section b) of the Dispute Resolution provisions of the SOW,

Howard and IBM must provide Matek with a written notice setting forth the nature of the

dispute and the remedy requested.

14.     Pursuant to the terms of the Agreement, Matek's contractual obligations

could only be terminated when one of the following has occurred, causing extreme harm

to Howard University and to IBM:

> (i) a material breach by Matek caused by fraud, Gross Negligence or willful misconduct of Matek;
>
> (ii) a material breach by Matek of its contractual obligations under the Agreement having a material impact on the affected Service Area (other than as set forth in Section above) by Matek that is not cured within sixty (60) days after written notice thereof;
>
> (iii) multiple or repeated breaches by Matek (other than failures to meet the Service Levels), which is subject to termination, of which Howard has provided Matek timely notice through the governance process in each instance, and which Matek had reasonable opportunity to correct in each instance, which collectively amount to a material breach of the Agreement or of a Service Area;
>
> (iv) (Disaster Recovery Services), any failure or inability to resume a Critical Service during a declared Disaster within forty-eight (48) hours of the applicable RTO time period(s) set forth in the applicable Disaster Recovery Plan;
>
> (v) Termination for Repeated Failure to Meet Service Levels, or a Failure to Meet Transition or Transformation related Critical Milestone delivered at least ninety (90) days prior to the requested effective date of termination and within one hundred and eighty (180) days of the occurrence that gave rise to such termination right, exercise its termination right pursuant to Schedule 1-D (Performance) or 1-N-1 (Transformation Milestones);
>
> (vi) Matek Insolvency; and
>
> (vii) A change in law which materially adversely affects the Fees by more than fifteen percent (15%) and Howard would not have incurred such increase if it were performing the Services for itself.

15.     Notwithstanding the absence of a Matek default, and before the end of the

Agreement's term, IBM breached the Matek Agreement when in  April of 2020, it

terminated the Agreement.

16.     The Agreement between the parties is a valid, binding and enforceable agreement for the provision of services and delivery of work product in accordance with the Agreement.  Plaintiff agreed to and performed all of its duties, responsibilities and obligations pursuant to and in accordance with the Agreement.

17.     IBM agreed to compensate Matek as described above in consideration of the Agreement.  However, IBM materially breached the Agreement with Matek by terminating the Agreement between the parties without cause and failing and refusing to pay Matek through the term of the Agreement.

18.     IBM's material breach of the Agreement in this regard has resulted in damages to Plaintiff in the form of compensatory damages, incentive payment, incidental and consequential damages and, loss of equity, attorney's fees and any other incidental and consequential damages associated with IBM's breach of the Agreement.

## COUNT I

## BREACH OF CONTRACT

19.     Paragraphs 1-18 are repeated and realleged the same as though pleaded fully set forth herein full.

20.     On or about June 27, 2017, Matek executed a  Supplier Relationship Agreement with IBM to provide certain telecom services to Howard University. Thereafter, Matek executed a "SRA Statement of Work" with IBM providing that Matek would  provide IBM the Voice Communications Services and other services described in the Statement of Work # 4917011866.000 ("SOW") which adopts and incorporates by reference the terms and conditions of Supplier Relationship Agreement # 4917011615.000 # 4917011617 between International Business Machines Corporation and Matek, Inc., in

support of project for Howard University (Customer).  These documents comprise the

Agreement which is a valid contract between the parties.

22.     The Agreement's term is through the later of 06/30/2024 or until

Deliverables and Services are completed (the "Term").

23.     In exchange for the provision of these services, IBM promised to pay Matek

compensation as outlined in the Agreement.

24.     The Agreement between the parties is a valid, binding and enforceable

agreement for the provision of services and delivery of work product in accordance with

the Agreement.  Matek agreed to and did in fact perform all of its duties, responsibilities

and obligations pursuant to and in accordance with the Agreement.

25.     IBM agreed to compensate Matek as described above in consideration of

the Agreement.

26.     However, Defendant materially breached the Agreement with Matek by

terminating the Agreement without cause and before Deliverables and Services were

completed on the Howard Project, and failing to pay Plaintiff in violation of the terms of

the Agreement.

27.     IBM's material breach of the Agreement in this regard has resulted in

damages to Plaintiff in the form of compensatory damages, incentive payment, incidental

and consequential damages and, loss of equity, attorney's fees and any other incidental and

consequential damages associated with IBM's breach of the Agreement.

28.     **WHEREFORE**, Plaintiff Matek respectfully requests that this Court enter

judgment for Plaintiff against Defendant for Defendant's breach of contract in the amount

of Five One Hundred Thousand Dollars (**$5,100,000.00**), plus prejudgment interest, post

judgment interest and all costs associated with Defendant's conduct and the filing and prosecution of this action, and such other and further relief as the Court deems just, necessary and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all counts so triable.

Dated: March 30, 2023                          Respectfully submitted by,

**PERRY & ASSOCIATES**


/s/ Chalfrantz E. Perry
Chalfrantz E. Perry, Esq.
DC Bar No.: 377364
505 Capitol Court, NE
Suite 100
Washington, DC 20002
(202)506-8122 (o)
(301)560-5750 (efax)
chalfrantz@perrypllc.com

COUNSEL FOR PLAINTIFF

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

## MATEK, INCORPORATED

_____
                                    Plaintiff

                    vs.                                    Case Number    **2023-CAB-002097**

INTERNATIONAL BUSINESS MACHINES CORPORATION
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

**Chalfrantz Perry**
_____
Name of Plaintiff's Attorney

**505 Capitol Court, NE, Suite 100**
_____
Address
Washington, DC  20002
_____

**(202)506-8122**
_____
Telephone

_Clerk of the Court_

By _____
                        Deputy Clerk

Date                    **April 13, 2023**
_____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828        ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____

Demandante

contra

Número de Caso: _____

_____

Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección

Subsecretario

_____

Fecha _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                          Super. Ct. Civ. R. 4

# Superior Court of the District of Columbia

CIVIL DIVISION - CIVIL ACTIONS BRANCH

INFORMATION SHEET

Matek, Incorporated
_____
Plaintiff(s)

vs

International Business Machines Corporation
_____
Defendant(s)

Case Number: **2023-CAB-002097**
_____

Date: _____

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)* | Relationship to Lawsuit |
|---|---|
| Chalfrantz Perry (DC Bar No. 377364) | ☑ Attorney for Plaintiff |
| Firm Name: Perry & Associates | ☐ Self (Pro Se) |
| Telephone No.:            Unified Bar No.: (202) 716-0767 | ☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury        ☐ 6 Person Jury        ☑ 12 Person Jury

Demand: $ _____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____   Judge: _____   Calendar #: _____

Case No.: _____   Judge: _____   Calendar #: _____

---

**NATURE OF SUIT:**   *(Check One Box Only)*

**CONTRACT**
☑ Breach of Contract
☐ Breach of Warranty
☐ Condo/Homeowner Assn. Fees
☐ Contract Enforcement
☐ Negotiable Instrument

**COLLECTION/INS. SUB**
☐ Debt Collection
☐ Insurance Subrogation
☐ Motion/Application for Judgment by Confession
☐ Motion/Application Regarding Arbitration Award

**EMPLOYMENT DISPUTE**
☐ Breach of Contract
☐ Discrimination
☐ Wage Claim
☐ Whistle Blower
☐ Wrongful Termination

---

**REAL PROPERTY**
☐ Condo/Homeowner Assn. Foreclosure    ☐ Ejectment       ☐ Other
☐ Declaratory Judgment                 ☐ Eminent Domain  ☐ Quiet Title
☐ Drug Related Nuisance Abatement      ☐ Interpleader    ☐ Specific Performance

☐ **FRIENDLY SUIT**
☐ **HOUSING CODE REGULATIONS**
☐ **QUI TAM**
☐ **STRUCTURED SETTLEMENTS**

---

**ADMINISTRATIVE PROCEEDINGS**
☐ Administrative Search Warrant
☐ App. for Entry of Jgt. Defaulted Compensation Benefits
☐ Enter Administrative Order as Judgment
☐ Libel of Information
☐ Master Meter
☐ Petition Other

☐ Release Mechanics Lien
☐ Request for Subpoena

**MALPRACTICE**
☐ Medical – Other
☐ Wrongful Death

**AGENCY APPEAL**
☐ Dangerous Animal Determination
☐ DCPS Residency Appeal
☐ Merit Personnel Act (OEA)
☐ Merit Personnel Act (OHR)
☐ Other Agency Appeal

☐ **APPLICATION FOR INTERNATIONAL FOREIGN JUDGMENT**

# Information Sheet, Continued

**CIVIL ASSET FORFEITURE**
- ☐ Currency
- ☐ Other
- ☐ Real Property
- ☐ Vehicle

**NAME CHANGE/VITAL RECORD AMENDMENT**
- ☐ Birth Certificate Amendment
- ☐ Death Certificate Amendment
- ☐ Gender Amendment
- ☐ Name Change

**TORT**
- ☐ Abuse of Process
- ☐ Assault/Battery
- ☐ Conversion
- ☐ False Arrest/Malicious Prosecution
- ☐ Libel/Slander/Defamation
- ☐ Personal Injury
- ☐ Toxic Mass
- ☐ Wrongful Death (Non-Medical Malpractice)

**GENERAL CIVIL**
- ☐ Accounting
- ☐ Deceit (Misrepresentation)
- ☐ Fraud
- ☐ Invasion of Privacy
- ☐ Lead Paint
- ☐ Legal Malpractice
- ☐ Motion/Application Regarding Arbitration Award
- ☐ Other - General Civil

- ☐ Product Liability
- ☐ Request for Liquidation
- ☐ Writ of Replevin
- ☐ Wrongful Eviction

**CIVIL I/COMPLEX CIVIL**
- ☐ Asbestos

**MORTGAGE FORECLOSURE**
- ☐ Non-Residential
- ☐ Residential

**STATUTORY CLAIM**
- ☐ Anti – SLAPP
- ☐ Consumer Protection Act
- ☐ Exploitation of Vulnerable Adult
- ☐ Freedom of Information Act (FOIA)
- ☐ Other

**TAX SALE FORECLOSURE**
- ☐ Tax Sale Annual
- ☐ Tax Sale Bid Off

**VEHICLE**
- ☐ Personal Injury
- ☐ Property Damage

- ☐ **TRAFFIC ADJUDICATION APPEAL**
- ☐ **REQUEST FOR FOREIGN JUDGMENT**

_____
Filer/Attorney's Signature

March 30, 2023
_____
Date

CV-496/February 2023

IBM

# SRA Statement of Work

**SRA** # 4917011615
**SOW #** 4917011866

This Statement of Work # 4917011866.000 ("SOW") adopts and incorporates by reference the terms and conditions of Supplier Relationship Agreement # 4917011615.000 ("SRA") and the Attachment# **4917011617** ("Attachment) between **International Business Machines Corporation** ("IBM" or "Buyer") and **MATEK,Inc** ("Supplier") in support of project for **Howard University (Customer),** in effect as of the date hereof. The effective date of this transaction will be the date the last party signs this SOW ("Effective Date"), and this SOW will remain in effect until the later of **06/30/2024** or until Deliverables and Services are completed (the "Term"). Transactions performed under this SOW will be conducted in accordance with and be subject to the terms and conditions of this SOW, the SRA and the Attachment attached thereto and incorporated therein.

## 1.0 Scope of Work

Supplier will provide IBM the Voice Communications Services described in this Scope of Work. Supplier's solution to fulfill the requirements of the Voice Communications, Infrastructure and Wireless Access Points (WAP) design and installation services are consistent with the solution described in this schedule unless otherwise approved by IBM and Supplier.
Service level defined under Attachment 1-D-1 Service Level Matrics

## 1.1 Definitions.

Unless otherwise defined in this Schedule or an Appendix to this Schedule, capitalized terms used in this Schedule and the Appendices to this Schedule will have the meanings set forth in the Agreement.  Other terms used in this Schedule and the Appendices to this Schedule are defined where they are used and have the meanings there indicated. Those terms, acronyms, phrases and abbreviations utilized in the IT services industry or other pertinent business context will be interpreted in accordance with their generally understood meaning in such industry or business context**.**

## 1.2 References.

Any reference herein to a particular Article or Section number or Appendix or other attachment will mean that the reference is to the specified Article or Section in, or Appendix or other attachment to, this Schedule, except to the extent that the cross-reference expressly refers to another document.

## 1.3 Policies and Procedures.

Unless otherwise specified in the applicable Service description, Supplier will perform the Services described in this Schedule in accordance with applicable established IBM and Customer Standards.  Supplier will assist IBM to develop and maintain detailed procedures that define how IBM and Supplier will deliver the Services for each Service Area, including required inputs, outputs, dependencies and activity descriptions, in a Procedures Manual.  Supplier will incorporate IBM and Customer Standards applicable to the Services in the applicable Procedures Manual, including additions and changes to Customer Policies and Standards during the Term.  If Supplier is required to develop any policies or procedures in connection with the performance of the Services, such policies and procedures will be documented and maintained by Supplier in the applicable Procedures Manual.  IBM will provide the supplier with the standard IBM Voice Communication's policies and procedures associated with implementing and maintaining an enterprise voice solution.

## 1.4 Responsibility Matrices.

Each responsibility matrix in this Schedule sets forth the respective task-level responsibilities of Supplier and Customer for the category of Services described in the section in which such matrix is located.  Without limiting the generality of each such section, Supplier will perform those tasks and activities for which Supplier is listed as the responsible Party in the applicable matrix, and Customer will perform those tasks and activities for which Customer is listed as the responsible Party in the applicable matrix, as indicated in each case with an "R" in the applicable column.   In those cases where Customer has an approval right with respect to a particular Supplier activity, recommendation or Deliverable, such right is indicated in each case with an "A" in the Customer column.

## 2.0 Supplier's Responsibilities

In addition to providing the Deliverables and Services set forth in this SOW and the applicable Attachment, Supplier will:



**SRA Statement of Work**

- participate in progress reviews, as requested by IBM, to demonstrate Supplier's performance of its obligations;
- participate in an annual security review of Deliverables as requested by IBM

**3.0 Schedule for Deliverables**
The relevant milestones, completion dates, and terms associated with this SOW is attached as TRANSFORMATION MILESTONES AS ATTACHMENT 1-N-1

**4.0 Prices & Payments**
**4.1 Price List**
The pricing is attached as Attachment: Pricing

**4.2 Payment Terms**
Unless otherwise set forth in this SOW, the terms of payment are net 60 days either after receipt of Supplier's valid invoice or after receipt of the Deliverables or Services, whichever is later. IBM will pay Supplier the amounts set forth above for the Deliverables and/or Services provided hereunder:

**5.0 Customer Specific Terms and Conditions**
For purposes of this SOW, these additional requirements will apply to Deliverables and Services provided in support of IBM's Customer, HOWARD UNIVERSITY

- **Provision of Services**. Subject to Customer's retained authority in accordance with (Retained Authority), Supplier is responsible for performing Services in accordance with the Customer Standards. Supplier will provide to Customer and the relevant Customer Entities all of the services, functions, and responsibilities that: (i) are specifically stated in this Agreement and its Schedules, including, but not limited to, the Attachments to the Services Schedule for each SOW; (ii) are included in the expenditures in the Customer Base Case; (iii) are an inherent, necessary, or customary part of the services or are reasonably necessary for the performance and provision of the services described in (i) above in compliance with Customer Standards; and (iv) are directly related to the services described in (i) above and that were performed during the twelve (12) months immediately prior to the Agreement Effective Date by Customer Personnel (including contractors) to be displaced by this Agreement. As used in this Agreement, the term "Services" means the services, functions, and responsibilities described in (i) – (iv) above as such are modified, enhanced, supplemented, and replaced in accordance with the Agreement, including as subject to the Change Control Procedures.

- **Change Control**

 (a) Change Control Procedures

 (i) Change Contract Orders. Either party may request a Change to the Agreement, the Services or any other component thereof by providing a description of the proposed Change in a written notice to the other party (the "Change Contract Order"). Except as otherwise provided in (Change Control in Response to Urgent Situations) and (Temporary Emergency Changes), Supplier shall submit all Change Contract Orders and related responses to Customer's Services & Project Review Committee for approval within one (1) Business Day of receiving or submitting any Change Contract Order. Supplier shall not enter a Contract Change Order unless it has received written approval from Customer's Services & Project Review Committee.

 (ii) Customer-initiated Change Contract Orders.

 (1) Preparation of Impact Statements. Unless otherwise agreed, within five (5) Business Days following the receipt of a Customer-initiated Change Contract Order, Supplier will provide notice to Customer setting forth Supplier's plan for implementing such Change and the impact to the Services as a result of such Change (if any)



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

(the "Impact Statement"), which must be directly attributable to the Change requested in the Change Contract Order.

(2) Content of Impact Statements.  In preparing the Impact Statement associated with a Customer-initiated Change Contract Order, Supplier will evaluate the Change described in the Customer-initiated Change Contract Order to determine options for implementing such Change.  Each Impact Statement will include: (A) a restatement of the requested Change; (B) a narrative of expected positive or negative impact to operating model; (C) staffing impacts (on Supplier and anticipated impacts on Customer staff), detailing location, skill set, and timing; (D) impact to current equipment, tooling or licensing; (E) impact to Service Levels; (F) required changes to the Fees; (G) Billable Project work, if any, that may be required to implement such Change(s), and related dependencies; and (H) any other relevant impacts, if applicable, Supplier reasonably determines are necessary for Customer to evaluate the requested Change.  If the Impact Statement indicates that implementation of the Change described in the Change Contract Order will have an impact on the staffing, Fees, or the Performance Standards, Supplier will include a detailed description of, and justification for, such Changes and impacts in the Impact Statement.  Supplier may not charge additional Fees for any Change that Supplier can implement or provide, to the extent a Change can be accommodated within the existing level of resources then being used by Supplier to provide the Services and without material additional cost to Supplier or degradation of Service Levels, other Performance Standards or the Customer Standards (unless otherwise agreed by Customer in writing).

(3) Acceptance of Impact Statement.  If Customer elects to have Supplier perform such Change in accordance with the Impact Statement, the Customer Relationship Manager (or his/her designee) will notify Supplier of Customer's acceptance of the Impact Statement by signing and returning the Impact Statement (as applicable, indicating which Supplier proposal Customer has selected) to the Supplier Relationship Manager (or his/her designee),who seek final approval from the Customer Services & Project Review Committee, and once such approval is received, will countersign the Impact Statement within three (3) Business Days and provide a copy of the fully executed Impact Statement to Customer for its records.  Supplier will implement the Change as described in the Impact Statement (including the agreed upon time frames for such Change), and where necessary, the parties will implement an amendment to this Agreement to effectuate the Change in such Impact Statement.

(iii) Supplier-initiated Change Contract Orders.  Supplier may initiate a Change by providing Customer with a Change Contract Order.  For a Supplier-initiated Change, the Change Contract Order also will include a corresponding Impact Statement (which will contain the same types and levels of detail as described (Content of Impact Statements)).  Supplier will submit all Supplier-initiated Change Contract Orders and associated Impact Statements to the Customer Relationship Manager (or his/her designee).  Within ten (10) Business Days following the receipt of a Supplier-initiated Change Contract Order, the Customer Relationship Manager will notify Supplier whether Customer accepts or rejects the Change requested, by indicating Customer's acceptance or rejection and signing and returning the Change Contract Order to the Supplier Relationship Manager (who will, in the case of an acceptance, promptly countersign the Change Contract Order and provide a copy of the fully executed Change Contract Order to Customer for its records).  No signature shall be deemed a rejection.  Customer's failure to provide a response to the Change Contract Order shall not be deemed a breach of this Agreement. If Customer accepts the Impact Statement, Customer will notify Supplier of its acceptance of such Change as described above, Supplier will implement the Change as described in the agreed Impact Statement upon receiving final approval from the Customer Services & Project Review Committee, and this Agreement will be deemed to be amended to include such Impact Statement.

(iv) Response Time.  If the scope of a Change Contract Order delivered by a party (the "Order Provider") is such that the other party (the "Order Recipient") reasonably requires more time to respond than that provided for in this Control Change Procedure then the Order Recipient may extend its time to respond to such Change Contract Order for a reasonable period (but in any event, unless otherwise agreed by the Order Provider, no longer than five (5) additional Business Days) by providing the Order Provider with written notice prior to the end of the time allotted for its response specifying in reasonable detail: (1) the need for additional time; and (2) the estimated amount of additional time that the Order Recipient requires.

**IBM**

(v) <u>Updating Documentation Affected by a Change</u>.  Unless otherwise agreed, within five (5) Business Days following any Changes approved pursuant to this <u>Section 6.6</u>, Supplier will update and deliver to Customer any documentation affected by such Change, including, without limitation, the Procedures Manual.

- **Retained Authority**

(a) <u>Overview</u>.  Without limiting Customer's rights and authority otherwise stated in this Agreement , Customer will retain the following specific rights and authority: (i) the exclusive right and authority to set Customer's telecommunications and IT Infrastructure strategy and to determine, alter and define any or all of Customer's requirements or business processes; (ii) the right to approve or reject any and all Supplier proposals regarding Infrastructure design, technical platform, architecture, and standards and to retain final architectural controls, including final approval as well as direction of Customer's strategic roadmap of future technologies and their implementation, including but not limited to technology types, preferred hardware and implementation timelines; and (iii) the right to make decisions regarding strategic and operational planning, provided however, the right and authority to cause Supplier at any time to change the Services in furtherance of any or all of the foregoing shall be subject to the Change Control Procedure.  Supplier must obtain the prior written authorization of Customer before undertaking any activity that is within the retained authority of Customer pursuant to the terms hereof.

(b) <u>IT Strategy</u>.  Customer will consult with Supplier to inform Supplier of significant Changes in Customer's telecommunications and IT Infrastructure strategy and Changes in its requirements and business processes relating to the Services.  As part of the Innovation Services and in accordance with <u>Innovation</u>, Supplier will provide Customer with advice, information and assistance in identifying and defining Infrastructure projects and future technology requirements to meet Customer's objectives, in accordance with <u>Section Use of Technology in the Provision of Services</u>. Without limiting the generality of the foregoing, Customer will retain exclusive authority, discretion, and rights of approval as provided below in this <u>Retained Authority)</u>

- **Innovation**.

General Obligation to Provide Innovation Information.  Supplier acknowledges that the innovation requirements set forth in this Section is a critical component of the Services and as such Customer reserves the right to include Supplier's provision of the innovation report as a Service Level in accordance with Schedule 1-D (Performance). Supplier will have a regular and ongoing responsibility to provide the Customer Entities with information to improve the use of telecommunications and IT capabilities within those aspects of the Customer Entities' business or operations with which Supplier is familiar.   Such information will include: (i) information about newly improved or enhanced commercially available products and technology, including equipment and improved processes that could reasonably be expected to positively impact the Customer Entities; (ii) information about the application of such technology or processes to Customer's business areas; and (iii) suggestions for new work that Supplier reasonably believes will provide benefits as described above (and any such suggestion will include an Impact Statement and an ROI (return on investment) analysis, upon Customer's reasonable request) (the "Innovation Obligations").

Information Technology for Business and Technical Innovation.  At least quarterly beginning no later than ninety (90) days following the Agreement Effective Date, Supplier will meet with designated Customer Personnel to discuss, outline and leverage projects, development work, modern, emerging and nascent technologies, creative business thinking and ideas for more efficient systems and processes ("Innovations") that Supplier believes will provide real and significant value to the Customer Entities.  No later than thirty (30) days following each such meeting, Supplier will deliver a report to Customer describing: (i) the Innovations of interest to Customer as identified in the above meeting; (ii) the return on investment expected of such Innovations; (iii) the tactical or strategic value of the Innovations; and (iv) any other reasons that Supplier believes in its reasonable opinion that Customer should implement or otherwise engage therein ("Innovation Report"). The parties will mutually agree on a minimum number of Innovations that Supplier will present in each Innovation Report and on other metrics necessary to evaluate the Innovations Report and the actions and results of such Innovation Reports.



- **Shared Resources**

Except as provided in Schedule 1-F (Technical Solution), or in accordance with the Transition Plan, prior to migrating or relocating any of the Customer Equipment or Software to a shared equipment or software environment or to any shared network or platform provided by Supplier ("Shared Resources"), Supplier will provide to Customer for review and approval, as part of the required Impact Statement (defined in Section Preparation of Impact Statements, a proposal for such migration or relocation, including: (i) a listing of all assets that would be operated using such Shared Resources (the "Shared Use Assets"); and (ii) a breakdown of the price benefits and savings, as well as an identification of all foreseeable risks, to Customer during the SOW Terms and following the expiration or termination of this Agreement. As part of Wind Down Assistance, upon the expiration or termination of the applicable SOW and/or Service, at Customer's request, Supplier will identify and assist Customer, in finding suitable functionally equivalent replacements for any Shared Resources and/or Shared Use Assets, such as hardware, software, networks or platforms then used by Supplier, to provide the Services.

- **Cooperation**.  At Customer's request or otherwise as appropriate, Supplier will, as part of the Services, cooperate and coordinate in good faith with Customer, the Customer Entities, and/or any of their respective agents, contractors, outsourcers, or other Third-Party providers.  To the extent requested by Customer, Supplier will provide such cooperation by, among other things: (a) timely providing reasonable access to the Supplier Locations as necessary for Customer Personnel to perform any necessary audit activities in accordance with Section Audits; (b) timely providing reasonable access to dedicated Equipment and All dedicated Software used in the provision of Services to the extent necessary and appropriate for Customer, other Customer Entities or Third Parties to perform the work assigned to them within the lesser of (i) the timeframe set out in Supplier's access policies, or (ii) three (3) days (but not to exceed two (2) hours, in cases of emergency); (c) at all times maintaining service compatibility and integration in compliance with Section Service Compatibility; (d) timely providing cooperation and assistance in accordance with Section Wind Down Assistance to facilitate the orderly transfer of Discontinued Services from Supplier to Customer, any other Customer Entity and/or any Third Party without reduction in responsiveness or quality as provided in connection with the Ongoing Services; (e) performing the Discontinued Services in a manner such that that there is no Degradation of Services caused by the adjustments made by Supplier following such transfer of Services, (f) following reasonable procedures and arrangements with Third Parties that ensure continuity of seamless service to the Customer Entities; and (g) permitting the co-location of Customer Entities' facilities and equipment in Supplier Locations that are expressly identified as "Co-location Facilities" in Attachment 1 (Customer and Supplier Locations) where technical, legal or regulatory considerations reasonably require such facilities and equipment to be located in the proximity of the Equipment.  The co-location of such facilities and equipment will be in accordance with Supplier's standards and policies at the applicable Supplier Locations (details of which Supplier agrees to provide to Customer before entering any such co-location arrangement) and subject to the Change Control Procedures where appropriate.  If requested by Customer, Supplier shall enter into a mutually agreed joint governance and issue resolution document between Supplier and Third Parties who provide similar or related services to a Customer Entity.

- **Access to Supplier Locations**.
 Subject to Supplier's reasonable access security requirements (as communicated to Customer in advance in writing by Supplier), Supplier will provide Customer Personnel with reasonable access to Supplier Locations, as appropriate for the purposes of, in accordance with Section Audits (i) inspection and monitoring access and use of all dedicated Equipment, Customer System Software, and Customer Data and Information, and (ii) auditing Supplier's maintenance of all Equipment, Customer System Software, and systems.

- **Customer Audit Rights**

 Upon thirty (30) days' prior notice and subject to Supplier's reasonable security requirements, Supplier will allow Customer and/or Customer's designees reasonable access to Supplier facilities, equipment, software, personnel used in providing the Services and all data and records related to the Services for the purposes of performing

**IBM**

<h2 style="text-align:center">SRA Statement of Work</h2>

audits, investigations, tests and inspections related to the Services.  This right to audit, investigate, test and inspect is in addition to the other audit rights or assessments granted herein.  Customer will determine the scope of such audits, investigations tests or inspections, which may extend to other Supplier Resources (other systems, environmental support, recovery processes, etc.) used in connection with the Services performed under this Agreement.  Supplier will provide Customer and such Customer designees such assistance as they require to complete such audits without additional charge.  The subject of such audits, investigations, tests and inspections may include: (i) general controls and security practices and procedures; (ii) disaster recovery and back-up procedures; (iii) Supplier's operations; (iv) Supplier's compliance with applicable Performance Standards, Customer Standards and other terms of this Agreement; and (v) any other audits, tests and inspections reasonably required by Customer.  Supplier shall provide full cooperation to Customer's auditors, inspectors, regulators and representatives, including the installation and operation of audit and investigative and forensic software. Independent external auditors shall be subject to the applicable provisions contained in Section Confidential Information of this Agreement. Without limiting any other rights of Customer herein, if: (a) a Security Event occurs; or (b) Supplier is in material breach or is otherwise not compliant with any of the provisions set forth in Section Confidential Information and/or Section Personal Information, then Customer may conduct additional audits upon twenty-four (24) hours prior notice.  Customer and auditors shall not be entitled to audit: (1) data or information of other customers of Supplier, or of other customers of Supplier's Subcontractors; (2) any other Supplier or Supplier Subcontractor Confidential Information that is not relevant for the purposes of the audit, or (3) Supplier's or Supplier's Subcontractor's costs in performing the Services (unless the Fees being audited are on a cost-plus basis).  Customer's auditors shall not be competitors of Supplier and shall execute and deliver confidentiality and non-disclosure agreements reasonably acceptable to Supplier.

- **Relocations**

.  Supplier will not change, relocate, or add to the Service Locations, without Customer's express prior written approval in each instance.  With respect to changes in the types or allocation of Services provided at any Service Location, if any such change could foreseeably adversely impact the risk profile of the Services or costs or burden to any Customer Entity, Supplier will obtain Customer's prior written approval for such change.  Supplier will manage any relocation in accordance with a migration plan prepared by Supplier and approved by Customer. Customer may change, relocate, or add to the Customer Locations at will; provided however, that Customer will (i) will have financial responsibility for all additional costs, taxes, and other expenses related to such change, relocation, or addition, and (ii) provide reasonable notice to Supplier to afford a reasonable amount of time to prepare for and implement such change, relocation, or addition to the extent that it affects Supplier or its provision of the Services.  Supplier will provide all reasonable assistance as may be requested by any Customer Entity in an effort to affect such relocation in a seamless, orderly and uninterrupted manner.  In respect of changes to Supplier Locations, Supplier will submit an Impact Statement to Customer as provided in the Change Control Procedures. Supplier will have financial responsibility for all additional costs, taxes, and other expenses related to any Supplier-initiated change, relocation of, or addition to, a Service Location. Supplier will also be financially and operationally responsible for obtaining any permit and complying with any legal requirements (including any data transfer agreement) related to such change, relocation of, or addition to, a Service Location.  All relocations or additions pursuant to this Section Relocations other than any Supplier-initiated changes will be processed via the Change Control Procedures to the extent they materially affect Supplier's provision of the Services.

- **Limitation of Turnover**.

Supplier will use commercially reasonable efforts to minimize turnover of Supplier Personnel performing the Services for Customer on a dedicated basis.  Supplier will monitor and periodically (at least semi-annually or as otherwise reasonable requested by Customer) provide Customer with a report of turnover rates among the Supplier Personnel performing the Services for Customer on a dedicated basis, as provided in Schedule 1-J (Reports).  If Supplier has missed one or more Critical Performance Indicators for two (2) consecutive months and Customer believes that such failure is the result of Excessive Turnover, Customer will notify Supplier and Supplier will: (i) determine the cause of the Excessive Turnover; (ii) develop a mutually agreed upon plan to minimize turnover; (iii) meet with Customer to discuss the implementation and timely impact of the plan; (iv)



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

implement the plan; and (v) provide reports of turnover rates (as described above) as frequently as Customer may reasonably request until Supplier has achieved such Critical Performance Indicator for six (6) consecutive months.

- **Compliance with Policies and Procedures**.

 If Supplier Personnel are on-site at Customer Locations, in the course of performing Supplier's obligations under this Agreement, Supplier will require such Supplier Personnel to comply with workplace policies, standards and procedures for the physical security of the facilities, workplace safety, and policies regarding non-discrimination and non-harassment, as these are made available to Supplier.  Supplier will document and notify Customer of all access by Supplier Personnel who have un-badged and/or unaccompanied access to the Customer Locations, Network and other facilities and provide such access log to Customer monthly. In addition, Supplier shall provide such access logs upon Customer's request therefor.  Access to Customer Data by Supplier Personnel will be limited and controlled in accordance with the rules and procedures set out in Schedule 1-I (Customer Policies and Controls).

- **Drug Screening.**

Supplier acknowledges and agrees that Customer regards the use of alcohol or the illegal use of drugs in the workplace as a serious issue.  Accordingly, to the extent and in the manner permitted by applicable Laws, Supplier will, at Customer's reasonable request and cost, subject all Supplier Personnel to drug screening in accordance with a mutually agreed drug screening policy and procedures prior to such Supplier Personnel being placed on site at Customer Locations; provided, however, unless otherwise requested by Customer, the foregoing screening obligation is not required (i) for Supplier Personnel required to respond to an emergency situation whose presence on the Customer Locations will be strictly limited by Supplier to the time required to address such emergency; (ii) for those Supplier Personnel who are not providing any Services and who have no access to Customer Data and Information, Customer Network or systems, and are not on-site at Customer Locations; and (iii) for any Supplier Personnel used by Customer prior to the Agreement Effective Date in connection with any Assigned Agreement or Managed Agreement. Notwithstanding the foregoing, Supplier will not condition the employment of any Transferring Employee upon such Transferring Employee successfully passing a drug screening. Supplier is responsible for taking appropriate and lawful action when Supplier has reasonable suspicion to conclude that any Supplier Personnel is under the influence of illegal drugs and/or alcohol while on any Customer Entity's property or while providing Services hereunder.  Supplier will ensure that any violating individual will no longer be permitted to work on Customer's account.  To the extent permitted by applicable Laws, Supplier will ensure that any individual who does not successfully pass a drug screen (where such drug screening is performed) or who violates Supplier's drug screening policy will no longer be permitted to work on Customer's account. Supplier will include the obligations in this Section in its contracts with its Subcontractors performing Services.

- **Background Checks**.

 Supplier will, to the extent and in the manner permitted by applicable Laws, conduct background checks on all Supplier Personnel in accordance with all applicable Laws and Supplier's policies (as provided in Schedule 1-I: Customer Policies and Controls) prior to such Supplier Personnel being placed on site at Customer Locations; provided, however, unless otherwise requested by Customer, the foregoing screening obligation is not required (i) for Supplier Personnel who dedicate less than five percent (5%) of their time performing Services for Customer; (ii) for Supplier Personnel required to respond to an emergency situation whose presence on the Customer Locations will be strictly limited by Supplier to the time required to address such emergency; (iii) for those Supplier Personnel who are not providing any Services and who have no access to Customer Data and Information, Customer Network or systems, and are not on-site at Customer Locations; (iv) for any Supplier Personnel used by Customer prior to the Agreement Effective Date in connection with any Assigned Agreement or Managed Agreement.  Supplier will condition the assignment of any such Supplier Personnel to Customer's account as provided in this Section on such personnel successfully passing such background check.   Supplier will include the obligations in this Section in its contracts with its Subcontractors performing Services.



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

- **Immigration.**

Supplier is responsible for handling and processing, at Supplier's expense, all immigration and employment-related issues and requirements for Supplier employees (including processing visas and ensuring compliance with all applicable Laws) and that Supplier has records ensuring that all Supplier Personnel placed on site at Customer Locations have accurate and up-to-date I-9 information arising in connection with Supplier Personnel. Customer Entities will not be required to participate in any immigration or visa activities. Supplier will, at Customer's request, verify in writing (and provide reasonable supporting documentation to the extent permitted by Law) that all Supplier Personnel have valid work authorizations and visas that permit them to perform the Services in the manner and location set forth in this Agreement. If a Transitioned Employee requires a work permit or employment pass or other approval ("Work Permit") for the Transitioned Employee's employment to continue with Supplier after the relevant employment commencement date, Supplier shall use its commercially reasonable efforts to see that any necessary applications are made promptly to secure the necessary work permits.

- **Training**.

Supplier will provide, and cause its Subcontractors and Supplier Third Party Service Providers to provide, to the Supplier Personnel (including the Transferring Employees) such training as may be necessary for them to perform, on behalf of Supplier, all of Supplier's duties under this Agreement. Such training and opportunities for employees to develop their skills will be equal to or greater than the average levels of training given to other Supplier or Supplier Affiliate employees performing comparable duties. Supplier will require any Supplier Personnel who may come in contact with students to participate in Title IX training to be provided by Customer.

- **Transition Plan**.

(a) **Development of Transition Plan.** Supplier will provide the Transition Services in accordance with a plan developed in accordance with this Section (such plan, including the versions described below in this Section , collectively the "Transition Plan"). The Transition Plan will identify and describe the Transition and Transformation Services applicable to the Services and to each SOW and service area within each SOW, as applicable. Supplier will prepare versions of the Transition Plan for Customer's review and approval and incorporate Customer's comments into each version.

(b) **Transition Plan Guidelines.** The versions of the Transition Plan (such versions, as further described in Section Versions of the Transition Plan will build upon each other so that the Final Transition Plan includes all of the following elements: (i) an overall project plan, including an initial launch plan for Transition Services (30, 60, 100 day plan), and setting up Transformation Projects for each SOW in accordance with Section Transformation and Transformation Projects; (ii) identification of Transition Milestones, form and format of reports on progress prior to reaching each Transition Milestone; (iii) a staffing plan describing the Supplier Personnel reasonably required to meet the applicable Transition Milestones; (iv) a facility plan describing Supplier's space requirements at Customer Locations; (v) a list setting forth the responsibilities of Supplier and Customer with respect to Transition and Transformation; (vi) all necessary steps for knowledge transfer from Supplier's Predecessor to Supplier; (vii) dependencies on outside resources, including: Third Parties, Third Party Materials, Third Party Resources, Customer Resources and the like; (ix) a list of any Deliverables, such as documentation, training manuals, or development work associated with included Transition Milestones; (x) testing criteria to determine whether the applicable Transition Milestones have been met; and (xi) any other information typically associated with a well-developed project plan for a project of this complexity.

- **Versions of the Transition Plan**.

 Attached to Schedule 1 K (Transition Plan) is a version of the Transition Plan current as of the Agreement Effective Date. This Transition Plan sets out a proposed statement of all major tasks for Transition within each SOW Schedule, along with the major tasks and time frames associated with achieving any Critical Transition Milestones. This Transition Plan will also include the required Customer Resources (including Third Party),

Page **8** of **73**

IBM

**SRA Statement of Work**

major project Deliverables, completion criteria, and training and communication requirements and any other information as set out in the guidelines set forth in Section Transition Plan Guidelines. Supplier will submit to Customer, within thirty (30) days following the Agreement Effective Date, a revised version of the Transition Plan for Customer's review and approval (the "Final Transition Plan"). The Final Transition Plan will set out the details required in Section (Transition Plan Guidelines) and any other details as discussed and agreed between the parties. Customer and Supplier will work together to reach agreement on the Final Transition Plan within ten (10) Business Days following the submission of such plan.

- **Failure to Meet Transition or Transformation Milestones.**

(a) If Supplier fails to meet a Transition or Transformation Milestone, Supplier shall pay Customer any Critical Milestone Credits specified in Schedule 1-K (Transition Plan) or 1-N-1 (Transformation Milestone), if any, for such Transition Milestone or Transformation Milestone.

(b) Neither the Transition and Transformation Services nor the activities and deliverables associated with individual Transition Milestones or Transformation Milestones will be deemed complete until Acceptance of such activities and deliverables by Customer in accordance with the Acceptance Test Procedures (set out in Section Acceptance Testing).

- **Progress Reports**. Supplier will provide to the Customer Contract Executive (or his/her designee) a written update as to progress of the applicable Transition and Transformation, at least bi-weekly until such implementation is successfully completed and each of Supplier's and Customer's responsibilities thereunder have been met.

**Procedures Manual.**

**(a) General.** A Procedures Manual will be prepared in accordance with this Section for each Service Area, and Supplier will Manage and deliver the Services in accordance with the applicable Procedures Manual. In the event of a conflict between the provisions of this Agreement and the Procedures Manual, the provisions of this Agreement will control. Until such time that each Procedures Manual is finalized as provided in this Section Procedures Manual, Supplier will follow and comply with Customer's existing policies and procedures regarding the performance of the Services to be provided under the applicable SOW, as practiced by Customer and Customer Entities prior to the Applicable SOW Effective Date for the Services under such SOW.

**(b) Preparation of Procedures Manual.**

(i) Supplier will (A) analyze gaps in Customer's existing processes and procedures; and (B) recommend new processes to mitigate such gaps no later than the Applicable SOW Effective Date.

(ii) No later than thirty (30) days after the Applicable SOW Effective Date, Supplier will prepare and deliver an initial draft of a procedures manual that describes the Services delivery and management processes Supplier proposes to undertake in order to provide the Services, including, where appropriate, those supervision, monitoring, reporting, planning, and oversight activities to be undertaken by Supplier in order to govern the Services (the "Procedures Manual"). Such initial draft will be organized generally in accordance with the draft table of contents for the Procedures Manual set forth in Attachment 3 (Procedures Manual Table of Contents) and will follow the parameters set forth in Attachment 3 (Procedures Manual Table of Contents) (collectively, the "Procedural Requirements").

**(c) Review and Finalization of the Procedures Manual**. All drafts of the Procedures Manual will be subject to Customer's review and approval. Customer will provide promptly Customer's changes to Supplier which Supplier promptly will incorporate. Supplier will deliver to Customer the draft of the final version of the Procedures Manual no later than ninety (90) days following the Applicable SOW Effective Date. Customer will validate the updated final version of the applicable Procedures Manual within no more than ten (10) Business Days following delivery from Supplier. This Critical Transition and Transformation Milestone will have been met upon Customer's validation that Supplier has incorporated the agreed Customer-requested changes to the final version of the applicable Procedures Manual.

IBM

**SRA Statement of Work**

**(d) Updates to the Procedures Manual.** The parties acknowledge and agree that each Procedures Manual is a process and change management document, which Supplier shall revise from time to time to reflect changes in the operations or procedures described therein, to reflect new SOWs or other changes in the work to be performed and to comply with the Procedural Requirements. Changes to the Procedures Manual shall be made with the Customer Contract Executive's written approval and without the need to amend this Agreement. Subject to Customer's review, comment and approval, Supplier is responsible for maintaining and keeping the Procedures Manuals current at all times during the applicable SOW Term(s). The parties shall meet to perform a formal annual review of the Procedures Manual, on a mutually agreed upon date but not later than thirty (30) days from each anniversary of the Applicable SOW Effective Date, during which the parties will review, approve and formalize any changes and updates to the Procedures Manual that were made throughout the course of the preceding year.

**(e) Ownership and Use of the Procedures Manual.** Supplier acknowledges and agrees that Customer and the Customer Entities own and have the right to perpetually use the Procedures Manual in their businesses. (For purposes of this Section , "use" means the right to use, load, execute, store, transmit, display, copy, perform, distribute copies of, maintain, modify, enhance, create derivative works, make and have made, as and to the extent set forth in the applicable license agreement, if any, between Supplier and a Third Party with respect to any components of the Procedures Manual.) Customer and the Customer Entities may permit any of their respective Third-Party Service Providers to use the Procedures Manual during and after the applicable SOW Term(s). If Supplier considers any Supplier-Owned Materials incorporated into such manual to be confidential, it hereby grants to Customer and the Customer Entities a non-exclusive, perpetual, royalty-free, fully-transferrable and sublicensable right and license to use such Supplier-Owned Materials in connection with the use of the Procedures Manual and all future versions and derivatives therefrom.

- **Review and Acceptance.**

**(a) Overview**. The Customer Contract Executive, or his/her designee, on behalf of Customer, will have the right to review all components, deliverables and systems with respect to certain Transition and Transformation activities, Critical Transition and Transformation Milestones, Billable Projects or other work product to be provided by Supplier to Customer under this Agreement. For Deliverables requiring Customer's approval, Supplier will submit the applicable Acceptance Criteria to Customer at least five (5) Business Days before commencing the Deliverable project for Customer's review and approval, not to be unreasonably withheld. The parties acknowledge that certain Deliverables will require Customer approval, and as such, will have agreed Acceptance Criteria. Such Deliverables will be submitted for Customer review and approval, and Customer will review and either approve or provide comments as appropriate, within the timeframes set forth for such review in the applicable plan governing such Deliverable or if no timeframe is set forth then within a reasonable period of time.

**(b) Acceptance Testing**. Upon Supplier's notification to Customer that Supplier has completed any component or Deliverable that is subject to acceptance testing, as provided in a relevant plan, specification or other document (including, but not limited to, the Transition Plan, SOW, or Change Order), Customer will begin testing the component or Deliverable. In performing such testing, Customer will use the test procedures agreed upon by the parties in writing ("Acceptance Test Procedures"), to determine whether such component or Deliverable meets the specifications or acceptance criteria as the parties mutually agree in writing (the "Acceptance Criteria"). After Customer has completed such testing or upon expiration of the testing period agreed in writing by the parties (the "Acceptance Testing Period"), Customer will notify Supplier in writing either that: (1) the component or Deliverable meets the Acceptance Criteria ("Acceptance"); or (2) the Acceptance Criteria have not been met. If Customer fails to notify Supplier in writing within ten (10) Business Days of the completion of the Acceptance Testing Period, then such failure to respond will be deemed an Acceptance and the Acceptance Criteria will be deemed to have been met. Customer's failure to provide a response after the Acceptance Testing Period shall not be deemed a breach of this Agreement.

- **Review and Acceptance.**

IBM

**SRA Statement of Work**

**(a) Overview**.  The Customer Contract Executive, or his/her designee, on behalf of Customer, will have the right to review all components, deliverables and systems with respect to certain Transition and Transformation activities, Critical Transition and Transformation Milestones, Billable Projects or other work product to be provided by Supplier to Customer under this Agreement.  For Deliverables requiring Customer's approval, Supplier will submit the applicable Acceptance Criteria to Customer at least five (5) Business Days before commencing the Deliverable project for Customer's review and approval, not to be unreasonably withheld. The parties acknowledge that certain Deliverables will require Customer approval, and as such, will have agreed Acceptance Criteria.  Such Deliverables will be submitted for Customer review and approval, and Customer will review and either approve or provide comments as appropriate, within the timeframes set forth for such review in the applicable plan governing such Deliverable or if no timeframe is set forth then within a reasonable period of time.

**(b) Acceptance Testing**. Upon Supplier's notification to Customer that Supplier has completed any component or Deliverable that is subject to acceptance testing, as provided in a relevant plan, specification or other document (including, but not limited to, the Transition Plan, SOW, or Change Order), Customer will begin testing the component or Deliverable.  In performing such testing, Customer will use the test procedures agreed upon by the parties in writing ("Acceptance Test Procedures"), to determine whether such component or Deliverable meets the specifications or acceptance criteria as the parties mutually agree in writing (the "Acceptance Criteria").  After Customer has completed such testing or upon expiration of the testing period agreed in writing by the parties (the "Acceptance Testing Period"), Customer will notify Supplier in writing either that: (1) the component or Deliverable meets the Acceptance Criteria ("Acceptance"); or (2) the Acceptance Criteria have not been met. If Customer fails to notify Supplier in writing within ten (10) Business Days of the completion of the Acceptance Testing Period, then such failure to respond will be deemed an Acceptance and the Acceptance Criteria will be deemed to have been met. Customer's failure to provide a response after the Acceptance Testing Period shall not be deemed a breach of this Agreement.

**(c) Cure**.  If Customer determines that a component or Deliverable does not conform with the applicable Acceptance Criteria, Customer promptly will deliver to Supplier an exception report describing the nonconformity (the "Exception Report").  Within two (2) Business Days of receiving an Exception Report, Supplier shall forward the Exception Report to the Customer Governance Committee. Supplier will promptly investigate the alleged nonconformity and: (i) will promptly correct such nonconformity; or (ii) if the nonconformity is incapable of cure within twenty-four (24) hours following Supplier's receipt of such report, Supplier will present Customer, within forty-eighty (48) hours following its receipt of the Exception Report, a plan to cure such nonconformity within a reasonable amount of time.  Upon Supplier's notice to Customer that Supplier has cured such nonconformity, Customer will re test the defective component or Deliverable in accordance with the process described in Section Acceptance Testing.

- **Annual Review of Services**.

Commencing twelve (12) months after the Agreement Effective Date, Supplier will undertake ongoing reviews of the Services, their associated Fees and the underlying technology used to deliver the Services, and provide to Customer a plan to improve Supplier's performance of the Services.  Similarly, Customer may elect to conduct an annual business process review to compare Supplier's then-current technologies and process against industry best practices and standards.  If any such review reveals that the technologies and processes then utilized by Supplier are not to the level of industry best practice, then the parties shall review the results of the review and promptly establish and implement a plan to implement identified best practices in accordance with the Change Control Procedures.

- **Annual Technology Plan.**

During each Contract Year and at Customer's option, Customer will prepare an annual technology plan to address the Infrastructure and technology requirements of Customer based upon Customer's annual strategic IT plan (the "Customer Annual IT Plan").  Supplier will participate in the development of the Customer Annual IT Plan as reasonably requested by Customer, in accordance with this Section.  When Customer completes its preparation of the Customer Annual IT Plan, Customer will provide Supplier a copy of the Customer Annual IT Plan.  Upon



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

receipt of the Customer Annual IT Plan, Supplier will analyze the Customer Annual IT Plan and compare it with Supplier's current-state solution for the Services.  Within ten (10) days of Supplier's receipt of the Customer Annual IT Plan: (i) Supplier will identify to Customer in writing any gaps between Customer's stated strategic direction in the Customer Annual IT Plan and Supplier's current-state solution for the Services; and (ii) Supplier will propose to Customer in writing (in accordance with Customer's direction), any modifications (including related costs, if any) to the current-state solution for the Services, in order to meet Customer's strategy provided in the Customer Annual IT Plan.  To the extent Customer agrees with such recommended modifications, such modifications will be subject to the Change Control Procedures.

- **Compliance with Customer Policies, Standards and Procedures.**

 Customer shall have final authority to promulgate and Supplier shall comply with: (i) the standards, policies, practices, procedures, controls and processes to be adhered to and enforced by Supplier in the performance of the Services; and (ii) the associated architectures, products, software, systems and technologies to be provided, operated, managed, supported and/or used by Supplier in connection therewith, which include the Procedures Manual and the SRA for each Service Area (collectively, the "Customer Standards"), including those specified in Schedule 1-I (Customer Policies and Controls). Changes to the Customer Standards occurring after the Effective Date that materially affect the provision of Services of the Agreement may be subject to the Change Control Procedures.  Supplier will adopt and implement any revised technical architecture, policy, standards and specific requirements required by Customer, subject to Supplier's reasonable input and the Change Control Procedures.  Supplier will comply with and implement the Customer Standards in providing the Services, work with Customer to enforce the Customer Standards and obtain Customer's prior written approval for any deviations from such Customer Standards.

- **Benchmarking Review.**

 After the first anniversary of the Transition Date and no more frequently than one time every eighteen (18) month period thereafter during the Agreement Term, Customer may, subject to this Section, engage the services of an independent third party selected by Customer from the benchmarkers listed in Attachment 6 (Approved Benchmarkers), as such list may be updated by agreement of the parties from time to time; or such other independent third party as the parties may agree in writing (a "Benchmarker"), to compare the pricing and associated Service Levels, in the aggregate, against the pricing and associated Service Levels, in the aggregate of other well-managed tier one service providers performing similar services to ensure that Customer is receiving from Supplier pricing that is competitive with market rates and prices, given the nature, Service Levels, volume and type of Services provided by Supplier hereunder ("Benchmarking"). In making this comparison, the Benchmarker shall consider the following factors and other similar variables and normalize the prices as and to the extent appropriate in order to achieve as close to a "like-for-like" comparison as possible: (i) any financial engineering, including whether and to what extent Supplier transition charges are paid by the customer as incurred or amortized over the term of the Agreement; (ii) the extent to which Supplier pricing includes the cost of acquiring future assets; and (iii) whether Taxes are included in such pricing or stated separately in Supplier invoices (iv) type and age of hardware and software employed,  human resources terms and conditions, and unfettered right to move services globally (or restriction thereof), and (v) any other factors that the parties reasonably believe are relevant to the Benchmark.

**(a) General**. The Benchmarker engaged by Customer, as described above, shall be a nationally recognized firm with experience in benchmarking similar services and shall execute a non-disclosure agreement substantially in the form provided by Customer. The Benchmarker shall not be compensated on a contingency fee or incentive basis, or be a competitor of Supplier. The Benchmarker will execute a tripartite agreement with Customer and Supplier ("Tripartite Agreement"), which shall at a minimum reflect the requirements set forth herein.  All information provided to or obtained from the Benchmarker will be simultaneously provided to both parties. Supplier shall cooperate with Customer and the Benchmarker during such effort, and shall: (i) provide the Benchmarker reasonable access to any premises, equipment, personnel or documents (no later than within ten (10)



**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

Business Days from Benchmarker's request); and (ii) provide any assistance required by the Benchmarker to conduct the Benchmarking. As between the parties, Customer and Supplier shall bear the cost of the Benchmarker(s) equally. The Benchmarking shall be conducted so as not to unreasonably disrupt Supplier's operations under this Agreement. The Benchmarker will provide and review the Benchmark methodology with Customer and Supplier and will explain how each comparator in the group compares to the normalization factors and the normalization approach that will be applied. Each party must give notice in writing to the Benchmarker and to the other party advising whether it approves the draft Benchmark methodology and normalization approach, or, if it does not approve, its reasons for withholding approval and any suggested amendments.

**(b) Result of Benchmarking.** If, after making the comparison described in this Section Benchmarking Review, the Benchmarker finds that the Fees paid by Customer for any Service Area is more than ten percent (10%) greater than the (i) average of the prices (in terms of lowest cost) charged by at least four (4) (but not greater than seven) other well-managed top tier service providers of a similar size for work of a similar nature, type or volume, or (ii) average of the top quartile prices (in terms of lowest cost) charged by at least eight (8) other well-managed top tier service providers of a similar size for work of a similar nature, type or volume (the "Benchmark Standard"), the Benchmarker shall submit a written report setting forth such findings and conclusions. The Parties shall then meet and negotiate in good faith as to reductions in the Fees to eliminate any such unfavorable variance as described in Section Reduction in fees below.

**(c) Reduction in Fees.** Pursuant to the Benchmarker's findings and conclusions and subject to Section Supplier Review and Dispute and Customer Termination Right below, the parties shall meet and implement a reduction to the Fees on a prospective basis such that the aggregate Fees for the affected Service Area(s) do not exceed more than ten percent (10%) greater than the Benchmark Standard identified by the Benchmarker's findings and conclusions.

**(d) Supplier Review and Dispute**. The Benchmarker shall provide Customer and Supplier with a copy of the Benchmarker's report and Supplier shall have twenty (20) days to review such report and contest the Benchmarker's finding. If the Parties are unable to agree upon the validity of such findings the matter shall be resolved pursuant to the dispute resolution procedures set forth in Section Dispute Resolution.

**(e) Customer Termination Right**. If Supplier is unwilling to adjust the Fees to be within ten percent (10%) of the Benchmark Standard (as described in Section Result of Benchmarking (b) above), Customer may upon ninety (90) days prior notice to Supplier, terminate any affected portion of the Agreement as provided in Section Termination for Benchmarking Results, without any Termination Fees (provided Customer will still remain responsible for payment of any Wind-Down Expenses, including any Unamortized Investments), and the Fees will be adjusted to reflect the terminated Services according to Section Volume Adjustments; Repricing.

**(f) Technology Benchmarking**. In addition, Customer may elect to retain a Benchmarker to conduct (no more than once per year during the Term of this Agreement) a technology audit and business process review to benchmark Supplier's use of hardware, systems, software, communications and other technologies and business processes against then-current "industry best practices". If any such audit and review reveals that the technologies and business processes then utilized by Supplier are not at the level of "industry best practices," then, the parties shall jointly review the results of the review and, within thirty (30) days of Customer's receipt of such review, promptly establish and implement a plan to implement identified best practices and such plan shall be implemented pursuant to the Change Control Procedures; provided that the Change Control Procedures shall not apply to any such new technologies or business processes to the extent addressed by the Refresh Plan.

- **Supplier Audits.**

(a) Supplier will develop, implement and document quality assurance and internal controls (e.g., financial and accounting controls, organizational controls, input/output controls, system modification controls, processing controls, system design controls, and access controls) processes and procedures, including implementing tools and methodologies, which are designed to ensure that the Services are performed in an accurate and timely manner, in accordance with: (i) the Service Levels and other requirements in this Agreement; (ii) generally accepted accounting principles; (iii) the accepted practices of leading providers of services comparable with the Services provided hereunder; (iv) all applicable Laws; and (v) the Customer Standards.



**SRA Statement of Work**

(b) Without limiting the foregoing, Supplier shall:

* * *

(v) promptly conduct investigations of suspected fraudulent activities or security breaches within Supplier's organization that impact or could impact Customer Confidential Information. Supplier shall promptly notify Customer of any such suspected fraudulent activity or security breaches and the results of any such investigation to the extent they relate to Customer Confidential Information;

- **Quality Certifications.** Supplier will implement and maintain (e.g., by keeping certifications current) procedures that adhere to the independently audited quality certification ISO 9001 (or any successor standards) and such other certifications described in the applicable SOW and Policies and Controls Schedule, and provide to Customer copies of Supplier's certification upon reasonable request.

- **SSAE No. 16 Audit.**

Supplier will: (i) undertake at least annually, a Statement on Standards for Attestation Engagements No. 16 SOC 1 Type 2 Report audit (or any successor standard, or a PCI DSS audit and report to the extent Supplier is not required to perform the SOC 1 Type 2 Report, each a "SSAE 16 Audit") that covers the common controls for any applicable Supplier data centers designated in Supplier Locations where Supplier performs work for Customer; (ii) provide the reports from such audits to Customer no later than November 30th; and (iii) provide Customer documentation evidencing any periodic (e.g., quarterly or annual) certifications performed by Supplier or any material Subcontractor to the extent reasonably requested or required by Customer to comply with its audit requirements. In the year of transition, the SSAE 16 Audit and related report will be provided only if the transfer to Supplier of operational responsibility for all applicable Services and/or systems under the applicable SOW is completed in sufficient time to allow six (6) months of steady state provision of the Services during the period to which the audit relates. Supplier shall endeavor to require Supplier's material subcontractors providing Services directly to Customer to provide an annual SSAE 16 Audit to Customer under terms and conditions identical to those applicable to Supplier under this Section 8.3. Customer shall endeavor to require any of its subcontractors that will be managed by or novated to Supplier in accordance with this Agreement to provide an annual SSAE 16 Audit to Customer under terms and conditions identical to those applicable to Supplier under this Section 8.3. In addition, each year Supplier will provide Customer with a "GAP" letter (i.e. "bridge letter") from the last date of the SSAE 16 Audit to the end of Customer's fiscal year end (for example, if Supplier's SSAE 16 Audit ends on September 30, 2017 Supplier shall provide a GAP letter to Customer confirming in writing that Supplier's internal control environment and controls has not materially changed as of June 30, 2018).

- **Confidential Information.**

(a) **General.** Each party will treat the Confidential Information of the other party in accordance with this Section Confidential Information. The Receiving Party's obligations under this Section apply to Confidential Information of the Furnishing Party whether disclosed to the Receiving Party before or after the Agreement Effective Date. Each party's Confidential Information will remain the property of that party. Nothing contained in this Section will be construed as obligating a party to disclose its Confidential Information to the other party, or as granting to or conferring on a party, expressly or by implication, any rights or license to the Confidential Information of the other party. Any such obligation or grant will only be as provided by other provisions of this Agreement. Nothing in this Section shall prohibit Supplier from disclosing this Agreement, any Schedule, Attachment or documents related thereto to any assignee of Undisputed Payments that agrees with Supplier to confidentiality terms that are no less restrictive than the confidentiality terms set forth herein.

(i) **Definition.** "Confidential Information" of a party means any non-public information belonging to, concerning, or in the possession or control of, a party or its Affiliates (the "Furnishing Party"), that is furnished, disclosed or otherwise made available to the other party or its Affiliates (the "Receiving Party"); and which is either (1) marked or identified in writing as confidential, proprietary, secret or with another designation sufficient to give notice of its sensitive nature; or (2) of a type that a reasonable person would recognize as being commercially sensitive. Any notes, memoranda, compilations, derivative works, data files or other materials prepared by or on behalf of the Receiving Party that contain or otherwise reflect or refer to Confidential Information of the Furnishing Party



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

will also be considered Confidential Information of the Furnishing Party to the extent such document contains Confidential Information of the Furnishing Party. In the case of Customer, "Customer Confidential Information" includes, regardless of whether or how it is marked, all Developed Materials and associated documentation, Customer Data and Information, Customer-Owned Materials, systems access codes and nonpublic information to which Supplier has access in Customer Locations or systems, including information concerning Customer and Customer Entities' products, marketing strategies, financial affairs, employees, customers or suppliers and other materials and classifications as may be set forth in any applicable Customer Policies. In the case of Supplier, "Supplier Confidential Information" includes personnel data, financial information regarding Supplier's business plans and operations, Supplier's proprietary software and tools and methodologies owned by Supplier and used in the performance of the Services. Supplier will treat Personal Information (including without limitation all required or permitted disclosures of Personal Information) in accordance with Section Personal Information and consistent with all applicable Customer Policies and the Procedures Manual.

**(ii) Exclusions.**  Confidential Information does not include any information that the Receiving Party can demonstrate: (1) was, at the time of disclosure to the Receiving Party, a matter of public knowledge; (2) after disclosure by the Furnishing Party, is published or otherwise becomes a matter of public knowledge through no fault of the Receiving Party; (3) was already in the possession of the Receiving Party when received from the Furnishing Party and was not the subject of a pre-existing confidentiality obligation; (4) was received separately by the Receiving Party after disclosure by the Furnishing Party from a Third Party unaffiliated with either the Furnishing Party or the Receiving Party who had a lawful right to disclose such information to the Receiving Party; or (5) was independently developed by the Receiving Party without use of the Confidential Information of the Furnishing Party.

**(b) Confidential Treatment of this Agreement.**  This Agreement is a confidential agreement between Supplier and Customer. Neither party will reproduce or show copies of this Agreement to Third Parties without the other party's consent, except as may be permitted by Section Permitted or Required Disclosures or Section Publicity / Service Marks. Nothing in this Section will preclude Customer from disclosing to Third Parties Customer's budgetary information (which may include Fee information derived from Fees under this Agreement but which will not be a direct representation of Supplier's Fees) kept in the normal course. Customer may disclose this Agreement, excluding Supplier's Fees, information and details of Supplier's pricing, to Customer's Third-Party providers or prospective Third-Party providers in connection with insourcing, resourcing or outsourcing the Services to other service providers. Supplier may disclose this Agreement to its Affiliates or Subcontractors and Supplier Third Party Service Providers solely as necessary to provide the Services.

**(c) Confidentiality Obligations.**

**(i) Generally**.  The Receiving Party will: (1) not disclose, publish, release, transfer or otherwise make available the Furnishing Party's Confidential Information in any form to, or for the use or benefit of, any person or entity without the Furnishing Party's consent on a case-by-case basis; (2) except as otherwise specified in this Agreement, secure and protect the Furnishing Party's Confidential Information from unauthorized use or disclosure by using reasonable care, provided that, where Customer prescribes a particular set of security procedures applicable to specific types of data, Supplier's compliance with such procedures will be deemed to be reasonable care for this provision; and (3) not duplicate the Furnishing Party's Confidential Information, or any material containing the Furnishing Party's Confidential Information, except in the direct performance of its obligations under this Agreement.

**(ii) Shared Service Location**.  If Supplier provides Services to a Customer Entity from a Supplier Location that is shared with one or more Third Parties, Supplier will develop and implement a process to restrict access in any such shared environment so that Customer Confidential Information is not directly or indirectly disclosed to any Third Party.

**(iii) Notice of Unauthorized Acts**.  The Receiving Party will notify the Furnishing Party promptly upon its becoming aware of: (1) any unauthorized possession, use, or knowledge of the Furnishing Party's Confidential Information by any person; (2) any attempt by any person to gain possession from the Receiving Party of the

Page 15 of 73

IBM

**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

Furnishing Party's Confidential Information without authorization; or (3) any attempt to use or acquire knowledge from the Receiving Party of any of the Furnishing Party's Confidential Information without authorization. The Receiving Party will promptly furnish to the Furnishing Party full details that the Receiving Party has or may obtain regarding any unauthorized access and use reasonable efforts to assist the Furnishing Party in investigating or preventing the reoccurrence of any such access, and the Receiving Party will promptly take all reasonable actions necessary to prevent a reoccurrence of any unauthorized access; provided that any Changes to security requirements will be processed via the Change Control Procedures. The Receiving Party will reasonably cooperate with the Furnishing Party in any litigation, investigation, and/or other proceeding against Third Parties including Supplier subcontractors and Customer contractors deemed reasonably necessary by such Furnishing Party to protect its proprietary rights.

**(d) Permitted or Required Disclosures.** The Receiving Party may disclose relevant aspects of the Furnishing Party's Confidential Information to its officers, directors, agents, professional advisors, approved subcontractors, and employees, to the extent that such disclosure is not restricted under this Agreement or any governmental approvals and only to the extent that such disclosure is reasonably necessary for the performance of the Receiving Party's duties and obligations, or exercise of its rights, under this Agreement; provided, however, the Receiving Party will take all reasonable measures to ensure that the Furnishing Party's Confidential Information is not disclosed or duplicated in contravention of the provisions of this Agreement by such officers, directors, agents, professional advisors, subcontractors and employees. The Parties' respective obligations in this Section Confidential Information will not restrict any disclosure required pursuant to any Law; provided, however, that: (i) where legally permitted to do so, the Receiving Party will give reasonable and prompt advance notice of such disclosure requirement to the Furnishing Party and give the Furnishing Party reasonable opportunity to object to and contest such disclosure; and (ii) the Receiving Party will use reasonable efforts to secure confidential treatment of any such information that is required to be disclosed. With respect to Personal Information, to the extent the provisions of Section Personal Information conflict with or are more stringent than the protections accorded Confidential Information, then the provisions of Section Personal Information shall govern.

**(e) Return or Destruction of Confidential Information**. As requested by the Furnishing Party during the Agreement Term, the Receiving Party will return or destroy any designated Confidential Information of the Furnishing Party. Except to the extent this Agreement provides for the Receiving Party to continue to use items that constitute or contain the Furnishing Party's Confidential Information after the date of expiration or termination (e.g., during Wind Down Assistance), the Receiving Party will return, or at the Furnishing Party's option, destroy all copies of materials containing the Furnishing Party's Confidential Information upon the Receiving Party's cessation of work, completion of its obligations associated with such information under this Agreement or upon any earlier termination of this Agreement for any reason whatsoever. Notwithstanding the foregoing, the Receiving Party will not have to return or destroy notes or memoranda or other similar materials of the Receiving Party that contain, among other things, the Confidential Information of the Furnishing Party, provided that the Receiving Party will maintain the confidentiality of such materials as provided in this Section 9.3. The obligations to return or destroy herein shall apply to all copies of the Furnishing Party's Confidential Information in the possession or control of the Receiving Party's or any of its Affiliates or contractors and, at the Furnishing Party's request, the Receiving Party will certify to such return or destruction.


- **Personal Information**. Definitions For purposes of this Section: "Person" means a natural person to the extent permitted by local Law.

**(i) "Personal Information"** means any data or information (regardless of the medium in which it is contained and whether in individual or aggregate form) that: (1) relates to a Person; and (2) identifies or can be used to identify the Person, such as a Person's name, postal address, e-mail address or other online contact information, such as an online user ID or a screen name, telephone number, date of birth, Social Security number, or equivalent national identification number, driver's license number or other government-issued identification number, account information (including financial account number), payment card information (including without limitation primary account number, expiration date, personal identification number, card validation code or value,

**IBM**

## SRA Statement of Work

and full magnetic stripe data or equivalent on a chip), Internet Protocol (IP) address, access code, password, security questions and answers, health or medical information, biometric data, or one or more factors specific to physical, psychological, mental, economic, cultural or social identity, or any other unique identifier, that is: (a) disclosed at any time to Supplier or Supplier Personnel by an Customer Entity or on their behalf by Customer Personnel; or (b) created, obtained, used, procured, Processed or accessed at any time by Supplier or Supplier Personnel in connection with or incidental to the performance of the Services hereunder or derived from Personal Information. Personal Information also includes any additional information or classifications that may be more protective to the extent set forth in any of Customer's Policies or as may be required under applicable Laws.

**(ii)"Process"** or "Processing" or "Processes" means any operation or set of operations performed upon Personal Information, whether or not by automatic means, such as creating, collecting, procuring, obtaining, accessing, recording, organizing, storing, adapting, altering, retrieving, consulting, using, or disclosing by transmission, disseminating or otherwise making available, aligning or combining, blocking, erasing or destroying the information.

**(b)Ownership of Personal Information**.  Any Personal Information will at all times be and remain the sole property of Customer and Supplier will not have or obtain any rights therein.

**(c)Transfer of Personal Information.**  Supplier will not transfer Personal Information outside the United States without the explicit written consent of Customer. Supplier will Process Personal Information only on behalf of and for the benefit of Customer and, except with the prior written consent of Customer, only for the purpose of performing the Services hereunder.

**(d)Confidentiality of Personal Information**.  Supplier will hold in confidence any and all Personal Information. Except with the prior written consent of Customer, Supplier will not share, transfer, disclose or otherwise provide access to Personal Information (or any portion thereof) to any Third Party; provided, however, that such prior written consent will not be required where such sharing, transferring, disclosure or access is provided to Supplier Personnel who have a genuine need to know or have access to Personal Information as a necessary condition to Supplier's performance of the Services.  Where Supplier, with the consent of Customer, provides to a Third-Party access to Personal Information, or contracts such rights or obligations to a Third Party, Supplier shall enter into a written agreement with such Third Party that imposes obligations on the Third Party that are substantially similar to those imposed on Supplier under Section Personal Information of this Agreement.  Supplier will cause all Supplier Personnel who have access to Personal Information to comply with the terms and conditions of this Section in the same manner as Supplier is bound hereby.  (To the extent there is a conflict between the requirements of this Section and Privacy Laws, the requirements of Privacy Laws will prevail.)  In all events, Supplier agrees to remain fully responsible for and liable to Customer for compliance by Supplier Personnel with this Agreement and any and all losses, uses or disclosures of, activities involving, and access to or acquisition of Personal Information by Supplier Personnel in violation of Supplier's obligations under this Agreement.  Supplier will not retain Personal Information for longer than is necessary to perform the Services unless otherwise required by applicable Customer policies, including records retention policies or requirements.

**(e)PCIDSS**.  Supplier will perform the Services in compliance with the PCIDSS subsections applicable to the Services and any subsequent versions, updates or modifications thereto, and hereby acknowledges its responsibility for the security of any cardholder data (as such term is defined in the PCIDSS) that it stores,

transmits or processes in connection with the Services.  Supplier will, in the performance of the Services, comply with all requirements to be considered compliant with PCIDSS, including as may exist under Customer's Policies, and will perform the necessary steps to validate its compliance with the PCIDSS as it relates to the system elements and portions of cardholder data environment for which Supplier is responsible (the "PCI Environment") [Privacy experts for both sides to identify the services and systems components which are included in the required scope of IBM's PCI DSS assessment]. Supplier will deliver to Customer copies of all documentation necessary to verify such compliance ("Verification Documentation").  At least annually thereafter for so long as such documentation is required under the PCIDSS, Supplier will deliver to Customer a copy of the Verification Documentation applicable to the PCI Environment at no additional charge to Customer.  Within ten (10) business days after Customer's request, Supplier will deliver to Customer, at no additional charge, evidence of a passing

Page 17 of 73

vulnerability scan applicable to the PCI Environment conducted within the preceding three (3) months. Without any limitation to Supplier's obligation under this Section, Supplier will immediately notify Customer of any exception in a PCIDSS report on compliance, attestation of compliance or quarterly vulnerability scan, or if it learns that it is no longer PCIDSS compliant, or reasonably anticipates that it is or will be non-compliant, and will promptly notify Customer of the steps being taken to remediate such exception or non-compliance.

**(f)Information Security**.  In addition to any other privacy, data protection, confidentiality and information security requirements set forth herein and in Customer's Policies, Supplier will, in accordance with all applicable Privacy Laws, establish controls designed to maintain the confidentiality of Personal Information and provide that Personal Information is not disclosed contrary to the provisions of this Section Personal Information or any applicable Privacy Law.  Supplier will implement and maintain generally accepted security procedures and practices designed to protect against theft and any actual or suspected unauthorized Processing, loss, use, disclosure or acquisition of, or access to, Personal Information (hereinafter "Information Security Incident"). Supplier will maintain and implement a comprehensive written information security program that includes administrative, technical and physical safeguards and other security measures generally accepted by other Tier 1 providers of services substantially the same as the Services designed to: (i) protect the security and confidentiality of Personal Information; (ii) protect against any anticipated threats or hazards to the security and integrity of Personal Information; and (iii) protect against any Information Security Incident and unauthorized access to, acquisition of, or use of the data processing equipment used to Process Personal Information.  Subject to the Change Control Procedures, Supplier will adopt all reasonable recommendations Customer may make concerning data security measures, programs and procedures to ensure ongoing compliance with this Section Personal Information.

**(g)Right to Notice**.  Supplier agrees, to notify Customer in writing immediately, but in no event later than twenty-four (24) hours, of any Information Security Incident of which Supplier becomes aware.  Such notice will summarize in reasonable detail the effect on Customer, if known, of the Information Security Incident and the corrective action taken or to be taken by Supplier.  Supplier will promptly take all necessary and advisable corrective actions, and will cooperate fully with Customer in all reasonable and lawful efforts to prevent, mitigate or rectify such Information Security Incident, including: (i) investigating such Information Security Incident and performing a root cause analysis thereon; (ii) remediating the effects of such Information Security Incident; and (iii) providing Customer with such assurances as Customer shall request that such Information Security Incident is not likely to recur.  Unless otherwise required by Law, the content of any filings, communications, notices, press releases or reports related to any Information Security Incident must be approved by Customer prior to any publication or communication thereof.

**(h)Notification Related Costs.** In the event of: (1) a Security Event or (2) an Information Security Incident involving Personal Information in Supplier's possession, custody or control or for which Supplier is otherwise responsible, in each case arising from Supplier's breach of its contractual obligations resulting in unauthorized access to unencrypted Personal Information, Supplier will subject to the limitations of liability reimburse Customer on demand for all commercially reasonable Notification Related Costs (as defined below) incurred by Customer arising out of or in connection with any such Security Event or Information Security Incident. "Notification Related Costs" include Customer's actual external costs associated with investigating, addressing and responding to the Security Event or Information Security Incident, including:  (i) preparing and mailing or other transmission of notifications or other communications to consumers, employees, regulators or others as Customer deems reasonably appropriate; (ii) establishment of a call center or other communications procedures in response to such Security Event or Information Security Incident (e.g., customer service FAQs, talking points and training); (iii) public relations and other similar crisis management services used by Customer for communications associated with legally required notifications or where advisable under the circumstances; (iv) legal, consulting and forensic expert fees and expenses or other fees and expenses associated with Customer's investigation of and response to such event; and (v) costs for commercially reasonable credit monitoring or identity protection services that are associated with legally required notifications or are advisable under the circumstances.

**IBM**

## SRA Statement of Work

SRA # 4917011615
SOW # 4917011866

**(i)Official Proceeding**. Supplier agrees to notify Customer immediately in writing of any subpoena or other judicial or administrative order or proceeding seeking access to or disclosure of Personal Information unless such disclosure is otherwise prohibited by Law, such as a prohibition under criminal Law to preserve the confidentiality of a Law enforcement investigation.  Customer will have the right to defend such action in lieu of and on behalf of Supplier.  Customer may, if it so chooses, seek a protective order.  Supplier will reasonably cooperate with Customer in such defense.

**(j)Effect of Termination.**

(i)Promptly upon the expiration or earlier termination of this Agreement or an applicable SOW, or such earlier time as Customer requests, Supplier will return to Customer or its designee, or render unreadable or undecipherable if return is not reasonably feasible or desirable to Customer (which decision will be based solely on Customer's written instructions), the Personal Information in Supplier's, its Affiliates' or Subcontractors' possession, custody or control.  Promptly following any return of Personal Information or alternate action taken to comply with this Section, Supplier will provide to Customer a completed Officer's Certificate certifying that such return or alternate action has occurred.

(ii)In the event applicable Law does not permit Supplier to comply with the delivery or destruction of Personal Information required by Section Effect of Termination (i), Supplier warrants that it will ensure the confidentiality of the Personal Information and that it will not Process any Personal Information disclosed by or on behalf of Customer after termination of this Agreement except solely with respect to the provision of Wind Down Assistance.

**(k)Termination for Breach of Section Personal Information.**  In the event of any (1) Security Event or (2) an Information Security Incident involving Personal Information in Supplier's possession, custody or control or for which Supplier is otherwise responsible, in each case arising from Supplier's breach of its contractual obligations resulting in unauthorized access to unencrypted Personal Information, Customer may, by giving written notice to Supplier, immediately terminate all or the relevant portion of this Agreement for cause.  In connection with such termination, no Termination Fee shall apply, provided however, Customer will remain responsible for payment of any Unamortized Assets.

**(l)Processing of Personal Information**.  It is understood and agreed by the parties that the lawful and secure Processing of Personal Information pursuant to this Agreement is of the utmost importance to Customer and the Data Subjects.  The parties further understand and agree that Personal Information is inherently valuable and therefore Supplier agrees to take reasonable and appropriate measures, as described in this Agreement, to protect such Personal Information from unauthorized or unlawful Processing by Supplier.

**(m)Response to Queries.**  Supplier will deal promptly and properly with all inquiries from Customer relating to its Processing of Personal Information and the provision of the Services.  Supplier will immediately inform Customer in writing of any requests with respect to Personal Information received from Data Subjects (including, Customer's customers, consumers or employees) or other individuals and will not respond to such request unless Customer has authorized Supplier to do so.  Supplier will respond to such requests in accordance with Customer's instructions.  Supplier will cooperate with Customer if an individual requests access to his or her Personal Information for any reason.

- **Compliance with Laws Generally.**

 Each party will perform its obligations in a manner that complies with Laws, including identifying and procuring required permits, certificates, approvals, and inspections related to its business. If a charge of noncompliance occurs, the noncompliant party will promptly notify the other party in writing.  Each party will communicate to the other all governmental, audit and other regulatory required changes with respect to its performance or receipt, as the case may be, of the Services. Without limiting the generality of the foregoing, each party agrees to the specific compliance obligations set forth below in Sections (a)-(f).

**(a)Privacy Laws.** Each party will comply with all Laws applicable to it which may include:  (i) federal, state, and local Laws, as well as all applicable rules, regulations, and governmental requirements currently in effect and as they become effective relating in any way to the privacy, confidentiality or security of Personal Information;



## SRA Statement of Work

**SRA** # 4917011615
**SOW** # 4917011866

(ii) all applicable industry standards concerning privacy, data protection, confidentiality or information security, including PCIDSS (as further detailed in Section PCIDSS and (iii) applicable provisions of every Customer privacy policy, statement or notice as set forth in Schedule 1-I (Customer Policies and Controls) (collectively, "Privacy Laws").  Supplier will provide all reasonable assistance and information to Customer to allow Customer to perform all of its obligations under the Privacy Laws.

**(b)Anti-corruption Laws.** Each party will comply with the U.S. Foreign Corrupt Practices Act, and all successor legislation(s), as well as any applicable foreign anti-bribery and anti-corruption law, act or regulation in connection with this Agreement. Each party acknowledges and agrees that, in connection with this Agreement it, and its officers, directors, employees and agents, have not and will not, offer, make or promise to make any payments of money, or anything of value, directly or indirectly to, nor accept same from, any person or entity including but not limited to officials of any government or officials of any international organization, political party, or candidate for political office, for the purpose of obtaining or retaining business, or securing any improper or personal advantage, if such offer, promise or payment would violate any such laws, acts or regulations.

**(c)Employment Laws.**  Supplier shall provide the Services in accordance with all applicable federal, state and local regulatory or government pronouncements, requiring equal employment opportunity or preventing employment discrimination.  Any Services that Supplier provides (or causes to be provided) to the Customer Entities will be performed in compliance with all applicable Laws pertaining to minimum wage, overtime compensation, hiring and occupational safety or under the minimum age for employment.  Supplier will take the necessary steps to monitor and ensure that no Services provided to the Customer Entities are performed through the use of illegal, coerced or Child Labor or in unsafe working conditions.  Supplier will provide Customer, immediately upon its request, with documentation relating to the manner in which the Services have been provided and will grant Customer access to Supplier's facilities for purposes of inspection, if requested to do so by a government authority, pursuant to Section Audits; Records.  Customer reserves the right to suspend, discontinue or terminate this Agreement for Supplier's failure to comply with the standards set forth above in this Section and without any Termination Fees, provided that Customer will remain responsible for Unamortized Assets, if such failure to comply amounts to a material breach under this Agreement that is not cured within thirty (30) days from the time of Customer's written notice thereof, and any such failure shall be deemed a material breach under this Agreement if a government entity or court of law finds that Supplier has not complied with a material obligation entitling Customer to any remedies available under this Agreement, at Law or in equity.

**(d)Certified Business Enterprises.**

(i)It is the policy of Customer to encourage equal opportunity in its contract awards. Proposals from and as supported by small businesses, disabled veteran-owned businesses, women-owned businesses, firms owned by African-Americans, American Indians, Asian-Americans, Filipinos and Hispanics (Latinos), and local firms are strongly encouraged.

(ii)Customer encourages Supplier to provide for the participation of small businesses and businesses owned by women and minorities through subcontract, partnership or joint venture with these firms. Supplier will submit a Small Business Subcontracting Plan on an annual basis throughout the Term of this Agreement in the form prescribed by Customer. Supplier will at all times comply with the Small Business Subcontracting Plan and provide information when and as requested by Customer to demonstrate its compliance.

(iii)Customer endeavors to do business with firms sharing the Customer's commitment to equal opportunity and will not do business with any firm that discriminates on the basis of race, religion, ancestry, age, gender, disability, medical condition or place of birth.

**(e)Export Restrictions.**

(i)Compliance with Export Restrictions.  The parties will comply with all applicable U.S. Laws that limit Customer's ability to operate in or transact business with certain countries or share certain technologies and data with certain individuals, including: (a) the Trading with the Enemy Act and the International Emergency Economic Powers Act; and (b) regulations promulgated by the U.S. Department of The Treasury's Office of Foreign Assets Control, the U.S. Department of Commerce's Bureau of Industry and Security, the U.S.

IBM

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

Department of State's Directorate of Defense Trade Controls, and other U.S. federal departments and agencies (collectively, the "Export Restrictions"). Due to these Export Restrictions, the Services may only be performed in, or delivered from, those countries that are allowable under Laws.

(ii)Remedial Actions by Supplier. If Supplier: (a) operates in a country that later becomes subject to Export Restrictions; or (b) works with an individual (other than End-Users) who becomes a denied party under Export Restrictions, Supplier will, at its own expense, relocate or reorganize its business, or take other required remedial action to ensure that Supplier may lawfully continue to perform under this Agreement at Supplier Locations. If Supplier fails to take remedial action at its own expense, Customer will be entitled to any remedies available under this Agreement, at Law or in equity.

- **Representations, Warranties and Covenants**
a)   **Authorization and Financial Capacity.** Supplier and Customer each represents and warrants that it is duly authorized to enter into this Agreement and to make the commitments set forth in this Agreement. Supplier represents and warrants that it has the financial capacity to enter into this Agreement.
b)   **Work Standards**. Supplier represents and warrants that it will perform: (i) the Services with promptness and diligence in a professional and workmanlike manner and in accordance with the practices and professional standards used in a well-managed operation performing services similar to the Services under this Agreement; and (ii) use adequate numbers of qualified individuals with suitable training, education, experience, and skill to perform the Services.
c)   **Efficiency and Cost Effectiveness.** Supplier represents and warrants that it will efficiently deploy and use all resources and services necessary to provide the Services.
d)   **Technology**. Supplier represents and warrants that it will provide the Services using proven, current technology, while continually seeking to improve upon the selected technology, including as needed to meet all of Customer's Service Levels and transformative goals.
e)   **Personal Information.** Supplier represents and warrants that no applicable Law, or legal requirement, or privacy, information security or security enforcement action, investigation, litigation or claim prohibits Supplier from fulfilling its obligations under this agreement (Compliance with Law).
f)   **Non-infringement.** Supplier represents and warrants that it will perform its responsibilities under this Agreement in a manner that does not infringe, misappropriate, or otherwise violate any patent, copyright, trademark, trade secret, or other proprietary rights of any Third Party. Supplier offers no warranty of non-infringement in the performance of its duties, where the cause of the infringement is Materials provided by Customer.
g)   **Software Ownership**. Supplier represents and warrants that it is either the owner of, or, where Supplier distributes software to Customer, is authorized to distribute the Supplier Software.
h)   **Inducements**. Supplier represents and warrants to Customer that it has not violated any Customer policies of which Supplier has been given notice or any applicable Laws or regulations regarding the offering of unlawful inducements in connection with this Agreement.
i)   **Malware.** Supplier will use commercially reasonable efforts to prevent Malware from being coded or introduced into All Software. In the event Malware is found to have been coded or introduced into the All Software, Supplier will ensure that all commercially reasonable efforts are undertaken to reduce the effects of such Malware, consistent with the scope of the Services and Customer's retained responsibilities.
j)   **Disabling Code**. Supplier represents and warrants that it will not introduce (or authorize Subcontractors or Supplier Third Party Service Providers to introduce) into the Supplier Software any disabling code, backdoor or vulnerabilities without Customer's prior written consent. With respect to any disabling code, backdoor or vulnerability that may be part of the Supplier Software, Supplier will not, nor will Supplier instruct Supplier's Subcontractors or Supplier Third Party Service Providers to, purposefully invoke such disabling code, backdoor or vulnerability at any time, including upon expiration or termination of the applicable SOW, without Customer's prior written consent. In the event a disabling code, backdoor or vulnerability is found to have been introduced into the Supplier Software, Supplier will be responsible to reduce or eliminate the effects of such disabling code, backdoor or vulnerability.
k)   **Use of Customer-Provided Materials.** Supplier represents and warrants that it: (i) will use all Materials provided by Customer under this Agreement (a) solely for the purposes of providing the Services to the

**IBM**

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

Customer Entities and (b) in accordance with all applicable license restrictions and terms of use to the extent such license restrictions and terms of use have been provided or made available to Supplier in writing by Customer, as may be updated from time to time; (ii) will return such Materials to Customer upon the termination or expiration of the applicable SOW (except to the extent that such Materials are required for Supplier to perform Services under a different SOW or for Wind Down Assistance); and (iii) will maintain Supplier Software so that it operates in accordance with its specifications and entitlements, including performing Supplier Software maintenance in accordance with the applicable software provider's documentation and recommendations.

- **Adequate Opportunity for Due Diligence**.

  Supplier has conducted its own independent investigation, review and analysis of the Customer Infrastructure (including, but not limited to, the SRAs), and acknowledges that it has been provided adequate access to the Customer Personnel, Customer Locations, Customer Facilities, assets, books and records, and other documents and data of Customer for such purpose. Supplier acknowledges and agrees that: (i) in making its decision to enter into this Agreement and to propose the pricing set out in the Fee Schedule, Supplier has relied solely upon its own investigation and the express representations and warranties of Customer set forth in this Section Representations, Warranties and Covenants; and (ii) neither Customer nor any Third Party has made any representation or warranty as to Customer, its Infrastructure, or this Agreement, except as expressly set forth in this Section Representations, Warranties and Covenants

- **Force Majeure Event.**

  No party will be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent the default or delay is caused, directly or indirectly, by any cause beyond the reasonable control of such party, including such events as fire, flood, hurricanes, elements of nature or acts of God, outbreaks of disease, strikes, governmental acts, or any other cause beyond the reasonable control of the party (a "Force Majeure Event"), provided that: (i) the nonperforming party could not have prevented the default or delay by taking reasonable precautions; and (ii) Supplier has promptly executed the applicable disaster recovery plan and has promptly declared a disaster, in accordance with Schedule 1-G (Disaster Recovery Services) to SOW#1 (the "Disaster Recovery Plan"). In such event, the nonperforming party is excused from further performance for as long as such circumstances prevail and the party continues to use commercially reasonable efforts to recommence performance. Any party so delayed will notify the party to whom performance is due and describe the circumstances causing the delay. A performance failure of a Supplier subcontractor or supplier (other than in the case of a telecommunication circuit failure) will not be a Force Majeure Event for Supplier unless the subcontractor's or supplier's performance failure was caused by a Force Majeure Event.

  - **Procurement of Services from Alternative Source.** If a Force Majeure Event substantially prevents or delays Supplier's performance of its obligations to provide the Services and thus prevents the performance of critical Customer functions for more than the relevant time period set forth in the applicable Disaster Recovery Plan (and if no time period is set forth therein then forty-eight (48) hours after receiving notice from Customer), then, at Customer's option and without liability to Supplier hereunder, Customer may procure (and Supplier shall provide commercially reasonable assistance as requested by Customer to assist Customer to procure) the affected Services from an alternative source. Supplier will be liable for payment for such alternative source for a period not to exceed ninety (90) days, provided that in no event shall Supplier be liable to pay the alternate source an amount greater than one hundred twenty five percent (125%) of the Fees paid by Customer to Supplier for such Services, and during such ninety (90) day period, Customer shall continue to pay Supplier for such Services. After such ninety (90) day period, (i) Customer and/or the applicable Customer Entity shall continue to pay Supplier for such portion of the Services (if any) that Supplier continues to render during the time period the alternative source is providing alternative services, and (ii) Customer will pay the alternative source directly for any period beyond the ninety (90) days that Customer elects to continue use of the alternative source.
  - **Right to Terminate**. If a Force Majeure Event substantially prevents or delays Supplier's performance of the Services and, as a result, Supplier fails to perform the critical Customer functions for

IBM

## SRA Statement of Work

more than forty-eight (48) hours after the relevant time period set forth in the applicable Disaster Recovery Plan (and if no time period is set forth therein then forty-eight (48) hours after receiving notice from Customer), then, at Customer's option, Customer may terminate the affected Services and any Services directly related to the affected Services without any Termination Fees, and the Fees will be adjusted to reflect the terminated Services in accordance with the Fee Schedule (or in situations where the Fee Schedule doesn't address the issue, the Fees will be adjusted equitably) as of a date specified by Customer in a written notice to Supplier.

● **No Additional Payments**. Except as otherwise set forth in this Agreement with respect to implementation of the applicable Disaster Recovery plan, in the event of a termination, Supplier will not have the right to any additional payments from Customer as a result of any Force Majeure Event.

● **Dispute Resolution**
a) **General**. This Agreement is entered solely between and may be enforced only by Customer and Supplier. Any dispute between the parties arising out of or relating to this Agreement, including, without limitation, with respect to the interpretation of any provision of this Agreement and with respect to its performance by Supplier or Customer, will be resolved as provided in this Section. Supplier shall immediately notify the Customer Governance Committee of any such dispute.

b) **Informal Dispute Resolution**. Subject to Section Equitable Relief, in order to promptly resolve any disputes that may arise during the performance of this Agreement, the parties initially will attempt to resolve their dispute informally as set forth in this Section Informal Dispute Resolution. If a dispute arises between the parties, the aggrieved party will provide the other with a written notice setting forth the nature of the dispute and the remedy requested. The date of the other party's receipt of such notice will be the "Notice Date" for the purpose of this Section Dispute Resolution. Within seven (7) days following the Notice Date, each party will appoint a designated representative who does not devote substantially all of his or her time to performance under this Agreement as well as any other representatives, who will promptly meet to attempt to resolve the dispute and will continue to meet in accordance with a schedule they establish until the dispute is resolved. If the dispute is not resolved within fourteen (14) days following the Notice Date, a member of each party's respective Service Leadership Committee will participate in the dispute resolution efforts. If the dispute is not resolved within twenty-one (21) days following the Notice Date, the Executive Steering Committee will participate in the dispute resolution efforts. If, and to the extent that, any such dispute has not been settled pursuant to the meetings of representatives within thirty (30) days of the commencement of such meetings, either party may pursue any and all remedies they may have available at Law and in equity.

c) **Expedited Dispute Resolution for Payment Disputes.** Notwithstanding anything to the contrary, to the extent that Customer and/or the applicable Customer Entity disputes a payment or portion thereof, the parties shall follow the procedures set forth in this Section in lieu of the procedures set forth in Section Informal Dispute Resolution. In accordance with Section Invoicing, Payment and Withholding, Customer and/or the applicable Customer Entity will provide a Payment Dispute Notice Date within fifteen (15) days of receipt of the invoice. Within five (5) days following the Payment Dispute Notice Date, each party will appoint a representative to discuss an attempt to resolve the payment dispute. If the dispute is not resolved by the designated representatives within ten (10) days following the Payment Dispute Notice Date, the Management Committee will participate in the dispute resolution efforts. Upon mutual resolution of the dispute, Customer and/or the applicable Customer Entity will promptly pay to Supplier such portion, if any, of the disputed amount determined to be owing to Supplier. If, and to the extent that, any such dispute has not been settled pursuant to the meetings of representatives and/or the Management Committee within fifteen (15) days following the Payment Dispute Notice Date, either party may pursue any and all remedies they may have available at Law and in equity.

d) **Continued Performance**. Without limiting Supplier's right to terminate the Agreement for an uncured failure to pay Disputed Fees , during the pendency of a dispute and notwithstanding anything to the contrary contained herein, and even if any dispute or other dispute arises between the parties, and regardless of whether or not it requires at any time the use of the dispute resolution procedures described above (i) both parties will continue to perform all of their obligations under this Agreement; and (ii) in no event nor for

Page 23 of 73

**IBM**

## SRA Statement of Work

any reason will Supplier interrupt the provision of Services to Customer or any of the Customer Entities, or any obligations related to Wind Down Assistance, disable any hardware or software used to provide Services, or perform any other action that prevents, impedes, or reduces in any way the provision of Services or the Customer Entities' ability to conduct their activities.

- **Termination**
- Generally.  This Agreement (including any Service Areas hereunder) may only be terminated as provided in this Section 18.  Unless this Agreement expressly provides otherwise, termination of this Agreement or any Service Areas by a party will be without prejudice to and with full reservation of any other rights and remedies available to the party.

\* \* \*

- **Termination**

a)  18.1 Generally.  This Agreement (including any Service Areas hereunder) may only be terminated as provided in this Section.  Unless this Agreement expressly provides otherwise, termination of this Agreement or any Service Areas by a party will be without prejudice to and with full reservation of any other rights and remedies available to the party.

\* \* \*

- **Termination by Howard.**

(a)  Termination for Cause Generally.  Howard may terminate this Agreement (including any affected or all Service Areas) for any of the following, by providing notice to Supplier within three hundred sixty-five (365) days of the time when it first becomes aware of the occurrence that gave rise to such termination right:

(i)  a material breach by Supplier caused by fraud, Gross Negligence or willful misconduct of Supplier;

(ii)  a material breach by Supplier of its contractual obligations under the Agreement having a material impact on the affected Service Area (other than as set forth in Section  above) by Supplier that is not cured within sixty (60) days after written notice thereof. For example, if Supplier materially breaches its contractual obligations under the Agreement which has a material impact on the Voice Service Area, Howard may terminate the Voice Service Area, in which case Howard may not also terminate the Network Service Area unless removal of the Voice Service Area would have a material impairment on Howard's receipt of the Services for the Network Service Area, it being understood that a termination and removal of the Mobility Service Area will not be deemed to have a material impairment on Howard's receipt of Services for the Network or Voice Service Areas absent intrinsic evidence by Howard to the contrary;

(iii) multiple or repeated breaches by Supplier (other than failures to meet the Service Levels, which is subject to termination, of which Howard has provided Supplier timely notice through the governance process in each instance, and which Supplier had reasonable opportunity to correct in each instance, which collectively amount to a material breach of the Agreement or of a Service Area; or

(iv) in regard to Supplier's obligations under Schedule 1-G (Disaster Recovery Services), any failure or inability to resume a Critical Service during a declared Disaster within forty-eight (48) hours of the applicable RTO time period(s) set forth in the applicable Disaster Recovery Plan.

\* \* \*

Termination for Repeated Failure to Meet Service Levels, or a Failure to Meet Transition or Transformation related Critical Milestone identified as a "Termination Milestone".  Howard may, upon written notice to Supplier delivered at least ninety (90) days prior to the requested effective date of termination and within one hundred and eighty (180) days of the occurrence that gave rise to such termination right, exercise its termination right pursuant to Schedule 1-D (Performance) or 1-N-1 (Transformation Milestones).  In connection with such termination, no Termination Fee shall apply provided however, Howard shall remain responsible for (i) Unamortized Assets, and

**IBM**

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

(ii) with respect to a termination as a result of a failure to meet a Termination Milestone, all unpaid portions of any completed and Accepted Transition and Transformation Milestones.

**Termination for Enduring Force Majeure Events.** Howard may, upon delivery of written notice to Supplier at least ninety (90) days prior to the requested effective date of termination and delivered within one hundred and eighty (180) days of the occurrence that gave rise to such termination right, terminate pursuant to Section Right to Terminate. In connection with such termination, no Termination Fee shall apply, provided however, Howard will remain responsible for payment of any Unamortized Investments.

**Termination for Benchmarking Results.** Howard may, upon delivery of written notice to Supplier at least ninety (90) days prior to the requested effective date of termination and delivered within one hundred and eighty (180) days of the occurrence that gave rise to such termination right, exercise its termination right pursuant to Section Howard Termination Right. In connection with such termination, no Termination Fee shall apply, provided however, Howard will remain responsible for payment of Wind Down Expenses.

**Termination for Breach of Personal Information Duties.** Howard may, by giving written notice to Supplier, exercise its termination rights pursuant to Section  Personal Information (l) (Termination for Breach of Section Personal Information). In connection with any such termination, no Termination Fee shall apply, provided however, Howard will remain responsible for Unamortized Assets.

**Termination for Supplier's Insolvency.** Howard may terminate this Agreement in its entirety if Supplier: (i) becomes insolvent or is unable to meet its debts as they mature; (ii) files a voluntary petition in bankruptcy or seeks reorganization or to effect a plan or other arrangement with creditors; (iii) files an answer or other pleading admitting, or fails to deny or contest, the material allegations of an involuntary petition filed against it pursuant to any applicable statute relating to bankruptcy, arrangement or reorganization; (iv) is adjudicated a bankrupt or makes an assignment for the benefit of its creditors generally; (v) a receiver or trustee is appointed for all or a substantial part of its property and such receiver or trustee  is not discharged within thirty (30) days after the date of such appointment. In connection with such termination, no Termination Fee shall apply, provided however, Howard shall remain responsible for the payment of any Unamortized Investments.

(g) **Termination upon Change of Control.** Howard will have the right to terminate this Agreement, with at least sixty (60) days' prior written notice to Supplier, upon the Change of Control of all or substantially all of the business of Supplier. In connection with such termination, Howard shall pay the applicable Termination Fee and any Wind-Down Expenses as set forth in Attachment 1-E-1(e) (Termination Fees) to the Fee Schedule.

(h)  **Termination for Convenience.** Howard will have the right to terminate this Agreement, any SOW(s) and/or any one or more Service Areas hereunder, for its convenience upon at least ninety (90) days' prior written notice to Supplier, at any time. In connection with such termination, Howard shall pay the applicable Termination Fee and any Wind-Down Expenses, as provided in as set forth in Attachment 1-E-1(e) (Termination Fees) to the Fee Schedule.

(i)  **Termination for a Change in Law.** Howard may, by giving written notice to Supplier, terminate this Agreement or the affected Service Area, as of a date specified in such termination notice, which shall not be less than sixty (60) day prior notice, if a Law or change in Law materially adversely affects the Fees by more than fifteen percent (15%) and Howard would not have incurred such increase if it were performing the Services for itself. In connection with such termination, Howard shall not be required to pay a Termination Fee, provided however, Howard would remain responsible for payment of any Wind-Down Expenses.

* * *

**SRA Statement of Work**

- **Partial Termination**. If Howard exercises any right to terminate this Agreement or any Service Areas in part pursuant to any applicable provision in this Agreement: (i) the Fees (excluding Termination Fees) will be adjusted to only reflect those Services that are not terminated, including any impacts on such remaining Services by such partial termination; and (ii) upon the payment of the applicable Termination Fees related to such terminated Services, the Termination Fees payable by Howard will be adjusted to fairly reflect those Services that are being terminated, taking into account any impact on the remaining Services and, where applicable, Replacement Services, by such partial termination

- **Extension of Termination Date.**

Howard may extend the effective date of Wind Down Assistance up to three (3) times as it elects in its discretion upon, in each instance, sixty (60) days' written notice to Supplier prior to the then effective date of wind down. The total of the Wind Down Assistance Period and all such extensions may not exceed one (1) year after the effective date of termination or expiration.

- **Wind Down Assistance.**

**(a)  Overview.** Supplier will perform the required services, functions, and responsibilities in connection with the cessation of any Service, or the expiration or earlier termination (for any reason) of this Agreement, to accomplish the orderly wind down of the Service being ceased, terminated, or expiring (the "Discontinued Services") or the migration of such Services from Supplier's operating environment(s) to the replacement operating environment(s) of Howard or Howard's designee (either or both such entities, the "Successor"), all as reasonably directed by Howard (such assistance "Wind Down Assistance."), provided however, where Supplier notifies Howard that a material disruption is an unavoidable result of any specific Howard instruction related to the Wind Down Assistance, Supplier shall not be responsible for the consequences of such disruption, including disruption to Service Level performance. Supplier has provided to Howard and Howard has approved an initial plan to account for the then-contemplated Wind Down Assistance to be provided by Supplier, the current form of which is attached a Schedule 1-L (the "Wind Down Assistance Plan"). In connection with the annual review conducted under Section Annual Review of Services, Supplier will propose updates to the Wind Down Assistance Plan, which updates will take effect only upon Howard's written approval thereof. The parties acknowledge and agree that the Wind Down Assistance to be provided by Supplier shall in no event be limited by what is set forth in the Wind Down Assistance Plan, but any additional assistance required that is not included in such plan shall be subject to the Change Control Procedures and in all cases, be subject to the terms of this Section.

**(b)  Performance.** All Wind Down Assistance shall be provided in accordance with the terms and conditions of this Agreement. Without limiting the foregoing, Supplier shall perform the Wind Down Assistance with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and resource efficiency as it was required to provide the same or similar Services during the Term, including compliance with the Service Levels and payment of the Service Level Credits in the event it fails to do so, unless otherwise specified in the Wind Down Assistance Plan. Supplier will ensure that Supplier Personnel reasonably considered and identified by Howard to be critical to the performance of the Services and the Wind Down Assistance shall be retained on the Howard account (and their hour commitment to the Howard account shall not be reduced in a manner that adversely affects the provision of Wind Down Assistance) through the completion of their respective responsibilities in the Wind Down Assistance.

**(c)  Identification of Supplier Subcontractors, Third Party Service Providers and Materials**. As part of the Wind Down Assistance Plan, Supplier shall develop and maintain a database that includes all of the following information:

(i)  Contact information for all Subcontractors and Third-Party Service Providers on the Howard account;

IBM

## SRA Statement of Work

(ii) Detailed information related to Supplier and such Subcontractors and Third-Party Service Providers, including, but not limited to: assignability of the contracts and any related transfer fees;

(iii) Which Supplier-Owned Materials and Third-Party Materials are dedicated to the Howard account or shared with other customer accounts; and

(iv) Other information Supplier should know that Howard would need to make the Wind Down Assistance Period as smooth as possible as reasonably requested by Howard.

**(d)  Scope of Wind Down Assistance.** Notwithstanding anything to the contrary in the Wind Down Assistance Plan, Wind Down Assistance shall include at least the services, functions, and responsibilities described below in this Section Wind Down Assistance:

**(i)  Third Party Contracts.** Within three (3) Business Days of beginning the Wind Down Assistance Period, Supplier shall provide prompt notice to Howard of all subcontracts and Third-Party contracts used by Supplier to perform the Discontinued Services. At Howard's request, Supplier will use commercially reasonable efforts to cause any such Subcontractors or Third Parties to permit Howard or its designee to assume prospectively any or all such contracts relied upon in the performance of the Services and that can be assumed by Howard or to enter into new contracts with Howard or its designee on substantially the same or more favorable terms and conditions. Any charge or fee imposed on such assignment of a Third-Party contract or the entering into of a new Third-Party contract will be borne by Howard, provided that Howard has agreed in advance in writing to the same. To the extent that such contracts are assigned, Supplier shall represent and warrant that it is not in default under such subcontracts and Third-Party contracts and shall notify Howard of any Subcontractor or Third Party contractor's default with respect to such subcontracts and Third Party contracts of which it is aware at the time. With respect to all Howard agreements for which Supplier assumed operational responsibility under this Agreement, Howard will resume operational responsibility for such agreements, to the extent permitted under such agreements, upon the effective date of expiration or termination of this Agreement (or such other earlier date Howard may reasonably specify if Howard takes a portion of the Services out of scope).

**(ii)  Return to Howard.** Within ten (10) Business Days of beginning the Wind Down Assistance Period, Supplier will return any Howard Equipment (in substantially the same condition it was in when Supplier began use of it, subject to reasonable wear and tear) and all Howard Materials that Howard requests to have returned in accordance with Section

Equipment; Software; Office Space and Other Resources)

. Upon expiration or termination of this Agreement, Howard will own or be the licensee or lessee of, and will have the right to transfer from the Supplier Location(s) to an Howard Entity or Third Party data center selected by Howard in its sole discretion any and all: (1) Howard Equipment; (2) Howard System Software (and associated updates and upgrades); and (3) the automation tools, processes, and procedures that are owned, licensed, or leased by Howard.

**(iii) Software and Other Materials.** Within ten (10) Business Days of beginning the Wind Down Assistance Period, Supplier will obtain for Howard the rights to Supplier-provided Materials in accordance with Section 5.6 (Howard Rights upon Wind Down of a SOW).

**(iv) Howard Resources**. Commencing immediately upon the beginning of the Wind Down Assistance Period, Supplier will grant Successor reasonable access, with Supplier's supervision to all of Howard's resources, data and information, and as otherwise to the extent necessary to carry out Wind Down Assistance.

**(v)  Howard On-Site Resources**. Within ten (10) Business Days after the Wind Down Assistance Period, Supplier will return Howard Resources to Howard (or its applicable Entity) in substantially the same condition as when Supplier began use of them, subject to reasonable wear and tear.

**(vi) Straddling Resources.** Within ten (10) Business Days of beginning of the Wind Down Assistance Period, Supplier will notify Howard if any resources used in the provision of the Discontinued Services are necessary for the provision of those remaining Services, if any, and cannot be duplicated; whereupon the parties will reasonably agree on an appropriate allocation of such resources.

IBM

**SRA Statement of Work**

**(vii) Return of Howard Other Works; Works in Progress.** Commencing immediately upon beginning the Wind Down Assistance Period, Supplier will: (1) provide information to Successor with respect to any work then in progress or in development pursuant to this Agreement; (2) deliver to Successor all such work and all related documentation to the extent Howard would otherwise be entitled to it under this Agreement; and (3) deliver to Successor all Howard-owned, Howard-leased, and Howard-licensed works not otherwise covered by the other provisions of this Section Wind Down Assistance.

**(viii) Bid Assistance.** Commencing immediately upon the beginning the Wind Down Assistance Period and as Howard may require on an ongoing basis during the Wind Down Assistance Period, Supplier will provide to Howard information and other cooperation regarding performance of the Services as reasonably requested by Howard, to enable a Third Party to prepare an informed, nonqualified offer for the performance of services similar to the Services following termination or expiration of this Agreement. The types of information (other than Supplier's internal cost data) and level of cooperation to be provided by Supplier pursuant to this Section Wind Down Assistance (d)(viii) will include all such information and data (e.g., Infrastructure details, including all relevant Equipment, Software, LAN Devices, Servers, Materials, Service Locations, Third Party Resources, etc..) as Supplier may rely on in preparing and submitting its bid.

**(e) Wind Down Assistance Period.** Subject to the extension right in Section Extension of Termination Date, Supplier will provide Wind Down Assistance for up to a one (1) year period commencing upon Howard's reasonable request (i) at any time up to six (6) months prior to the cessation of any Service or portion thereof, or (ii) upon termination or expiration of this Agreement (the "Wind Down Assistance Period"). The parties acknowledge and agree that any Wind Down Assistance Period is included within the time period comprising each SOW Term.

**(f) Hiring.** Howard and/or Howard Entities shall be permitted to hire, effective after the date when Supplier ceases provision of the Discontinued Services: (i) any Transferring Employees; and (ii) Supplier Personnel primarily assigned to the performance of the Discontinued Services during the twelve (12) months preceding such date. Supplier shall waive, and shall use commercially reasonable efforts to cause its Subcontractors, Third Party Service Providers and Affiliates to waive, their rights, if any, under contracts with such personnel restricting the ability of such personnel to be so recruited or hired. Supplier shall provide Howard with reasonable assistance in Howard's, and/or any Howard Entities' efforts to hire such Supplier Personnel. Notwithstanding the foregoing, nothing herein shall be interpreted to limit or restrict Howard, any Howard Entities and/or any Successor from hiring any Supplier Personnel to the extent required by Law.

**(g) Fees for Wind Down Assistance.** To the extent any Wind Down Assistance is requested by Howard that falls outside the scope of Section Wind Down Assistance (a) – (d) above and can be provided by Supplier using personnel and resources already assigned to Howard, there will be no additional charge to Howard for such Wind Down Assistance. However, to the extent any Wind Down Assistance that falls outside the scope of Section Wind Down Assistance (a)-(d) above requires Supplier to use resources other than the Supplier Personnel then currently assigned to the Howard account or to increase the percentage of time dedicated to the provision of the Services by Supplier Personnel, such use and/or increase in time will require the prior written approval of Howard and will be provided at the T&M rates set forth in Attachment 1-E-1(d) (Rate Cards) to the Fee Schedule. Supplier will notify Howard if any resources used in the provision of the Discontinued Services are necessary for the provision of those remaining Services, if any, and cannot be duplicated, whereupon the parties will reasonably agree on an appropriate allocation of such resources.

**(h) Effect of Termination by Supplier.** In no event will any termination by Supplier relieve Supplier of its obligation to provide the Wind Down Assistance requested by Howard; provided however, Howard agrees that in the event of any such termination by Supplier, Supplier will invoice monthly and Howard will pay for any Wind Down Assistance in advance.

- **Survival.**

**SRA Statement of Work**

IBM

Any and all provisions of this Agreement, which by their nature or effect are required or intended to be observed, kept, or performed after the expiration or termination of this Agreement, will survive the expiration or any termination of this Agreement and remain binding upon and for the parties' benefit.

**6.0 Supplier's Use of Subcontractors**

Supplier may subcontract its works under this SOW. IBM reserves the right to reject Supplier's use of a Subcontractor in performance of this Agreement for any reason. Supplier shall enter into a written contract with each Subcontractor it is authorized to retain, with such contract committing each such Subcontractor to comply with all of Supplier's obligations and responsibilities under this Agreement (including the SRA, this SOW, any WAs and any Attachments hereunder). By way of example but not limitation, those obligations and responsibilities include those contained in the Ethical Dealings and Record Keeping and Audit Rights provisions of the SRA. Notwithstanding the foregoing, Supplier's use of a Subcontractor will not relieve Supplier of the responsibility for the Subcontractor's performance.

**7.0 Contractor Safety Guidelines**

Supplier will require its Personnel assigned to work on IBM's or Customer's premises to comply with the U.S. Contractor Environmental and Safety Guide, as may be amended from time to time or a local country equivalent that may be provided by IBM. The US Guide is applicable for all US locations, unless a location specific guide exists for the particular IBM site where the work is to be performed at the following URL:   http://www-03.ibm.com/procurement/proweb.nsf/ContentDocsByTitle/United+States~U.S.+Contractor+safety+guides?OpenDocument&Parent=Information+for+suppliers

**8.0  Project Change Request (PCR)**

Changes to the SOW may be requested by either party. Changes implemented under this procedure also may affect other terms of the Agreement not included in the SOW.

1. A Project Change Request ("PCR") or an alternate mutually agreeable document will be used to communicate any requested change. The requesting party's project manager (or other designee) will draft the PCR and submit it to the other party's project manager (or other designee). The PCR should describe the changes, the rationale for the changes and the effect the changes will have on the Statement of Work or other aspects of the Agreement. The PCR must incorporate the SOW by reference and include an effective date.

2. The parties will review the proposed change and approve it for further investigation, if any, or reject it. The investigation will validate the effect that the implementation of the PCR will have on price, schedule, service level agreements (SLAs) and other terms and conditions of the Agreement.

3. When there is agreement on the PCR, the SOW will be amended when the Supplier signs and Buyer's authorized Procurement representative countersigns the PCR.

4. A Purchase Order or PO alteration that references the PCR may be issued by Buyer to authorize Supplier to perform as required by the PCR. The PCR is not a WA.

**9.0 Additional Business Activity Restrictions when Personnel are On Premises**

1. Supplier will ensure that Supplier Personnel assigned to work on Buyer's or Buyer's Customer's premises will not use Buyer confidential information that Supplier Personnel may be exposed to or have access to while working on Buyer or Buyer's Customer's premises and will not use such information or disclose it by publication or otherwise to any other person during the term of this Agreement and for a period of three (3) years thereafter except as required by law.

2. Supplier shall have a written agreement with each of its Personnel who is involved in the performance of this Agreement sufficient to enable Supplier to comply with the requirements of this Section. Such Personnel agreements will be provided to Buyer upon request.

**10.0 Insurance**

Supplier will maintain at its expense (and provide certificates of insurance at IBM's request) i) all statutory mandated insurance such as workers' compensation and employer's liability, ii) commercial general liability insurance including products liability and completed operations with a minimum per occurrence limit of 2,000,000 USD (or local currency

**IBM**

## SRA Statement of Work

**SRA #** 4917011615
**SOW #** 4917011866

equivalent), and iii) automobile liability insurance (if a vehicle is to be used in performance of this Agreement) of at least 2,000,000 USD (or local currency equivalent). Commercial general liability insurance and automobile insurance policy limits may be met through a combination of primary and umbrella/excess liability insurance and must name IBM as an additional insured. Insurance required under a SOW, WA or Attachment must be purchased either from insurers with an AM Best Rating of A- or better, or with a Standard & Poor's rating of BBB and $50M in policy holder's                                    surplus                         or                          greater.

Notwithstanding the foregoing, the parties agree that no later than 60 days from the effective date of this Agreement, Supplier will obtain and maintain at its expense (and provide certificates of insurance at IBM's request) commercial general liability insurance and automobile liability insurance under the conditions above with a minimum per occurrence limit of 5,000,000 USD (or local currency equivalent).

### 11.0 Communications

All communications between the parties will be carried out through the following designated coordinators or their designated successors or delegates, whom each party hereby designates as its representatives and contacts for this SOW. All notices required in writing under this Agreement will be made to the appropriate contact listed below at the following addresses and will be effective upon actual receipt. Notices may be transmitted electronically, by registered or certified mail, or courier. All notices, with the exception of legal notices, may also be provided by facsimile.

| Business Coordinators | | Technical Coordinators | |
|---|---|---|---|
| **FOR SUPPLIER** | | **FOR SUPPLIER** | |
| Name | Chalfranz Perry | Name | John Huggins |
| Title | COO | Title | Project Manager |
| Address | 10320 Little Patuxent Parkway #200, Columbia MD 21044 | Address | Same |
| Phone | 202-716-0767 | Phone | 301-706-5433 |
| Fax | 866-255-6980 | Fax | Samer |
| E-mail | cperry@matekinc.com | E-mail | jhuggine@matekinc.co |
| | | | |
| **FOR BUYER** | | **FOR BUYER** | |
| Name | | Name | |
| Title | | Title | |
| Address | | Address | |
| Phone | | Phone | |
| Fax | | Fax | |
| E-mail | | E-mail | |

### Miscellaneous Provisions

**The undersigned parties** agree that (i) they have read the SRA, (ii) they have the right and authority to execute this SOW (which incorporates by reference the SRA) and (iii) they agree to be bound by the terms and conditions of the SRA and SOW and any Attachments hereto or thereto as if the undersigned were the named parties in the SRA.



## SRA Statement of Work

**SRA** # 4917011615
**SOW** # 4917011866

**ACCEPTED AND AGREED TO:**

By: International Business Machines Corporation

_____  7/7/2017

Buyer Signature                    Date

Maurice Torruella

_____

Printed Name

SRM,Connectivity

_____

Title & Organization

2455 South Road
Poughkeepsie, NY,
12603

_____

Buyer Address:

**ACCEPTED AND AGREED TO:**

By: MATEK, Inc.                June 30, 2017

_____

Supplier Signature                Date

Andrew P. Woods, III

_____

Printed Name

CEO & President, Matek, Inc.

_____

Title & Organization

Matek, Inc.

10320 Little Patuxent, Suite 200

Columbia, MD 21044

_____

Supplier Address:



**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

**ATTACHMENT-1
DESCRIPTION OF DELIVERABLES AND SERVICES**

**Voice Communications Services Overview.**

Supplier will provide end-to-end services and activities required to provide and support Customer's Voice Communications Services network implemented within the IBM provided/implemented network environment that transports data and voice traffic related to Customer and Third Party applications including but not limited to financial and business applications, web applications, video and associated video applications and IP/VOIP telephony system traffic , across all Customer Locations within the base line buildings, as the Network exists as of the Agreement Effective Date and as it evolves during the Term (collectively, the " Voice Communications Services"), as well as any other services, functions and responsibilities that could reasonably be viewed as being included in the expenditures in the Customer Base Case, in a manner that meets the Service Levels  and all Customer Standards for the Voice Communication Service. Nothing in this Schedule shall restrict Supplier's obligations under the Agreement in terms of continuous improvement and innovation with respect to all technology used.

Supplier's end-to-end responsibilities for the Voice Communication Services include the following:

- Comprehensive Voice Services monitoring and Management for the RCN Hosted Voice Solution and the RCN provided networks supporting the hosted solution.

- Responsibility for the interoperability of all Managed voice sites

- Supplier-provided and Managed Voice Communications Services, including but not limited to:

   o  Supplier hosted IP/VOIP-based Telephony Services

   o  Voice Messaging Services

   o  Auto Attendants

   o  Voice Conferencing Services

   o  E-fax Services

   o  E911 Services

- Customer legacy Voice Communications systems, including but not limited to:

   o   PBX and Premise Phone Systems

   o  IP/VOIP systems

   o  Key Systems

   o  Voice messaging systems

   o  Smart phone interface system



**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

      o   Other Services, including:

          ▪   Supplier will determine the location and support for ADA-compliant Services (e.g., TDD, hearing impaired volume control, sight impaired devices)

- Voice Network, including but not limited to:

      o   Local Service (dial tone)

      o   Long Distance

      o   Soft Phones to support (100) clients / devices

      o   Inbound Toll-free

      o   411 Services

      o   Managed call accounting system (billing) administration

- Class of service Management for Customer users

- Direct Inward Dial (DID) Management

- Miscellaneous analog based devices and connectivity, including but not limited to:

      o   Alarms

      o   Modems

      o   Fax lines

      o   Facility Management systems (e.g., badges, HVAC)

During the Term, Voice Communications Services will support changing Customer business, regulatory and technical requirements and will incorporate new technical and services solutions that meet Customer's requirements, SLAs, and business objectives.

**Service Objectives**

Supplier shall use its best efforts to meet the following key high-level objectives for the Voice Communications Services:

Cost-effective and scalable end-to-end Voice Communications Services solutions (e.g., Premise-based, Supplier hosted) including a secure, reliable and scalable IP/VOIP-based telephony services solution that meets Customer business and service level requirements;

Acquire Supplier services solutions that offer Customer users standard IP/VOIP telephony functions and features and offer additional enhanced telephony and other IP-based communications applications, functions and features;



**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

Provide Supplier services solutions that optimize costs by matching technical solutions (e.g., End User devices, applications, services) to user requirements; and

**Cost effectively maintain Customer's legacy voice Infrastructure with appropriately skilled staff to meet established Service Levels until migration to Supplier-provided IP/VOIP telephony solutions has been achieved.**

**SERVICE ENVIRONMENT**

This Section describes the scope of the service environment to be supported by Supplier.  Supplier will continually maintain and update the lists set forth in the Appendices throughout the Term as New Services and environment components are added and as Services and components are removed, in each case as reviewed and approved by Customer.  The then-current lists will be made available to Customer on a quarterly basis and upon Customer's request.

**Voice Communication Hardware and Software.**

Supplier will support hardware and Software in the Voice Communications environment, including such hardware and Software existing as of the Agreement Effective Date and new hardware and Software added during the SOW Term (the "Voice Communications Hardware" and "Voice Communications Software", respectively).

**Supplier Voice Communications Tools.**

Supplier will provide the tools, other than those provided by Customer, that are required for Supplier's delivery of the Voice Communications Services Voice Communications Services.

IBM

**SRA Statement of Work**

**Project Dependencies**

- Howard University provides accurate cable run list for the data and voice cabling.
- Howard University provides the Voice Customer Service records, current phone bills, dial plans, extensions and the IVR requirements.
- Howard University will provide the phone number and location of all in scope analog lines supporting elevators, fax machines, security systems, etc.
- Howard University provides accurate 'red-line' building floor plans with the location of legacy Telco Room closets, wireless access points and phone locations.
- IBM provided equipment is provided on a timely basis.
- 80% of the current Howard University cable plant is reusable to support VoIP.
- 50% of the current Howard University WAP cable plant is reusable to support the new project WAPs
- Howard University provides a minimum of 1,000 square feet of secured warehouse space.
- Howard University provides escorts until Matek personnel are cleared and badged.
- Howard University provides adequate access to the campus to support the Matek Project Plan.
- All open legacy voice trouble / incident tickets are resolved and closed prior to the commencement of Matek's responsibility to support the legacy environment.
- Howard University provides the service / help desk to support the Voice Communication Solution.
- Existing and adequate pathways for all new copper and fiber cabling
- Howard University's PBX consultant provides sufficient support and accurate details for the knowledge transfer.

**General Responsibilities.**

The Voice Communications Services include the general functions identified as Supplier's responsibility in the following matrix.

**General Roles and Responsibilities**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1. Provide Voice Communications strategies and requirements (e.g., functional, security, regulatory) | | R |
| 2. Provide recommendations for Voice Communications strategies and requirements | | R |
| 3. Provide Voice Communications design and engineering to meet Customer strategies and requirements | | R |
| 4. Approve Voice Communications design and engineering | R | |
| 5. Provide Supplier end-to-end (e.g., provision, install, implement, configure, Manage, operate, administer, maintain) Voice Communications Services solutions (e.g., IP/VOIP Telephony, Voice Conferencing, Messaging, Call Center) with standard and enhanced services, functions, features and applications that meet Customer requirements (e.g., functional, security, regulatory) and SLAs and that encompass all of the Components | | R |
| 6. Procure, deploy and support Customer-approved devices including headsets, handsets, wireless phones, common area phones, conference room phones, red/emergency phones, etc. | | R |

IBM

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 7. Review and approve Supplier end-to-end Voice Communications Services solutions | R | |
| 8. Design and implement new and emerging Voice Communications solutions to meet changes in Customer's business requirements | | R |
| 9. Manage, support and maintain Customer's legacy voice communications systems until such time that they are replaced with Supplier provided Voice Communications Services solutions per the Customer-approved replacement timeline | | R |
| 10. Provide Incident and Problem Resolution for all Voice Communications Services and components | | R |
| 11. Provide activity reporting in support of law enforcement and other forensic activities | | R |
| 12. Other than Customer's Voice Communications Services component assets as of the Agreement Effective Date, procure and own all Voice Communications Services components (e.g., hardware, Software, carrier network connectivity, peripherals) | R | |
| 13. Manage and maintain voice circuits for specified Customer Locations | | R |
| 14. Coordinate with carriers to provide connectivity for specified Customer Locations | | R |
| 15. Coordinate Service delivery with Customer and other support groups (e.g., Service Desk) and other Third Parties (e.g., IMACDs, Service Requests) | | R |
| 16. Provide Customer with a detailed explanation of outages that identify the regional impact, source of outage, and preventative measures being taken to prevent future similar outages | | R |
| 17. Provide broadcast notification of any outages | | R |
| 18. Manage user accounts (e.g., account set up, password resets, account deletions and terminations) and provide administrative support in accordance with Customer information security policies | | R |
| 19. Manage and maintain Customer's legacy voice communications spares inventory as required to meet Customer requirements and Service Levels | | R |
| 20. Provide billing (e.g., OCNET, toll charges, 411, long distance, conferencing) reporting per Customer requirements and assist Customer with Resolving any billing inquiries | | R |
| 21. Support Customer ad hoc requests for emergency events and preparatory planning | | R |
| 22. Manage and maintain miscellaneous components and connectivity associated with analog devices (e.g., alarms, paging systems, modems, fax lines) | | R |
| 23. Provide End User training documentation and training (e.g., telephony functionality training, voicemail training) | | R |
| 24. Provide and maintain conduit circuit diagrams | | R |
| 25. Retain ownership of DIDs | R | |

**SRA Statement of Work**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 26. Manage DIDs schema and process based on Customer approved dial plan and policies | | R |
| 27. Provide staffing and infrastructure required to staff ad hoc call centers (up to 50 stations) | | R |
| 28. Provide interoperability between Supplier-supported infrastructure and existing VOIP deployments not in scope | | R |
| 29. Program common handset features, such as speed-dial, multi-line appearances, etc. as directed by Customer | | R |
| 30. Plan, implement and administer optimal and appropriate Equipment and Supported Software in providing the Voice Communication Services, including as to meet or exceed all Performance Standards and to achieve the transformative goals of the Agreement | | R |
| 31. Maintain a current inventory of all phone numbers, circuits, software, hardware and devices that are used in, connected to and/or related to the Customer Network, and replace devices according to the Refresh Plan | | R |
| 32. Manage all Third Party providers of Voice Communication Services related to the Customer Network, including: (a) performing maintenance, monitoring, reporting, and Resolution of Incidents; (b) Managing and maintaining the equipment lines and circuits at Customer Locations; (c) where applicable, reporting performance against service levels under the applicable Third Party agreement, in a mutually agreed-upon format and frequency; and (d) coordinating with Customer Entities and Management of Third Parties (e.g., Equipment and software vendors, service providers) as required (e.g., Third Party hardware maintenance) to deliver the Services | | R |
| 33. Facilitate consistency of experience across all End User population | | R |

**Telephony Services**

Supplier shall perform the services necessary to provide Telephony Services to employees and in public areas throughout Customer Facilities or Customer-occupied facilities. Telephony Services include providing planning and assessment, design, engineering, provisioning, implementation, training and ongoing monitoring and Management of Supplier-provided standard and enhanced Telephony Services solutions and the Management, operation and maintenance of Customer legacy telephony systems until retirement.

Services shall be delivered to specified Customer sites and users through Supplier-provided solutions or through support of existing Customer telephony systems. Telephony Services environment components include, but are not limited to, PBX, IPBX, key systems, Premise-based or Supplier hosted VOIP systems, single-line telephones, multi-line telephones, consoles, fax lines, modem lines, and auxiliary equipment, which also include headsets and speakerphones. Telephony Services allows authorized callers to receive incoming calls and to make intra-campus, inter-campus, outside local, outside long distance, and international calls (limited stations). The following table identifies the roles and responsibilities associated with Telephony Services that Supplier and Customer shall perform.

**Telephony Services Roles and Responsibilities**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1. Provide Telephony requirements (e.g., locations, number of sets, functions and features, maintenance schedules) | A | R |

**IBM**

## SRA Statement of Work

**SRA** # 4917011615
**SOW** # 4917011866

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 2.  Provide Telephony design and engineering | | R |
| 3.  Approve Telephony design and engineering | R | |
| 4.  Provide Supplier end-to-end Telephony Services solutions and systems (e.g., provision, install, implement, configure, Manage, operate, administer, maintain) with standard and enhanced services, functions, features and applications that meet Customer requirements and SLAs and that encompass all of the telephony components | | R |
| 5.  Review and approve Supplier Telephony Services solutions | R | |
| 6.  Provision, install, configure, operate, administer, monitor and maintain Supplier-provided or Customer-provided remote and Premise-based Telephony equipment, software, services and associated peripherals | | R |
| 7.  Manage, support,maintain and coordinate repairs of the Customer's legacy Premise Telephony systems until such time that they are replaced with Supplier-provided Voice Telephony Services solutions per the Customer-approved replacement timeline | | R |
| 8.  Provide end to end internal and external Telephony connectivity including configuration of hardware, software, services and/or peripherals | | R |
| 9.  Provide e-911 database and management interface, using an authorized e-911 provider | | R |
| 10. Provide and support adaptive voice telecommunications services and equipment as required by laws affecting the support of the disabled | | R |
| 11. Define End User dialing plan authorizations and privileges | R | |
| 12. Implement, Manage and maintain Customer dialing plans | | R |
| 13. Provide physical and logical installations, moves, adds, changes and disposals (IMACDs) | | R |
| 14. Provide Incident and Problem Resolution (e.g., line static, dropped calls) through coordination of Third Party Resolution activities | | R |
| 15. ~~Provide cellular and satellite phone Management~~ 16. ~~*MOBI Service~~ | R | |
| 17. Conduct maintenance activities according to maintenance plans, schedules, and provide maintenance reporting | | R |
| 18. Own and assign DIDs | R | |
| 19. Implement and Replicate Customer-designed call routing scheme (i.e., dial plans, voice policies, etc.), as approved by Customer | A | R |
| 20. Conduct required testing of Premise equipment as required (e.g., backup power and balancing on PBX equipment) | | R |

## Voice Network Services

Voice Services are those activities required to provision and support the following voice network components: local service; long-distance service; and toll-free inbound services to Customer End Users requiring local, intrastate,

**IBM**

## SRA Statement of Work

**SRA #** 4917011615
**SOW #** 4917011866

interstate, and international calling from the Customer Facilities.  The following table identifies the Voice Network Services roles and responsibilities that Supplier and Customer shall perform.

### Voice Network Services Roles and Responsibilities

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1.   Provide Voice Services strategies and requirements | A | R |
| 2.   Provide Voice Services strategies and requirements recommendations | | R |
| 3.   Provide Voice Services design, engineering and implementation to meet Customer strategies and requirements and SLAs and that encompass all of the voice network components | | R |
| 4.   Approve Voice Services design and engineering | R | |
| 5.   Provide local and long-distance Voice Services for specified Customer customers | | R |
| 6.   Provide local and long-distance usage monitoring and reporting for specified Customer customers | A | R |
| 7.   Provide access to long-distance directory assistance services for specified Customer customers | | R |

## Voice Messaging

Voice Messaging Services are those activities required to support the following voice messaging components: the efficient storage and retrieval of voice messages enterprise-wide plus support of related voice messaging applications. The following table identifies the roles and responsibilities associated with Voice Messaging services that Supplier and Customer shall perform.

### Voice Messaging Services Roles and Responsibilities

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1.   Provide Voice Messaging Services requirements (e.g., maintenance requirements, capacity requirements, functional requirements, failing components strategy) | A | R |
| 2.   Provide Voice Messaging Services design and engineering to meet Customer requirements | | R |
| 3.   Approve Voice Messaging Services design and engineering | R | |
| 4.   Provide Supplier end-to-end Voice Messaging Services solutions (e.g., provision, install, implement, configure, Manage, operate, administer, maintain) with standard and enhanced services, functions, features and applications that meet Customer requirements and SLAs and that encompass all of the voice messaging components | | R |
| 5.   Review and approve Supplier Voice Messaging Services solutions | R | |
| 6.   Manage, support, maintain Customer's legacy Voice Messaging systems and coordinate repairs until such time that they are replaced with Supplier-provided Voice Messaging Services solutions per the Customer-approved replacement timeline | | R |
| 7.   Monitor and report on Voice Messaging usage | | R |
| 8.   Manage Voice Messaging storage capacity | | R |

**SRA Statement of Work**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 9.  Manage Voice Messaging retention per Customer requirements and external regulations | | R |
| 10. Conduct mailbox moves, adds and changes | | R |
| 11. Maintain mailboxes configurations by user | | R |
| 12. Provide new user training material | | R |
| 13. Conduct maintenance activities according to maintenance plans, schedules, and provide maintenance reporting | | R |
| 14. Provide auto attendant setup, documentation, recording and support services | | R |
| 15. Manage and maintain auto attendants | | R |
| 16. Manage and maintain voice mail applications | | R |

**Voice Conferencing Services**

Supplier shall provide Voice Conferencing Services that provide Customer users with conference capabilities. The Voice Conferencing Services components include: the planning and assessment, implementation, training, and ongoing Management necessary to implement Voice Conferencing Service. An array of features will be supported with the delivered services. The following table identifies the roles and responsibilities associated with Voice Conferencing Services that Supplier and Customer shall perform.

**Voice Conferencing Services Roles and Responsibilities**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1.  Develop Voice Conferencing Services requirements | | R |
| 2.  Design Voice Conferencing Services to meet Customer requirements | | R |
| 3.  Approve Voice Conferencing Services | R | |
| 4.  Provide Supplier end-to-end Voice Conferencing Services solutions (e.g., provision, install, implement, configure, Manage, operate, administer, maintain) standard and enhanced services, functions, features and applications that meet Customer requirements (e.g., maximum number of lines, maximum number of participants per voice conference) and SLAs and that encompass all of the voice conferencing components | | R |
| 5.  Review and approve Voice Conferencing Services solutions | R | |
| 6.  Provide support for the setup of conferencing sessions, including daily operations (on-site or remotely, as applicable) of video conference equipment, and full functionality in conference rooms, in order to ensure necessary video conferencing throughput and availability, such as providing: (a) setup of on campus video conferencing sessions, using the standard video capabilities of the RCN solution and cross-training of same for Customer administrative assistants; (b) IMACDs for video conferencing equipment at Customer Locations; (c) configuration, activation, and support for web conferencing services; (d) direction and oversight for remote site video conferencing services; (e) video conference Incident Management; and (f) daily checks to ensure video systems fully functional | | R |

**SRA Statement of Work**

IBM

SRA # 4917011615
SOW # 4917011866

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 7. Create and maintain a monthly summary report by host, including: conference types, total number of connects, total number of minutes, total call charges, total feature charges, and total charges | | R |
| 8. Create and maintain a year-to-date (YTD) summary report by host, including: conference types, total number of connects, total number of minutes, total call charges, total feature charges, and total charges | | R |
| 9. Provide outside Voice Conferencing conference bridges for Customer use in case of emergency or unavailability of Customer conference bridges | | R |
| 10. Provide broadcast capability for Customer wide broadcasts as required | | R |

**Video Conferencing Services**

Video Conferencing services are the activities that provide End Users with capabilities for the following components: video conferences, video productions, Webcasting, streaming services and audio-visual support services. Webcasting and streaming video services enable the broadcasting of important events over the Internet. Video Services include planning and assessment, implementation, training, and ongoing Management. The following table identifies the Video Services roles and responsibilities that the Supplier and Customer will perform.

**Video Conferencing Services Roles and Responsibilities**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1. Develop Video Services strategies and requirements | | R |
| 2. Design Video Services to meet Customer strategies and requirements | | R |
| 3. Approve Video Services design | R | |
| 4. | | |
| • | | |
| 5. | | |
| 6. Acquire and support video conferencing associated infrastructure (e.g., bridges, camera, TV sets, electronic classroom) | R | |
| 7. Monitor and support calls in progress | | R |
| 8. Maintain and Manage video conference calendar, reservations and room scheduling | | R |
| 9. Manage video room clock coordination | | R |
| 10. Deliver monthly summary reports by host, showing month-by-month and YTD information on conference activity. | | R |
| 11. Provide provisioning support for video conferencing | | R |
| 12. Identify and define requirements for video production Services | R | |
| 13. Provide capabilities for webcasting and streaming video for important events | | R |

**IBM**

**SRA Statement of Work**

**Operations, Administration & Management**

The following table identifies the Operations and Administration roles and responsibilities     that     Supplier and Customer will perform

**Operations, Administration & Management Roles and Responsibilities**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1. Provide Customer with a daily detailed explanation of outages that identify the regional impact, source of outage, and preventative measures being taken to prevent future similar outages | | R |
| 2. Manage End-User accounts (e.g., account set up, password resets, account deletions and terminations) and provide administrative support (online directory services to maintain and update the directory in accordance with the Service Levels) for all Voice Communications Services according to the Customer Standards and Policies | | R |
| 3. Coordinate with the appropriate Customer Personnel for the procurement of headsets, handsets, gateways, trunks (SIP & PRIs), ITFS numbers, DIDs, miscellaneous supplies, etc. to be used in the Customer-approved communications systems deployment and installation | | R |
| 4. Coordinate with the appropriate Customer Personnel to distribute communications and announcements to End-Users for Customer-approved communications systems training registration, go-live dates, and other important updates and ensure that a post-implementation survey is performed after each site to measure customer satisfaction | | R |
| 5. Evaluate, improve and deliver Customer's existing Customer-approved unified communications systems training approach, which consists of a virtual classroom, quick reference guides, live online training and classroom training when each Customer Location starts deploying Customer-approved communications systems | | R |
| 6. Provide proactive and reactive Voice Communications Services fraud and security Management and reporting | | R |
| 7. Provide, administer, implement, and Manage Service Requests for physical and logical IMACDs | | R |
| 8. Notification to Help Desk of Priority 1, 2, or 3 outage | | R |
| 9. Backup any voice-related configuration management systems at least weekly and after every change in configuration | | R |

**Directory Listing Services**

Supplier shall provide Directory Listing Services which include developing and maintaining an accurate Customer employee and department directory.  The following table identifies the Directory Listing Services roles and responsibilities that Supplier and Customer shall perform.

**Table 8.          Directory Listing Services Roles and Responsibilities**

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 1. Provide Directory Listing Services requirements | | R |

**SRA Statement of Work**

IBM

**SRA** # 4917011615
**SOW** # 4917011866

| Roles and Responsibilities | IBM | Matek |
|---|---|---|
| 2.   Provide recommendations to meet Customer requirements | | R |
| 3.   Approve Directory Listing Services recommendations | R | |
| 4.   Provide publishable numbers for the directory | R | |
| 5.   Maintain a searchable on-line repository of Customer employee directory information, in accordance with Customer requirements | | R |
| 6.   Provide and maintain a searchable on-line repository of Customer department directory information | | R |
| 7.   Provide tools and procedures to update directory information in real time | | R |
| 8.   Provide End User read-only intranet access to the directory | | R |
| 9.   Provide administrative support to maintain and update the directory in accordance with Customer policies and procedures | | R |
| 10.  Provide and maintain phone-displayed directory | | R |

**Wireless Access Point design and installation**

Supplier will survey the existing in scope Customer University buildings and complete a predictive analysis and RF Wi-Fi analysis for each in-scope building using best practices. The analysis will use tools specific to support Aerohive Wireless Access Points. IBM will provide the new WAP(s) which will be 802.11ac Wave2 compliant.

Supplier will install the new WAP(s) to provide coverage within each in-scope building using manufacturer's instructions and installation methods that were deployed with the legacy installed WAPS. Supplier will install a maximum of 1900 WAPS(s) to support the Customer University Wireless Solution.

Supplier will reuse approximately fifty percent of the existing legacy CAT5E WAP cabling supporting the legacy installed WAPS(s).

Installation will include the following:

- Predictive and RF Wi-Fi surveys and analysis
- Redline existing floor plans with the location of the new WAP(s)
- Install WAP(s) using manufacturer's installation kit or legacy installation hardware
- Reuse or provide new CAT6 cable installation from the new WAP to the designated patch panel in a telecommunication room.
- Test and label all cabling
- Work with IBM to validate that all WAP(s) can be identified by the network management solution.

**SRA Statement of Work**

IBM

**SRA** # 4917011615
**SOW** # 4917011866

**ATTACHMENT 1-N-1**

**TRANSFORMATION MILESTONES**

**TABLE OF CONTENTS**

1.0    Transformation Milestones, and Acceptance Criteria ................................................................45

1.1    Transformation Milestone Description ....................................................................................45

1.2    Acceptance Procedure ...........................................................................................................45

1.3    Acceptance Criteria ...............................................................................................................46

1.4    Transformation Milestones Missed. ......................................................................................46

1.5    Transformation Milestones ....................................................................................................47

1.6    Transformation Milestones dates ..........................................................................................48

1.6    Transformation Credits and Earn Back .................................................................................49

IBM

## SRA Statement of Work

SRA # 4917011615
SOW # 4917011866

**1.** Transformation Milestones, and Acceptance Criteria

1.1 Transformation Milestone Description

This document describes the Transformation Milestones, which the Supplier shall meet as part of the Transformation services during the Transformation period and the associated Acceptance Criteria.

The defined terms used in this Document are defined in the context in which they are used and shall have the meanings therein indicated. Capitalized terms used but not otherwise defined shall have the meanings set forth in the Agreement.

As defined in Section 1.5.a below, the Supplier will complete, and obtain IBM's approval of, an updated Transformation Plan. The final detailed Transformation Plan will detail the specific activities to be performed by each Party, and, unless otherwise requested by Supplier and agreed by IBM in its sole discretion, will be consistent in all material respects with the preliminary Supplier Transformation Plan attached as <u>Schedule 1-N</u>, including with respect to the activities, deliverables, and Transformation Milestones. The Supplier will address and resolve any questions or concerns IBM may have as to any aspect of the final detailed plan and will incorporate any modifications, additions or deletions reasonably requested by IBM subject to the Parties first agreeing upon any consequential changes (which may include additional or reduced Charges) resulting from the same. When approved by IBM, the final detailed Transformation Plan will be appended to and incorporated in this Agreement, and will supersede and replace the prior Transformation Plan. The Transformation Plan may thereafter be amended as mutually agreed by the Parties. Without limiting the foregoing, the final detailed Transformation Plan will specifically identify, among other things, (i) the deliverables to be completed by Supplier, (ii) the date(s) by which each such activity or deliverable is to be completed, (iii) which specific dates, deliverables and activities are to be considered Transformation Milestones for the purposes of this Agreement (it being agreed and acknowledged by IBM that not all dates in the Transformation are Transformation Milestones), (iv) Acceptance Criteria for Transformation Milestones, and (v) contingency or risk mitigation strategies to be employed by Supplier in the event of disruption or delay, The updated and final detailed Transformation Plan also will identify any related documents contemplated by this Agreement and/or required to effectuate the Transformation that will be executed by the Parties.

1.2 Acceptance Procedure

(a) The Supplier's final performance and/or delivery of Transformation services in accordance with each Transformation Milestone shall be subject to IBM's Acceptance. This <u>Section 1.2</u> sets forth the procedures that shall apply to IBM's Acceptance of each of the Transformation services for which there is an associated Transformation Milestone, and the specific criteria applicable to IBM's Acceptance of each Transformation service for which there is an associated Transformation Milestone.

(b) Upon the Supplier's completion of each Transformation service for which there is an associated Transformation Milestone, the Supplier shall submit to IBM written notification to IBM Executive Sponsor (each such notification, a "**Transformation Milestone Submission Notice**"): (i) that the Supplier reasonably believes it has met each of the Acceptance Criteria (as set forth below) for the applicable Transformation Milestone; and (ii) seeking IBM's Acceptance that the applicable Transformation service has been successfully completed in accordance with the Transformation Milestone.

(c) Each Transformation Milestone Submission Notice shall be subject to IBM's approval. Upon receipt of each Transformation Milestone Submission Notice, IBM shall review such Transformation Milestone Submission Notice and shall notify the Supplier in writing within five (5) business days of receipt (the "<u>**Acceptance Review Period**</u>") (each such IBM response, a "**Transformation Milestone Submission Response**") that either: (i) IBM agrees that the Acceptance Criteria have been

**IBM**

**SRA Statement of Work**

substantially met in all material respects and that the Transformation service has been completed in accordance with the Transformation Milestone (each such approval a "**Transformation Milestone Final Approval**"); or (ii) IBM, acting reasonably, does not agree that the applicable Acceptance Criteria for the Transformation Milestone have been substantially met, and thus the Transformation Milestone is incomplete (each such failure, a "**Nonconformity**").

(d)   In the event of a Nonconformity, IBM shall notify the Supplier in writing (within the Transformation Milestone Submission Response) specifying the nature of the failure in reasonable detail.   The Supplier shall then propose for IBM's approval a new completion date for remedying the Nonconformity and meeting the Transformation Milestone.

(e)   If IBM does not issue a Transformation Final Approval or deliver a notice of Nonconformity with reasonable details to Supplier by the end of the Acceptance Review Period, Supplier will so inform IBM and provide IBM an additional Acceptance Review Period of at least five (5) business days. IBM will be deemed to have accepted the Transformation Milestone, and delivery by Supplier of the Transformation Milestone will be deemed Completed, as of the end of this additional Acceptance Review Period if IBM does not deliver a notice of Noncompliance within the additional Acceptance Review Period. The target completion dates for all Transformation Milestones shall be extended automatically by any such extension of the Acceptance Review Period.

(f)   In respect of unexcused Nonconformities which is notified to Supplier during the Acceptance Review Period, at no additional charge to IBM, the Supplier shall: (i) correct the Nonconformity (and any other material problems of which the Supplier has knowledge) so that the Transformation Milestone meets the applicable Acceptance Criteria on or before the rescheduled completion date; and (ii) submit a new Transformation milestone completion notice for such Transformation Milestone. The Parties shall thereafter follow the same procedures as set forth in **Sections 1.2(b)-(e)** above as to the identified Nonconformities only.

1.3   Acceptance Criteria

Acceptance by IBM of each Transformation service for which there is an associated Transformation Milestone shall be subject to the Supplier's completion of (and demonstration to IBM of the completion of) each of the following Acceptance Criteria for each such Transformation service.  IBM shall accept documentary Deliverables if they: (i) are complete in all material respects, (ii) incorporate or reasonably reflect consideration of IBM's comments; and (iii) meet applicable quality standards contained in the Agreement.

The Parties shall agree, within 90 days after the Effective Date, for each non-documentary Transformation Milestones, a reasonable and objective checklist of the tasks reasonable required to complete each such Transformation Milestone, and such checklist shall be the Acceptance Criteria for the Transformation Milestones.

1.4   Transformation Milestones Missed.

(a)   In the event any Transformation Milestone is not Completed by the applicable target completion date set forth in this Attachment 1-NN-1 (as the same may be adjusted in accordance herewith) (each, a "**Completion Date**"):

(1)   Supplier Caused Transformation Milestone Target Completion Date Miss.  IBM will receive a credit of 8% of the Total Contract Transition and Transformation Charge multiplied by the figure in the "percentage of total credit" column included in the Critical Transformation Milestone Table below for the applicable missed Critical Milestone (Example: If IBM misses the first milestone for the data center core the credit would be $6,667,905 *0.08 *0.15 = $80,015).  The Supplier may earn back Transformation Milestone Credits with respect to its failure to meet Critical Transformation Milestones. If the Supplier achieves the Transformation Completion for the milestone, and the following milestone Critical Transformation Milestone, on or before the Completion date specified for the following Critical Transformation Milestone, the Supplier shall be entitled to the return of the

IBM

## SRA Statement of Work

SRA # 4917011615
SOW # 4917011866

50% of the Transformation Milestone Credits paid in connection with its prior failure to meet Critical Transformation Milestone.

(2)   In the event IBM causes a Transformation Milestone Completion Date miss, the Supplier will continue to receive their monthly invoice without any credits due to the client.

In this Document, "Completion" or "Completed", in respect of each Transformation Milestone, shall mean the earlier of the date that (1) IBM issues a Transformation Final Approval in respect thereof, (2) Supplier has corrected all Nonconformities in the applicable Transformation Milestone.

1.5   Matek Critical Transformation Milestones
The following are the Critical Transformation Milestones and associated Acceptance Criteria:

(a)   <u>Data Center Core ready to accept traffic</u>

Acceptance Criteria:

(1)   Detailed design of the RCN network at Lanham, MD Mega POP, the new MPOP2 as well as revise the design for the existing MPOP1is done. This design does not include the Howard University Network Core Design.

(2)   10Gb ISP circuit using existing campus fiber is installed.

(3)   Lanham MD MegaPOP Core is connected to both MPOP1 and MPOP2, and diverse paths to MPOP1 and MPOP2 is installed

(b)   Data Center Core implemented.  The new core will replace the components of the existing core and the existing components will be sunset.

Acceptance Criteria:

(1)   The MPOP at Howard University has been shut down.

(c)   Priority "1" buildings setup with Wireless service, VOIP Phase 2 done and Closet Rehabilitation and Conversion to 802.11ac Wave 2 Wireless Mobility

Acceptance Criteria:

(1)   Rehabilitation of the network wiring closets is done

(2)   Category 5E/6 cabling, and implement structured wiring in the LAN closets.

(3)   New 802.11ac Wave 2 (next generation wireless better coverage, higher capacity) wireless access points in the building are installed and operational.

(4)

(5)   WAPs with dual 5.0 GHz radios and a third 2.4 GHz radio are installed which provide full 802.11ac technology performance with data rates up to 2.6 Gbps to service Howard University faculty and student Wi-Fi access needs.

(6)   Built-in BLE (Bluetooth Low-Energy) radio to enable proximity, indoor location tracking, and other location-based mobile engagement services is installed

(7)   New IP telephony handsets are installed– enabling the fuller range of feature and function available on converged voice and data networks installed

(8)    Each IDF has fiber connectivity which will aggregate to the building MDF location for connectivity to the campus fiber.

(d)   Priority "2" buildings setup with Wireless service, VOIP Phase 2 done and Closet Rehabilitation and Conversion to 802.11ac Wave 2 Wireless Mobility

IBM

**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

Acceptance Criteria:

(1)    Analog to Priority "1" buildings

(e)    50% of Priority "3" buildings setup with Wireless service, VOIP Phase 2 done and Closet Rehabilitation and Conversion to 802.11ac Wave 2 Wireless Mobility

Acceptance Criteria:

(1)    Analog to Priority "1" buildings

(f)    100% of Priority "3" buildings setup with Wireless service, VOIP Phase 2 done and Closet Rehabilitation and Conversion to 802.11ac Wave 2 Wireless Mobility

Acceptance Criteria:

(1)    Analog to Priority "1" buildings

(g)    100% of Priority "4" buildings setup with Wireless service, VOIP Phase 2 done and Closet Rehabilitation and Conversion to 802.11ac Wave 2 Wireless Mobility

Acceptance Criteria:

(1)    Analog to Priority "1" buildings

Critical Transformation Milestones Table

| Milestone Number | Transformation Milestone | Date | Completion Criteria | percentage of total credit |
|---|---|---|---|---|
| 1 | Data Center Core is 'stood up' and ready | September 22, 2017 | Install (4) Data Cabinets in Data Center with power and ground. Provide a minimum of one fiber path | 5 |

**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

| | | | | |
|---|---|---|---|---|
| | | | from the campus MPOP-1 to the Data Center. | |
| 2 | Data Center Core Implemented | December 29, 2017 | The New Core is the primary network traffic mechanism for IBM University. Both POP1 & POP2 have been completed and will support traffic between Lanham Data Center and Howard University Campus. | 15 |
| | **Building oriented Services** | | | |
| 3 | Buildings with priority 1 done | TBD after Transformation assessment | For buildings with priority 1 network wiring closets finished, Wireless design complete and new wireless access points installed and cabled. VOIP Rollout Phase 2 done | 15 |
| 4 | Buildings with priority 2 done | TBD after Transformation assessment | For buildings with priority 2 network wiring closets finished, Wireless design complete and new wireless access points installed and cabled. VOIP Rollout Phase 2 done | 10 |
| 5 | 50% of buildings with priority 3 done | TBD after Transformation assessment | For 50% of buildings with priority 3 network wiring closets finished, equipment with new wireless infrastructure setup, VOIP Rollout Phase 2 done | 10 |
| 6 | 100% of buildings with priority 3 done | TBD after Transformation assessment | For 100% buildings with priority 3 network wiring closets finished, Wireless design complete and new wireless access points installed and cabled. VOIP Rollout Phase 2 done | 10 |
| 7 | Buildings with priority 4 done | +24 month | For buildings with priority 4 network wiring closets finished, Wireless design complete and new wireless access points installed and cabled., VOIP Rollout Phase 2 done | 30 |

1.6     Transformation Credits and Earn Back

       (h)     If the Supplier fails to obtain Transformation Milestone Final Approval on or before the applicable Critical Transformation Milestone date for a particular Transformation Service for which there is an associated Transformation Milestone Credit, the Supplier shall credit IBM as described in Section 1.4.

       (i)     The Supplier may earn back Transformation Milestone Credits with respect to its failure to meet Critical Transformation Milestones.  If the Supplier achieves Transformation Completion on or before the date specified in following Critical Transformation Milestone,

**IBM**

**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

the Supplier shall be entitled to the return of all Transformation Milestones Credits paid in connection with its prior failure to meet Critical Transformation Milestones.

(j)  The Supplier acknowledges and agrees that the Transformation Milestone Credits shall not be deemed or construed to be a sole and exclusive remedy or in derogation of any other rights and remedies IBM has hereunder or under the Master Agreement.  However, if IBM recovers monetary damages from the Supplier because of the Supplier's failure to meet a Critical Transformation Milestone, the Supplier shall be entitled to set-off against such damages any Transformation Milestone Credits paid for the failure giving rise to such recovery.

**ATTACHMENT 1-D-1**

SERVICE LEVEL MATRIX



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

Attachment 1-D-1
Incident Priority Definitions

| PRIORITY MATRIX | | IMPACT | | |
|---|---|---|---|---|
| | | High | Medium | Low |
| **U R G E N C Y** | High | Priority 1 | Priority 2 | Priority 3 |
| | Medium | Priority 2 | Priority 3 | Priority 4 |
| | Low | Priority 3 | Priority 4 | Service Request |

"Priority levels" are defined categories that identify the degree of business criticality and importance to the organization (the "business impact") of specific Incidents, and the associated Vendor response requirements attributed to any such Incident. The following priority level table categories and descriptions apply to all Services:

| | |
|---|---|
| 1 - Emergency/Urgent | The Problem has caused a complete and immediate work stoppage affecting a primary business process or a broad group of End Users such as an entire department, floor, branch, line of business, or external customer.  No Workaround is available. Note: Also, When VIP's have been affected (Dean's and above)<br>Examples:<br>Loss of service (e.g. site unavailable)<br>Severely degraded performance (e.g. circuit not functioning as intended)<br>Core network issues (e.g. routing problem, provider network issues) |
| 2 - High | A business process is affected  in such a way that business functions are impacted, multiple End Users are impacted or a key customer is affected.  A Workaround is not available<br>Examples:<br>Loss of resiliency (e.g. circuit unavailable)<br>Partially degraded service (e.g. issues with some QoS queues) |
| 3 - Medium | A business process is affected in such a way that certain functions are unavailable to End Users or a system and/or service is degraded.  A Workaround may be available.<br>Examples:<br>Non-critical system problem |
| 4 - Low | An Incident that has little impact on normal business processes and can be handled on a scheduled basis.  A Workaround is available.<br>Examples:<br>Preventative Maintenance |



IBM 3.2.1
Attachment 1-D-1 S...

IBM

# SRA Statement of Work

SRA # 4917011615
SOW # 4917011866

Attachment 1-D-1
Service Level Requirements

The following table sets forth the Service Level Requirements for Network Management and Voice Communications Statement of Work.

Allocation Limit 200%

| Tower | SLR Area | | Service Level Requirement (SLR) | Service Measure | Performance Target | Minimum Performance | Measurement Interval | Reporting Period | Formula | Fee Reduction Available | CPI/KPI | Measured at Tool | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Service Tower | Network Management Services | SLR Category | | | | | | | | 200% | | | |
| Network Management Services | Network Management Services | Network Management Services | Network Management Services | | | | | | | | | | |
| Network Management Services | Network Availability | Network Availability | Network Availability | Network Availability is defined as the time during which connectivity is fully functioning and normal business operations can be carried out with no data loss, downtime, or performance degradation. | | | | | | | | | |
| 1 Network Management Services | Network Availability | Network Availability | Overall Network Availability (includes WAN, LAN, Internet, VPN, etc.) | Aggregate Availability | 24x7 Excluding Maintenance Window | 99.9% | Monitor continuously, measure monthly | Monthly | Availability(%) = 100% - Unavailability(%) Where Unavailability is defined as: [(Sum of Outage Duration - Excused Downtime) / Scheduled Time](%); Scheduled Time = [Total possible time in Measurement Interval – Maintenance Window | 20% | CPI | HEAT IPC | Commencement once the first building comes up and measured by building availability on the new architecture |
| Network Management Services | Network Performance | Network Performance | Network Performance | Network Performance includes the ability of the network components to deliver data timely and accurately. Measured packet size is 120 bytes. | | | | | | | | | |
| 2 Network Management Services | Network Performance | Network Performance | Network Transit Delay | Elapsed Time = round trip transit delay from ingress and egress ports on premise devices | <120ms | 99.9% | Monitor synthetic transactions every 5 minutes; measure monthly | Monthly | IMTD = I2 – I1 Where I1 is the time when a packet leaves the ingress premise, and I2 is the time when the packet arrives at the egress premise | 20% | CPI | Solarwinds | |
| 3 Network Management Services | Network Performance | Network Performance | Packet Delivery Ratio | Successful packet transmission | 99.95% | 99.95% (data loss 0.05%) | Monitor synthetic transactions every 5 minutes; measure monthly | Monthly | Packet Delivery Ratio = 1 - PDR Where =PDR+; Packets delivered/packets sent. | 20% | CPI | Solarwinds | |
| Network Management Services | Network Administration | Network Administration | Network Administration | | | | | | | | | | |
| 4 Network Management Services | Network Administration | Network Administration | Implementation of Network Changes (e.g., MACs, firewalls, routers, switches) | Elapsed time to successfully complete Non-Howard | In Aggregate Logical Changes ≤ 1 day | 98.00% | Monthly | Monthly | Events successfully completed within performance target / total events | 10% | CPI | Heat IPC | |

Rev 0617

IBM

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

| | Voice Communications Services | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Voice Communications Service Availability | **Voice Communications Service Availability** | Availability of the voice communications network, including all circuits and all associated hardware (Routers, Switches, etc) | | | | | | | |
| 5 | **Overall System Availability** | Availability | 24/7x365 | 99.95% | Monitor Continuously, Measure Monthly, Report Monthly | Availability(%) = 100% - Unavailability(%) Where Unavailability is defined as [(Outage Duration - Excused Downtime x100%) ÷ Schedule Time - Planned Outage] | 20% | CPI | HeaT PC |
| Service Responsiveness | **Service Responsiveness** | The ability of the Supplier to respond to, process, and fulfill client requested changes and reconfiguration of various types of voice services. | | | | | | | |
| 6 | **Implementation of Voice Changes (e.g., MAC, Hardware Capacity, User Account Changes)** | Elapsed time to successfully complete from Howest authorized request | within mutually agreed timeframes | 95.00% | Monthly | Number of instances successfully completed within Performance Target/Total number of instances per Service Type | 1% | CPI | HeaT PC |
| Voice Network Performance | **Voice Network Performance** | | | | | | | | |
| 7 | **Voice Network Transit Delay** | Elapsed Time - round trip transit delay from ingress and egress ports on premise devices | 120ms | 99.9% | Monitor synthetic transactions every 5 minutes, measure monthly | NTD = t2 - t1 Where t1 is the time when a packet leaves the ingress premise, and t2 is the time when the packet arrives at the egress premise | 20% | CPI | Solarwinds |
| 8 | **Packet Delivery Ratio** | Successful packet transmission | 99.95% | 99.95% (data loss < 0.05%) | Monitor synthetic transactions every 5 minutes, measure monthly | Packet Delivery Ratio = 1 - PDR Where PDR = Packets delivered / packets sent. | 1% | CPI | Solarwinds |

Rev 0617

**IBM**

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

| Service Management | Service Management | Service Management | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Service Management | Service Management | CMDB Updates and Asset Inventory Tracking | Timeliness of Completion of CMDB Updates - measures the percentage of CMDB updates made within the allowable timeframe after each change. Applies to all Service-Area assets and configurations (e.g. end user devices, routers, switches, ...) | Time to update CMDB (e.g. updated component configurations) | ≤2 business days from completion of changes | 98.0% | Monthly | Monthly | Events completed within performance target / total events | 5x | CPI | Heat PC |
| Service Management | Service Management | Incident Resolution | Incident Resolution | | | | | | | | | |
| Service Management | Incident Resolution | Time to Respond to Howard of a priority 1 Incident | Time to respond | <15 minutes | 98.0% | Monthly | Monthly | Number of response completed within performance target of all priority 1 Incidents occurring during Measurement Interval | 10x | CPI | Heat PC |
| Service Management | Incident Resolution | Time to Respond to Howard of a priority 1 Incident | Time to respond | <1 Business Hour | 98.0% | Monthly | Monthly | Number of response completed within performance target of all priority 2 Incident occurring during Measurement Interval | 10x | CPI | HEAT PC |
| Service Management | Incident Resolution | Incident Resolution - priority 1 | Time to Resolve | <4 Hours | 98.0% | Monthly | Monthly | Number of Resolutions completed within performance target of all Priority 1 Incidents occurring during Measurement Interval | 10x | CPI | HEAT PC |
| Service Management | Incident Resolution | Incident Resolution - priority 2 | Time to Resolve | <8 Business hours | 98.0% | Monthly | Monthly | Number of Resolutions completed within performance target of all Priority 2 Incidents occurring during Measurement Interval | 10x | CPI | HEAT PC |

Rev 0617

IBM

**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

| Service Area | Process | Description | | | | Target | Frequency | Frequency | Time to recover Howard Systems (as defined in the DR plan) | % | Type | Tool |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Network Services / Network Management Services | IT Continuity and Disaster Recovery | IT Continuity and Disaster Recovery | Semi-Annual Site DR Testing (or Sites that are Corporate DR Pilots as defined Exhibit N) | Successful DR test | Successful performance of semi annual failover testing per Howard requirements, with mutual concurrence on test plan tasks and | 100% | Per Test | Per Test | Number of tests completed within performance target/node of all tests occurring during Measurement interval. For clarity, a successful test is within the testing window meets the successful completion criteria. | 10% | CPI | Manual Report |
| Service Management / Service Management | Documentation | Documentation | Timeliness and accuracy of Completion of Documentation Updates – measured the percentage of documentation updates made within the allowable timeframe after each change. Applies to all Service Area assets and configurations (e.g. network designs) | Time to update documentation/records (e.g. as built, updated component configurations, diagrams) | Documentation is maintained accurately | ≤5 business days from completion or changes | 99.0% | Monthly | Monthly | Events completed within performance target or with x/y errors corrected within X business days / total events | 8x | CPI | Heat IPC |

P_SRA_SOW

Rev 0617

**SRA Statement of Work**



**SRA** # 4917011615
**SOW** # 4917011866

**SRA Statement of Work**



**SRA** # 4917011615
**SOW** # 4917011866

**IBM**

## SRA Statement of Work

SRA # 4917011615
SOW # 4917011866

### ATTACHMENT 1

### SUPPLIER AND HOWARD LOCATIONS



IBM Attachment 1 -
Supplier and Howar

| Status | Priority | Building Number | Building Name | Building Other Name | Building Abbreviation | Building Address | Special Notes |
|---|---|---|---|---|---|---|---|
| P | 2 | 1 | Administration Building | Mordecai Wyatt Johnson Building | ADM | 2400 6th Street, NW | |
| P | 2 | 2 | Technology Center | Wonder Plaza | WPZ | 2301 Georgia Ave., NW | |
| P | 3 | 3 | Architecture and Planning, School of | Howard Mackey Building | HURB1 | 2366 6th St., NW | |
| P | 3 | 4 | Laser Chemistry Building | Chemistry Laser Research | LCB | 500 College St., NW | |
| In Scope - see notes | 3 | 5 | Howard University Center | Book Store Building | HCTR | 2225 Georgia Ave., NW | This bldg closes in July or Aug 2017, HOWEVER, the Starbucks and University Book Store on the ground floor must retain legacy support and be transformed to new WiFi support |
| P | 2 | 6 | Bethune Hall Annex | Mary McLeod Bethume Annex | BX | 2225 4th St., NW | |
| P | 3 | 7 | Biology Building | Earnest Just Hall | EJH | 415 College St. NW | |
| P | 3 | 8 | Burr Gymasium | John Burr Gymasium Building | BUR | 6 &Girard Sts., NW | |
| P | 4 | 9 | Green Stadium | | GS | Green Stadium | |
| P | 2 | 10 | Business, School of | Class Room Building 4 | SBA | 2600 6th St., NW | |
| P | 3 | 11 | School of Nursing & Allied Health | Freedman's Annex 1 | AN1 | 516 Bryant St. NW | |
| P | 3 | 12 | Carnegie Hall | | CAR | 2395 6th Sts.NW | |
| P | 2 | 13 | Communications, School of | C.B. Powell Building | CBP | 525 Bryant St., NW | |
| P | 3 | 14 | Minor Building | | MB | 2565 Georgia Ave., NW | Only one floor of this building is renovated and occupied |
| P | 1 | 15 | Chemistry Building | | CEM | 525 College Sts., NW | |
| P | 3 | 16 | Chemical Engineering Building | Downing Hall | CME | 2300 6th St., NW | |
| P | 3 | 17 | Allied health Sciences | Freedman's Annex 2 | AN2 | 6th & Bryant Sts. NW | |
| P | 3 | 20 | Cramton Auditorium | Louis Cramton Auditorium | CRA | 2455 6th St., NW | This building has little to no wifi |

**SRA Statement of Work**

IBM

**SRA** # 4917011615
**SOW** # 4917011866

| Status | Priority | Building Number | Building Name | Building Other Name | Building Abbreviation | Building Address | Special Notes |
|--------|----------|-----------------|---------------|---------------------|-----------------------|------------------|---------------|
| P | 1 | 22 | College of Dentistry | | DEN | 600 W St., NW | This building lost a 600-pair cable and has no phones, it has fibre and some VoIP into CM6 via the 450 in Mudd Bldg, priority for UCaaS |
| P | 2 | 23 | Douglass Hall | Frederick Douglass Memorial Hall | DGH | 2419 6th St., NW | |
| P | 3 | 24 | Center for Academic Reinforcement | Academic Spport Building A | ASA | 2441 4th St.NW | |
| P | 2 | 25 | Education, School of | Academic Spport Building B | ASB | 25004th St, NW | |
| P | 2 | 26 | Engineering, College of | Lewis K. Downing Building | LKD | 2300 6th St., NW | |
| P | 3 | 27 | Dental Building Addition (Old Medical Library)? | | DBA /OML | 600 W St., NW | |
| P | 3 | 27 | Old Medical Library | Dental Building Addition (MDC) | OML | 600 W St., NW | |
| P | 3 | 28 | Fine Arts College of | Lulu Vere Childers Hall | LVC | 2400 6th St., NW | |
| P | 3 | 29 | Founders Library | | LIB | 500 Howard Place, NW | |
| P | 3 | 31 | Graduate School of Arts & Sciences | Freedman's Annex 3 | AN3 | 4th & College Sts, NW | |
| P | 3 | 33 | Howard Hall | Oliver Otis Howard Hall | HH | 607 Howard Place NW | |
| P | 1 | 39 | Howard University Service Center | PFM | HSC | 2244 10th St. NW | This bldg houses HR, Finance/CFO, DPS police and PFM facilities, along with the 3rd party facilities vendor Thompson - this bldg is off-campus MPLS site |
| P | 3 | 40 | Middle School | Human Ecology | HEC | 405 Howard Place, NW | The Middle School has their own ISP, we connect for security cameras for DPS |
| P | 3 | 42 | International Affairs Building | Ralph J. Bunche Center | RJBC | 2218 6th Sts., NW | |
| P | 3 | 43 | Ira Aldridge Theatre | | IAT | 2445 6th  St., NW | |
| P | 2 | 44 | Arts & Sciences, | Alaine Locke Hall | LKH | 2500 4th st., NW | |

**SRA Statement of Work**

IBM

SRA # 4917011615
SOW # 4917011866

Howard University and IBM confidential information

| Status | Priority | Building Number | Building Name | Building Other Name | Building Abbreviation | Building Address | Special Notes |
|--------|----------|-----------------|---------------|---------------------|-----------------------|------------------|---------------|
| P | 3 | 83 | Telescope Storage Building (Beltsville, MD) | Observatory Storage | TSB | 7501 Muirkirk Road, Beltsville MD | |
| P | 3 | 127 | Howard University Research Building | PIC Building Daycare | HURB 1npl | 1850 7th St., NW | |
| P | 3 | 163 | Medical Arts Building | Student Health Center | MAB | 2139 Georgia Ave., NW | There is present HU, HUH and FPP networks in this one building, we will collapse FPP and HU in transformation, HUH must be segregated |
| P | 2 | 200 | Health Sciences Library | Louis Stokes Health Sciences Library | HSL | 501 W St., NW | |
| P | 3 | 350 | New Law Library (West Campus) | | NLL | 2900 Van Ness St., NW | |
| P | 3 | 353 | Notre Dame | | ND | 2900 Van Ness St., NW | |
| P | 3 | 354 | Holy Cross Hall (West Campus) | | HCR | 2900 Van Ness St., NW | |
| P | 3 | 355 | Huston Hall (west Campus) | | HUS | 2900 Van Ness St., NW | |
| P | 3 | 600 | Howard University Research Building | PIC Building Extended Health | HURB1 | 1840 7th St., NW | |
| P | 3 | 700 | Mental Health Clinic | | MHC | 520 College St., NW | There is present HU, HUH and FPP networks in this one building, we will collapse FPP and HU in transformation, HUH must be segregated |
| P | 2 | 62C | Crandall Hall | | CR | 2455 4th St., NW | |
| P | 2 | 62F | Frazier Hall | | FR | 2455 4th St. NW | |
| P | 2 | 62T | Truth Hall | | TR | 2455 4th St. NW | |
| P | 2 | 62W | Wheatley Hall | | WH | 2455 4th St. NW | |



**SRA Statement of Work**

**SRA # 4917011615**
**SOW # 4917011866**

**ATTACHMENT 3**
**PROCEDURES MANUAL TABLE OF CONTENTS**

Introduction
This is Attachment 3 (Procedures Manual Table of Contents) to the Agreement.

Unless otherwise defined in this Attachment or an Appendix to this Attachment, capitalized terms used in this Attachment and the Appendix to this Attachment will have the meanings set forth in the Agreement. Other terms used in this Attachment and the Appendix to this Attachment are defined where they are used and have the meanings indicated therein. Any undefined terms, acronyms, phrases and abbreviations will have the meanings utilized in the IT services industry or other pertinent business context interpreted in accordance with their generally understood meaning in such industry or business context.

This document describes the general content and organization of the Procedures Manual that will be developed to support the Services for Howard. It is intended that the structure of the Procedures Manual as a deliverable from Supplier will require that the individual compliance requirements and business rules of Howard are identified where applicable for each section or component part of the Procedures Manual.

The Procedures Manual is intended to be maintained and updated on a regular basis. Upon the Applicable SOW Effective Date and at the key milestones identified during the performance of Transition and Transformation, Supplier will be required to complete significant additional detail to record the further development of policies and procedures to be applied in the performance of the Services by Supplier.

The proposed table of contents is included in this initial draft and subsequent detail will be provided by the Supplier throughout the Transition Services and the Transformation Services, at commencement of Services and over the life of the Agreement. Although not intended to replicate the Agreement, the Procedures Manual should provide comprehensive documentation of the processes that will be followed to implement and manage the Agreement and the overall relationship. Specific references to detailed text or requirements in the Agreement may be incorporated within the Procedures Manual.

The responsibilities of Supplier and Howard should be clearly indicated in the process documents. The manual will be used jointly by the parties to assist with overall coordination and communication regarding the Agreement.

Drafting, Review and Approval
The requirements related to the Procedures Manual are as follows:

1.  The parties will develop and follow specific processes during the Agreement Term, which are to be set out in the Procedures Manual.

2.  The Procedures Manual will not contradict the provisions of this Agreement. If there is any discrepancy between the Procedures Manual and the Agreement, the terms in the Agreement will prevail.

3.  Supplier and Howard will jointly use the Procedures Manual to enable close cooperation and communication between the parties.



**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

| Category Designation | Description of Category | Initial Draft Due | Completed Process Due |
|---|---|---|---|
| Category 1 | Group of processes that is required to enable Supplier to begin providing the Services. | Two weeks after Applicable SOW Effective Date | Two Weeks after Applicable SOW Effective Date |
| Category 2 | Group of processes that is required after completion of Transition Plan. | Four weeks' after Applicable SOW Effective Date | Two Months after Applicable SOW Effective Date |
| Category 3 | Group of processes that is required for Supplier to provide Ongoing Services (starting with the ramp up of the first building). | Two Months after Applicable SOW Effective Date | Three Months after Applicable SOW Effective Date |
| Category 4 | Same as Category 3 | After Applicable SOW Effective Date | After Applicable SOW Effective Date |

| Content | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|
| **1.0   ORGANIZATIONAL OVERVIEW** | | | |
| Howard's governance organization and Supplier Management and delivery organization will be presented as organization charts. | Howard and Supplier | Category 1 | Organization charts |
| Key Contacts – Howard | Howard | Category 1 | A list of contacts within Howard that are key users of the Services and/or perform a liaison function in regard to the Services. |
| Key Contacts – Supplier | Supplier | Category 1 | A list of contacts within Supplier that have key responsibility for the Services and/or perform a liaison function in regard to the Services. |
| **2.0   PERFORMANCE MANAGEMENT PROCESSES** | | | Ongoing, "steady state" processes and policies; content below should include information on coordination activities, responsibilities of each party (by title/function). |
| 1.   Performance Analysis & Service Delivery Management – Supplier | Supplier | Category 3 | Supplier will describe processes to analyze, review, record, and report on the Supplier's performance of, and compliance with services identified in MSA, SOWs, SL exhibits, and other exhibits or schedules. This includes the active day-to-day Service delivery, Management of the Services, involving knowledge of the business area in which the Services are being provided, audit requirements and understanding of whether the Services are being provided in a way that correctly supports the business at the contracted Service Levels. Also included are the Management of the Disaster Recovery Plan and business continuity compliance. |



**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

| | Content | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|---|
| 2. | Service Requests & Authorization | Supplier | Category 3 | Supplier will describe the processes they will use to: receive, Manage, assure approvals, and project manage the service requests generated by Howard. processes including: receive request for work, prioritize work, provide rough order of magnitude quote (ROM), Howard review and approval; evaluate requirement for new Service, final bid on work, Howard review and approval; manage work from Supplier perspective; Change Contact Order; work acceptance and closeout, and project termination. |
| 3. | Asset Management | Supplier | Category 3 | Supplier will describe processes to Manage all assets required to provide the Services or that are acquired as a Deliverable of the Services. The processes encompass the life cycle subsequent to requisition and purchasing, and include deployment, tracking, maintenance, decommissioning, and disposal. Also includes interim process for asset Management prior to implementation of final system or process. |
| 4. | Incident Management | Supplier | Category 2 | Supplier will describe processes for the Management of Incidents. |
| 5. | Problem Management | Supplier | Category 2 | Supplier will describe processes followed for the Management of Problems and effective Resolution (ITIL definition - cumulative Incidents that reflect a pattern). |
| 6. | Root-Cause Analysis Procedures | Supplier | Category 2 | Supplier should describe procedures it will use to determine the root cause of Incidents, Problems, and Service Level Defaults, including involvement of (and/or support to) Howard. |



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

| Content | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|
| 7.    Service and Problem Escalation | Supplier | Category 2 | Supplier will describe processes followed for escalation and notification of Incidents or Problems through the agreed-upon escalation identified in the Agreement. This process includes the approach for setting severity levels and moving Incidents up the severity level chain if the issue warrants this treatment. |
| 8.    Change Management | Supplier | Category 2 | Supplier will describe processes to request changes to an operational or technical environment through Change Management processes or systems to accommodate a variety of business requirements from large scale high risk Changes that require rigorous controls to smaller, less risky changes and "fast track" processes. Includes identification of Change with back out plan, Change board meeting, approval of Change, execution of Change, risk mitigations associated with Change; close of Change, and back out if required. |
| **3.0    FINANCIAL MANAGEMENT PROCESSES** | | | Ongoing, "steady state" processes and policies; content below should include information on coordination activities, responsibilities of each party (by title/function). |
| 1.    Invoice Management (Supplier) | Supplier | Category 2 | Supplier should describe procedures for invoicing.<br>The content should include procedures for calculating Resource Unit volumes for pricing (per Tower, as applicable), invoicing of Projects, etc.<br>The content should include procedures regarding disputed invoice amounts.<br>Invoice Management is included in the Financial Management process. |



## SRA Statement of Work

**SRA** # 4917011615
**SOW** # 4917011866

| Content | | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|---|
| 2. | TBD | Supplier | Category 2 | Supplier should describe procedures for calculating Service Level Credits on invoices calculations. Service Level Credits is included in the Financial Management process. |
| **4.0** | **CONTRACT MANAGEMENT PROCESSES** | | | Ongoing, "steady state" processes and policies; content below should include information on coordination activities, responsibilities of each party (by title/function). |
| 1. | Contract Change Control | Supplier | Category 3 | Supplier should describe procedures regarding Changes to the Agreement, including Changes to any Schedule or Attachment. Content should include procedures to classify services as a New Service, as well as the resulting process to change the Agreement (including pricing). Content should include notification period and process, authority levels, and escalation procedures for changes to the Agreement. |
| 2. | Auditing | Supplier | Category 3 | Supplier should describe procedures for operational and/or financial audits (as required by Howard auditing. The Supplier should describe the notification process and the procedures to resolve audit findings. |
| 3. | Dispute Resolution | Service Provide | Category3 | Supplier should describe procedures regarding the formal dispute resolution process. |
| 4. | Requests for New Service | Service Provide | Category 1 | Supplier will describe processes to review, approve and manage requests for New Services not currently defined in the Agreement. The appropriate governance process will be followed for New Service requests.  New |

# SRA Statement of Work



**SRA** # 4917011615
**SOW** # 4917011866

| Content | | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|---|
| | | | | Services requests shall include sufficient details and requirements to enable Supplier to provide the New Services proposal, and shall at all times be assigned to a single point of contact within Howard, which individuals shall be responsible for interfacing with Supplier on all issues in connection with such New Services request, and for obtaining any necessary financial, technical, legal, or other subject matter experts or approvers regarding the New Services request. |
| **5.0** | **RELATIONSHIP MANAGEMENT PROCESSES** | | | Ongoing, "steady state" processes and policies; content below should include information on coordination activities, responsibilities of each party (by title/function). |
| 5. | Customer Satisfaction Surveys | Supplier | Category 2 | Supplier should describe the process to be used for conducting customer satisfaction surveys. Content should include procedures regarding action items and attempts to resolve customer issues. |
| **6.0** | **SUPPLIER OPERATIONAL PROCESSES** | | | Ongoing, "steady state" processes and policies; content below should include information on coordination activities, responsibilities of each party (by title/function) |
| 1. | Availability Management | Supplier | Category 3 | Supplier will define how it will provide Availability Management to controls Howard's and Howard customer's production environment and minimizes the impact of changes and Incidents on the availability of the Services. |
| 2. | Capacity Management | Supplier | Category 3 | Supplier will define how it will provide Capacity Management in alignment with the Agreement. |

IBM

## SRA Statement of Work

**SRA** # 4917011615
**SOW** # 4917011866

| Content | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|
| 3.   Service Level Management | Supplier | Category 3 | Supplier will define how it will monitor and maintain Service Levels required by the Agreement. |
| 4.   Security Management | Supplier | Category 3 | Supplier will define the processes for meeting the Security Management requirements of the Agreement. IT Security Management provides security protection for physical inventory and assets that are associated with the delivery of IT services. It involves the definition of security strategies, policies, and procedures; and monitoring their compliance. IT Security Management is intended to address the steady state environment. This document reflects the security responsibilities and practices defined in the Agreement. |
| 5.   Evaluation and Testing | Supplier | Category 3 | Supplier will define the processes which shall govern evaluation and testing requirements of the Agreement. Evaluation and testing is a sub-component of the Change Management process. |

| Content | Drafting Responsibility | Category Designation (1 – 4) | Brief Description |
|---|---|---|---|
| 6.   Refresh and Innovation | Supplier | Category 3 | Supplier will describe the process to be employed to meet the Refresh and Innovation requirements of the Agreement. Technology Strategy/Refresh Management provides research, planning, and administrative support to periodically refresh Howard Information Technology (IT) environment in a planned, cost-effective manner that minimizes disruption to Howard and Howard Customers business objectives and business cycles. |
| 7.   Delivery and Staging | Supplier | Category 3 | Supplier will describe the processes by which Equipment is to be delivered and staged in the Supplier Locations. |
| 8.   Equipment Maintenance | Supplier | Category 3 | Supplier will define the approach and processes by which Equipment will be maintained in accordance with the Agreement. |
| 9.   Facilities Management and Support | Supplier | Category 3 | Supplier will define how it will provide proper maintenance and safe operation of IT infrastructure facilities. |



**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

## SCHEDULE 1 – K
## TRANSITION PLAN

Transition Plan

Transition Plan Overview

The Transition is a defined set of subprojects, as further described in the following sections. Transition responsibilities consist of transferring responsibility for delivery of Services from Howard University or from Howard University's current vendors to Supplier after a period of knowledge acquisition of Howard University's existing information technology environment, processes, technology, and tools.

Each subproject generally consists of planning, execute, and close phases, which will be tailored for specific services upon contract signature.

Scope of Work

Transition Governance:

a) Define and agree to Project Management System and associated meetings, including, but not limited to, Transition program change management, issues management, risk management, and status reporting.

b) Create and reach agreement on the scope decomposition and completion criteria in Project Definition Reports (PDRs), and integrate comprehensive project schedule comprised of milestones and tasks for each of the subprojects.

c) Enable the global delivery team, including staffing, defining of requirements for knowledge transfer activities, and planning and scheduling of Transition project activities.

d) Provide a high-level termination project plan.

Human Resources (HR) Management:

a) Implement a human resources communications plan, which conveys all the information needed by the in-scope employees.

b) Coordinate the employment process, including interviews, offers, accepts/declines, and onboarding.

Account Management and Governance:

a) Verify baselines.

b) Identify third party contracts and obtain agency agreements, as applicable.

c) Implement contract governance processes and management system for Performance, Financial, Contract and Relationship Management.

Cross Functional Services

a) Service Management and Governance Manual Development

– Develop the manual, according to an agreed table of contents, which defines at a high level how Supplier will work with Howard University under the Agreement from a process point of view with the operational processes used for Service delivery.

b) Security Services



**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

- Gather and further develop, as necessary, Howard University's existing support processes and procedures for Supplier to assume responsibility for delivery of Services.
- Perform knowledge acquisition and knowledge transfer activities in order to educate Supplier's support staff on processes, procedures, and tools.

    c)   Measurement & Reporting

- Gather and further develop, as necessary, Howard University's existing reports for Supplier to assume reporting responsibility.

    d)   Incident, Problem, and Change Process

- Gather and further develop, as necessary, Howard University's existing Incident, Problem and Change Process processes and procedures for Supplier to assume responsibility for delivery of Services.
- Perform knowledge acquisition and knowledge transfer activities in order to educate Supplier's support staff on processes, procedures, and tools.

    e)   Supplier will perform a walk-in take-over management of the existing network.

Transition Schedule

Attached is a Transition MS Project Plan for Howard University Transition in pdf format.

For MS Project version refer to Attachment 1-K-1

The Project Plan assumes a start date of June 19th, 2017 for transition activities.

**IBM**

**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

Transition Organization

The organization chart shown illustrates each position within Supplier's proposed transition (and transformation) team.



Knowledge Transfer during Transition

Effective knowledge transfer is essential to the successful transition of work into the new delivery organization. The objective of knowledge transfer is to capture, preserve, and exchange both process and transactional knowledge relating to the identified in-scope Howard University functions that are transitioning to Supplier delivery centers.

We anticipate that knowledge transfer to the Supplier employees who will be receiving the knowledge will work directly with the Howard University employees who are currently performing the in-scope services.

The Supplier approach to knowledge transfer during transition includes the following components:

- Knowledge transfer and tools are incorporated into the transition methodology to facilitate effective transition. For a period of six to eight weeks, Supplier process leads will conduct onsite observations and gather information about Howard University's in-scope key processes and systems. They will leverage standard documentation, bi-directional work shadowing, and validation reviews to assist in the learning process.
- Selected members of Howard University's existing staff will perform the role of subject matter experts (SMEs) to aid the Supplier process leads in the information gathering process. They will provide Supplier staff with assistance and guidance for an agreed-upon period following service cutover.
- Howard University trainers will provide instruction to Supplier trainers.

Detailed activities within the transition plan will be developed for each work stream and will be monitored by Howard University and Supplier transition managers to achieve a successful transition.



**SRA Statement of Work**

SRA # 4917011615
SOW # 4917011866

Supplier recognizes the need for sensitivity when dealing with Howard University personnel, and as a result, will seek guidance from Howard University to assist in identifying SMEs who can assist in knowledge transfer activities.

As outlined in the transition plan, the Supplier knowledge transfer solution will also include a job shadowing period during which designated Supplier employees will work alongside Howard University employees to learn what they do. Job shadowing is designed to cause minimal or no interruption to operations. Therefore, the ratio of Supplier to Howard University employees will be kept to a reasonable number. That number and the duration of the shadowing period are driven by the complexity of the business process being transitioned. Supplier will assign a dedicated team of process trainers and subject matter experts, plus key process management and delivery personnel, to take part in the shadowing activities. After the shadowing period is over, these Supplier resources will be responsible for training their fellow Supplier staff in the delivery centers, using what they've learned along with Supplier-developed training materials. Supplier and Howard University will jointly validate that comprehensive knowledge transfer has occurred during identified points in the operations ramp-up period.

Approval Milestones

1. Transition Governance:

a. Transition schedule agreed and all activities finished  (except closing)

b. Documented Transition Governance

2. Human Resources (HR) Management:

c. Howard University transferees are on boarded and on IBM payroll

3. Cross Functional Services

d. Security Services

- Knowledge acquisition and knowledge transfer activities are done on processes, procedures, and tools.

e. Measurement & Reporting

- Knowledge acquisition and knowledge transfer is done for Howard University's existing reports to assume reporting responsibility.

f. Incident, Problem, and Change Process

- Howard University's existing Incident, Problem and Change Process processes and procedures for Provider is known by Provider to assume responsibility for delivery of Services.

The Approval Procedure is the same as descript in the Attachment 1-N-1.


Critical Dependencies and Assumptions

To successfully complete the transition to Supplier per the schedule, the following dependencies apply and will need to be supported by Howard University


a) Howard University's active participation in the overall governance and critical decision-making during the transition process, working closely with Supplier.

**IBM**

**SRA Statement of Work**

**SRA** # 4917011615
**SOW** # 4917011866

b)   Howard University assigning the necessary skilled technical and subject matter expert (SME) resources to comprise the transition team, which will be working with Supplier to achieve the implementation plan.

c)   Howard University assigning a lead transition manager who will serve as the point of contact for Supplier's overall transition manager. Both Supplier and Howard University transition managers will be responsible for overseeing the completion of the transition activities.

d)   Howard University assigning a single point of contact for each in-scope work stream / subproject, who will work closely with the corresponding Supplier project manager assigned to each work stream / subproject.

e)   Howard University assisting Supplier with the knowledge capture and transfer activity from Howard University per the implementation plan.

f)   Howard University providing existing documentation (i.e. operational and process documentation, desk procedures, work flows, system diagrams, etc.) from Howard University for in-scope service areas to be transitioned to Supplier.

Howard University reviewing and approving (or rejecting) all deliverables within a timely manner in accordance with the transition plan.



**SRA Statement of Work**

**SRA #** 4917011615
**SOW #** 4917011866

**ATTACHMENT 6**
**APPROVED BENCHMARKERS**

## Benchmarkers

The following table identifies, as of the Effective Date, the Benchmarkers that the parties may use to perform benchmarking of the Services during the Term in accordance with the Agreement.

| Benchmarker Name |
|---|
| Gartner, Inc |
| International Data Corporation (IDC) |
| Avasant |
| ISG |



## Supplier Relationship Agreement
# 4917011615.000

Using this Supplier Relationship Agreement (**SRA** or **Base Agreement**), International Business Machines Corporation (**IBM** or **Buyer**) may order deliverables (**Deliverables**) and services (**Services**) available from MATEK, Inc (**Supplier**) for itself or on behalf of its customers (**Customers**). Details regarding the Deliverables and Services are provided in Statements of Work (**SOWs**) and/or Work Authorizations as defined in Section 2 below. This SRA, applicable SOWs, together with any Attachments and the quantity, payment and delivery terms of the Work Authorization are the complete agreement (**Agreement**) regarding transactions hereunder. The effective date of this SRA will be the date of the last party's signature.

### 1. Deliverables and Services

#### Deliverables consisting of Programs and Products

A **Program** is a software program and related material available for license from Supplier. Programs are copyrighted and licensed (not sold) and a **Product** is a tangible item (other than a Program) that Supplier prepares for or provides to IBM. Applicable Program and Product details are described in a SOW or Attachment.

#### Services consisting of Cloud Services and Other Services

A Cloud Service is an offering hosted or managed by Supplier and made available via a network. Other Services, in addition to Cloud Services, may include consulting, installation, customization and configuration, maintenance, staff augmentation, and business, technical or other services (each, a **Service**). Applicable Service details are described in a SOW, WA or Attachment.

Deliverables and/or Services will be delivered as specified in a SOW and/or WA. If Supplier cannot comply with a delivery commitment, Supplier will promptly notify IBM and IBM may cancel without charge Deliverables or Services not yet delivered and exercise any and all other remedies available to it.

Except as otherwise specified in a SOW or Attachment, Supplier will only use the information, materials, assets, data (including any data that can identify or locate an individual (**Personal Data**)) and documents provided to Supplier or uploaded to or stored in a Cloud Service by IBM or its users (collectively, **IBM Materials**) as needed to perform under this Agreement. Supplier will not disclose IBM Materials to any third party and will return or destroy IBM Materials (and certify to IBM regarding the same) upon the earlier of the expiration of the relevant SOW or WA or IBM's request.

### 2. Issuance of a Work Authorization and Pricing

Unless otherwise set forth in a SOW, Supplier will begin work only after receiving a Work Authorization (**WA**) from IBM. A WA is IBM's authorization in either electronic or tangible form for Supplier to conduct transactions under this SRA in accordance with the applicable SOW (i.e., a purchase order, bill of lading, or another IBM designated document). A SOW is a WA only if designated as such in writing by IBM. The agreed upon pricing and currency for Deliverables and Services, exclusive of Taxes but including all applicable fees and royalty payments (**Prices**), shall be set forth in the SOW and/or WA. The Prices for Deliverables and Services specified in a SOW and/or WA plus applicable Taxes will be the only amount due to Supplier from IBM. Payment of invoices does not constitute acceptance of Deliverables or Services. Deliverables and Services are subject to inspection, test, acceptance or rejection in accordance with the relevant SOW and/or WA. Supplier must submit invoices and any other claims for reimbursement to IBM within one year from the date of IBM's acceptance of Deliverables or Services.

### 3. Warranties

Supplier warrants on an ongoing basis that i) its performance of the Agreement will comply with all applicable laws and the terms of any contracts applicable to it (including licensing agreements); ii) Deliverables and Services do not infringe any privacy, intellectual property or other right of a third party; iii) Deliverables are safe for use with, and will comply with, the warranties and requirements in this Agreement; iv) it has disclosed to IBM in writing the existence of third party or open source code in, or provided with, Deliverables; v) Deliverables do not contain harmful code; vi) will comply with import, export control and economic sanction laws and regulations, including those of the United States, that prohibit or restrict the export, re-export, or transfer of products, technology, services or data, directly or indirectly, to or for certain countries, end uses or end users. Supplier will not export, directly or indirectly, any technology, software or commodities provided by IBM under this Agreement to any prohibited destination or for any prohibited end use. Supplier will provide IBM with information about Deliverables and Services

necessary for export compliance.; vii) Programs and Services conform to their official published specifications and Supplier will not electronically or otherwise disable, remove or otherwise prevent the use of a Program or Service; viii) it will use all IBM Materials and Developed Works (as defined in Intellectual Property below) under this Agreement solely in the performance of this Agreement; ix) it has implemented and will maintain technical and organizational security measures to protect IBM Materials against loss, alteration, unauthorized disclosure, access or other unlawful forms of processing including, without limitation, not loading any IBM Materials provided to Supplier on any laptop computers or portable storage media unless such materials have (or the device itself has) been encrypted; x) it will report to IBM any actual or suspected breaches of security of IBM Materials immediately after discovery thereof if the IBM Materials were, or could be, accessed, used or acquired by an unauthorized person or entity or otherwise compromised; and xi) Services are provided using reasonable care and skill in accordance with this Agreement.

THE WARRANTIES IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OR CONDITIONS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Subject to the Indemnity section, if Deliverables or Services do not comply with the warranties in this Agreement or the acceptance or completion criteria, IBM may reject the Deliverables or Services and Supp lier will repair, replace or re-perform the Deliverables or Services without charge and in a timely manner. If Supplier cannot do so within ten (10) business days or any mutually agreed upon (in writing) time period, Supplier will refund all fees paid by IBM for such Deliverables and/or Services.

### 4. Ethical Dealings

Supplier will be familiar and will strictly comply with all laws and regulations on bribery, corruption, and prohibited business practices. Supplier and its Affiliates have not and will not, for the purpose of influencing or inducing anyone to influence decisions in favor of IBM or its Affiliates, offer, promise or make or agree to make, directly or indirectly, (a) any political contributions of any kind or any payment to or for the benefit of any public official, whether elected or appointed, (b) any payments for gifts, meals, travel or other value for a government employee or his/her family members or (c) any payments or gifts (of money or anything of value) to anyone. IBM shall not reimburse Supplier for any such political contributions, payments or gifts. **Affiliates** are entities that control, are controlled by, or are under common control with, a party to this Agreement.

### 5. Taxes

Supplier's invoices shall state all applicable Taxes, if any, by tax jurisdiction and with a proper breakdown between taxable and non-taxable Services and Deliverables. Supplier shall also bear sole responsibility for all taxes, assessments, or other levies on its own income, leased or purchased property, equipment or software. If IBM provides a direct pay certificate, certification of an exemption from Tax or reduced rate of Tax imposed by an applicable taxing authority, then Supplier agrees not to invoice or pay any such Tax unless and until the applicable taxing authority assesses such Tax, at which time Supplier shall invoice and IBM agrees to pay any such Tax that is legally owed. IBM shall withhold Taxes as required under applicable law on payments made to Supplier hereunder and shall be required to remit to Supplier only the net proceeds thereof. IBM agrees to remit in a timely manner all Taxes withheld to the appropriate government authority in each respective jurisdiction. Upon IBM request, Supplier will deliver the appropriate documentation as required by the corresponding jurisdictional tax laws, within 15 business days from such request. **Taxes** means any and all applicable taxes, charges, fees, levies or other assessments imposed or collected by any governmental entity worldwide or any political subdivision thereof and however provided by Supplier to IBM under or pursuant to the Agreement,



## Supplier Relationship Agreement
# 4917011615.000

exclusive, however, of any taxes imposed upon the net income or capital of Supplier, any taxes in lieu of such net income taxes and any other taxes which are to be borne by Supplier under law.

### 6. Intellectual Property

IBM will own the copyright in works of authorship that Supplier develops for IBM under this Agreement (**Developed Works**) and all such works are works made for hire. If any Developed Works are not considered works made for hire owned by operation of law, Supplier assigns the ownership of copyrights in such works to IBM.

Developed Works exclude **Preexisting Works** and **Tools**. Preexisting Works include works of authorship delivered to IBM, but not developed by Supplier specifically for IBM under the SOW, and any modifications or enhancements of such works made under the SOW.

Tools means software that is not commercially available, and its Externals, required for the development, maintenance or implementation of a software Deliverable other than a Program. **Externals** means any pictorial, graphic, audiovisual works, reports or data generated by execution of code and any programming interfaces, languages or protocols implemented in the code to enable interaction with other computer programs or end users. Externals do not include the code that implements them.

This Agreement does not grant either party the right to use the other party's or their Affiliates' trademarks, trade names or service marks, or other designations in any promotion or publication, without prior written consent.

### 7. Liability

Neither party will be liable to the other for special, incidental, exemplary, indirect, or economic consequential damages, or lost profits, business, value, revenue, goodwill, or anticipated savings. The following amounts, if a party is legally liable for them, are not subject to the above limitation: i) amounts arising from third party claims for which IBM is indemnified (see Indemnity below); ii) damages for bodily injury (including death); iii) damages to real property and tangible personal property; and iv) damages that cannot be limited under applicable law.

### 8. Indemnity

Supplier will defend, hold harmless and indemnify, including legal fees, IBM against third party claims that arise or are alleged to have arisen, and/or government fines and penalties that are imposed, as a result of negligent or intentional acts or omissions of Supplier or Supplier Personnel or breach by Supplier of any term of this Agreement. **Personnel** are individuals who are i) employees of a party, ii) agents appointed by a party, iii) independent contractors engaged by a party, or iv) provided to a party by a Subcontractor. A **Subcontractor** is an individual (independent contractor), a corporation, a partnership, a limited liability company or other entity to which (or to whom) work to be performed under this Agreement has been subcontracted by Supplier to the extent permitted under this Agreement.

Supplier will defend, hold harmless and indemnify, including legal fees, IBM from third party claims that Supplier's Deliverables or Services infringe the intellectual property rights of a third party. In addition, Supplier, at its own expense, will: i) obtain for IBM the right to continue to use, sell and license the Deliverables or Services; ii) modify the Deliverables or Services so they are non-infringing; or iii) replace the Deliverables or Services with non-infringing ones that comply with this Agreement. Alternatively, at IBM's request, Supplier will accept the cancellation of infringing Deliverables or Services without any cancellation liability and Supplier shall refund any amounts previously paid by IBM. IBM will give Supplier prompt notice of third party claims against IBM, and cooperate in the investigation, settlement and defense of such claims.

### 9. Term and Termination

This SRA will remain in effect until terminated. Either party may terminate this SRA for cause if the other is in material breach of this Agreement or, to the extent permitted by law, if the other party becomes insolvent or files or has filed against it a petition in bankruptcy, provided the one who is not in breach gives written notice (with the termination date) and, when in IBM's discretion a material breach can be cured, a reasonable opportunity to cure.

Supplier's breach (or IBM's reasonable belief that Supplier has breached or is likely to breach) of the Ethical Dealings provision of this SRA constitutes a material breach of this Agreement and, in such event IBM may terminate this Agreement immediately on written notice to Supplier, without any liability to IBM. When there are no SOWs or WAs in place between the parties, IBM may terminate this SRA without cause by providing written notice to Supplier. Any terms that by their nature extend beyond the Agreement termination remain in effect until fulfilled, and apply to successors and assignees.

IBM may, upon written notice to Supplier, terminate a SOW or WA i) for cause upon material breach by Supplier or ii) without cause, in each case with termination effective on the date set forth in the notice. Upon termination, in accordance with IBM's written direction, Supplier will cease work under the relevant SOW or WA and deliver to IBM, among other things, all Deliverables completed as of the date of termination and all works in progress.

### 10. Insurance

Supplier will maintain at its expense (and provide certificates of insurance at IBM's request) i) all statutory mandated insurance such as workers' compensation and employer's liability, ii) commercial general liability insurance including products liability and completed operations with a minimum per occurrence limit of 5,000,000 USD (or local currency equivalent), and iii) automobile liability insurance (if a vehicle is to be used in performance of this Agreement) of at least 5,000,000 USD (or local currency equivalent). Commercial general liability insurance and automobile insurance policy limits may be met through a combination of primary and umbrella/excess liability insurance and must name IBM as an additional insured. Insurance required under a SOW, WA or Attachment must be purchased either from insurers with an AM Best Rating of A- or better, or with a Standard & Poor's rating of BBB and $50M in policy holder's surplus or greater.

### 11. Record Keeping and Audit Rights

Supplier will maintain (and subject to applicable law provide to IBM upon request) relevant business, technical and accounting records i) to support Supplier's invoices; ii) show proof of required permits and professional licenses and iii) to demonstrate compliance with Supplier's performance of its obligations under this Agreement, for not less than six (6) years following completion or termination of the relevant Services. All accounting records will be maintained in accordance with generally accepted accounting principles.

Upon IBM's notice, IBM may, at no charge to IBM, audit Supplier's compliance with its obligations under this Agreement, including verifying compliance with applicable laws and the protection and integrity of IBM Materials. In connection with an audit, Supplier shall provide IBM (including its auditors and any regulators) access at reasonable times (or in the case of regulators, at any time designated by such regulators), to any facility at which Supplier or any Subcontractor is providing or has provided Services or Deliverables under this Agreement and to all systems, data and business, technical and accounting records relating to Supplier's (and any Subcontractor's) compliance with its obligations. Supplier shall provide its full cooperation in any such audit, including by designating a focal point to support an audit and, if required by IBM, promptly securing the rights for IBM to directly request from any Subcontractor, and for the Subcontractor to promptly provide to IBM, access to such systems, data and records relating to the work performed by such Subcontractors.

### 12. Governing Law

Except as otherwise set forth in a SOW or in a Participation Attachment, if any, the parties agree to: i) the application of the laws of the State of New York for all Agreements executed by International Business Machines Corporation (IBM Corp.) or Affiliates of IBM Corp. located in the U.S. or ii) for Affiliates of IBM Corp. not located in the U.S., the laws of the country where such Affiliate is located, without regard to conflict of law principles. If any provision of the Agreement is invalid or unenforceable, the remaining provisions remain in full force and effect. Nothing in the Agreement affects statutory rights that cannot be waived or limited by contract. The United Nations Convention on Contracts for the International Sale of Goods does not apply to transactions under this Agreement. The parties waive the right to a jury trial regarding disputes related to this Agreement. Neither party will bring a legal action arising out of or related to this Agreement more than two years



## Supplier Relationship Agreement
### # 4917011615.000

after the cause of action arose.  No right or cause of action for any third party is created by this Agreement or any transaction under it.

### 13.  Business Continuity

Supplier agrees to have and maintain a business continuity plan and business continuity testing procedures, which include but are not limited to the areas of disaster recovery planning and pandemic planning, and cyber security. Cyber security programs must include, at a minimum, provisions to prevent, detect and respond to cyber security incidents. Supplier agrees to review, update, and test the business continuity plan annually and, upon IBM's request, Supplier will provide a summary of the business continuity plan and test results.  IBM may, from time to time, provide feedback regarding the plan and requests that Supplier take IBM's comments into consideration when updating the plan. However, Supplier remains solely responsible for the performance of its responsibilities under the Agreement and the adequacy of the business continuity plan regardless of whether IBM has reviewed or commented on the plan.

### 14.  Supplier and Supplier Personnel

Supplier:

(a)  shall, upon request of IBM and to the extent permitted by applicable law, provide to IBM (I) for export evaluation purposes, the country of citizenship and permanent residence and immigration status of its Personnel, (II) written confirmation (i) that Supplier Personnel are eligible to work in the country where the Services are being provided and (ii) to the extent required by applicable law, that Supplier participates in eVerify pursuant to applicable Executive Order(s) and United States Department of Homeland Security, and (III) if specific education requirements are required by IBM, proof of education for Supplier Personnel;

(b)  shall instruct its Personnel that employment related issues should be brought forward to Supplier (and not IBM) and shall notify IBM promptly where such issues relate to actions which are alleged to have been taken by IBM or its Personnel to enable IBM to investigate as necessary;

(c)  is and shall remain responsible for the day to day supervision, control, terms and conditions, hiring, verification of eligibility to work, discipline, performance management, termination, counseling, scheduling, compensation, benefits and other activities, withholdings, health and safety of Supplier Personnel, and shall ensure Supplier Personnel do not seek to obtain the same from IBM;

(d)  acknowledges that IBM has no responsibility for reviewing or approving timesheets; however, IBM may review such timesheets for billing verification purposes only;

(e)  is responsible for the actions and inactions of Supplier Personnel and compliance by Supplier Personnel with the requirements of this Agreement;

(f)  agrees that IBM retains the right to refuse to accept Supplier Personnel made available by Supplier to perform Services hereunder and may request the removal of Supplier Personnel from assignment under this Agreement, for any lawful reason at IBM's sole and reasonable discretion.

The section entitled "IBM Assets" may be deleted unless Supplier Personnel will have access to IBM Assets (see definition at end of clause to determine relevance):

### 14.1 IBM Assets

Supplier shall instruct Supplier Personnel to:

(a)  use IBM Assets only for purposes of this Agreement and Supplier will reimburse IBM for any unauthorized use;

(b)  only connect with, interact with or use programs, tools or routines that IBM agrees are needed to provide Services;

(c)  not copy, disclose or leave IBM Assets unsecured or unattended;

(d)  promptly notify IBM of any accident or security incidents (such as those involving loss or misuse of, or damage to, IBM Assets (as defined below), and

Supplier will provide IBM with a copy of any accident or security incident report involving the above.

IBM may periodically audit Supplier's use of IBM Assets. "IBM Assets" means IBM's or Customer's computer systems and/or networks, IBM's or Customer's property that is accessed or used by Supplier Personnel or materials, data, documents or information provided to Supplier Personnel by (or on behalf of) IBM.

### 14.2 Supplier Access to IBM or Customer Premises

i). If Supplier Personnel will have access to IBM or Customer premises, Supplier shall conduct orientation sessions with its Personnel before placement on an assignment with IBM or Customer and identify and provide contact information (which shall be updated by Supplier as necessary) for all supervisor(s) for Supplier Personnel.

ii). Supplier shall instruct Supplier Personnel as follows:

(a) Supplier Personnel on IBM's or Customer's premises may not (i) bring weapons of any kind onto such premises; (ii) possess, use or be under the influence of controlled substances or alcoholic beverages; (iii) have in their possession hazardous materials of any kind without IBM's authorization; (iv) send or receive non-IBM or Customer email through IBM's or Customer's mail systems; (v) sell, advertise or market any products or distribute printed, written or graphic materials without IBM's written permission; or (vi) conduct any non-IBM or Customer related business activities while assigned to work under this Agreement.

(b) Supplier Personnel on IBM's or Customer's premises must (i) obtain a valid identification badge from IBM or Customer and return identification badges upon completion or termination of assignments; (ii) remain in authorized areas only (limited to work locations, cafeterias, restrooms and parking lots); (iii) access and use for work only the materials, documents, information and data necessary to perform and (iv) immediately report to Supplier any incidents (such as actual or alleged physical alterations, assaults, harassment and/or inappropriate behavior) so that Supplier can promptly notify IBM and provide IBM with a copy of any incident report.

### 14.3 Criminal and other Background Checks

(a) Supplier shall inform IBM if any Supplier Personnel to be assigned to perform Services hereunder are former employees of IBM, which assignment is subject to IBM's approval.

(b) To the extent permitted by local law, Supplier will obtain from Supplier Personnel photographic proof of identity from an official government source (including but not limited to documentation such as a valid driver's license or government issued passport).

(c) To the extent permitted by local law, Supplier will conduct criminal background checks on Supplier Personnel as defined in section (d) below, in locations where the Supplier Personnel resided for the past seven years. Where no criminal convictions within the past seven years are identified, Supplier Personnel may be assigned to perform Services.  Where a criminal conviction is identified, Supplier may not assign Supplier Personnel where Supplier Personnel is disqualified from performing Services based on Supplier's individualized assessment of the conviction against the Services to be performed in accordance with applicable law and guidance, which may include but is not limited to the Equal Employment Opportunity Commission's promulgated guidance in the United States or similar state or other government promulgated guidance, as applicable.

If, after such assessment, Supplier still recommends assigning a Supplier Personnel with a criminal conviction to perform Services, IBM must first be informed of such decision.  IBM will thereafter review the criminal conviction and Services which will be performed and/or access that the Supplier Personnel will have.  Unless otherwise required for this review, IBM will not receive any personally identifiable information (e.g., Supplier Personnel name, social security number, etc.)

(d) For Supplier Personnel in the United States, a Federal background check must be conducted as well as a county or state background check, whichever is



## Supplier Relationship Agreement
### # 4917011615.000

more comprehensive. In other countries, background checks may be at the county, state, province and/or country level, whichever is most comprehensive.

(e) Upon IBM request and subject to applicable law, Supplier will provide documentation to IBM to verify its compliance with this section.

(f) Notwithstanding the foregoing, Supplier is not required to conduct an additional background check on Supplier Personnel if (a) Supplier conducted a background check that meets or exceeds IBM's requirements in the Criminal and other Background Checks subsection above in the last five (5) years and (b) the Supplier Personnel have not had a gap in employment with Supplier during that five-year period.

### 15. General

i) A party will not disclose confidential information to the other without a separate, signed confidentiality agreement governing such disclosures.
ii) Any licenses accompanying the Programs, and any shrink wrap, click wrap, cloud services, or online terms for Services are null and void, and the terms and conditions of the Agreement prevail.
iii) The parties will not publicize their relationship in any advertising; marketing or promotional materials without prior written consent of the other party except as may be required by law.
iv) IBM may process and store business contact information of Supplier Personnel in connection with the performance of this Agreement wherever IBM does business.
v) The Agreement is nonexclusive and either party may design, develop, manufacture, acquire or market competitive products or services. Each party is responsible for determining the assignment of its Personnel.
vi) All changes to the Agreement must be in writing signed by both parties. In the event of a conflict, the order of precedence will be: A) any accepted changes to price, payment, quantity or delivery terms contained in the WA; B) the relevant SOW (including Attachments thereto); and C) this SRA (including Attachments thereto).
vii) Supplier is an independent contractor and this Agreement does not create an agency, partnership or joint venture relationship between IBM and Supplier or Supplier Personnel. IBM assumes no liability or responsibility for Supplier Personnel.
viii) Parties shall be responsible for the damage, destruction, loss or theft ("Loss") of their respective tangible property (whether owned or leased). Parties shall look to their own insuring arrangements regarding such Loss.
ix) Neither party may assign its rights under this Agreement to third parties or Affiliates without the prior written consent of the other party, such consent not to be unreasonably withheld; except that either party may assign this Agreement in conjunction with the sale of a substantial portion of its business utilizing the Agreement. Any unauthorized assignment of this Agreement is void. Supplier shall not delegate or subcontract any of its duties or obligations under this Agreement to any third party, Subcontractor or Affiliate, except to the extent permitted in a SOW.

x) An effective waiver under the Agreement must be in writing signed by the party waiving its right. A waiver by either party of any instance of non-compliance by the other will not be deemed a waiver of future instances of non-compliance.
xi) All notices under the Agreement must be in writing and sent to the address below, unless a party designates in writing a different address (or an Affiliate designates a different address in a Participation Attachment). **"Participation Attachment"** or **"PA"** means an attachment signed by one or more Affiliates which incorporates by reference the terms and conditions in this SRA, any relevant SOW and/or WA, and other attachments or appendices specifically referenced in the PA.
xii) The parties consent to the use of electronic means and facsimile transmissions for communications as a signed writing. This SRA, and any SOWs and Attachments may be signed in one or more counterparts. Any reproduction of this Agreement made by reliable means is considered an original. This Agreement supersedes any prior course of dealing, discussions or representations between the parties regarding the subject matter hereof.
xiii) Neither party will be in default or liable for any delay or failure to comply with this Agreement due to any act beyond the control of the affected party, excluding labor disputes, provided such party immediately notifies the other.
xiv) This SRA applies to IBM and Supplier (the signatories below) and their respective Affiliates who avail themselves of the SRA by entering into a SOW or Participation Attachment under this SRA. Such Participation Attachments and/or SOWs and/or WAs entered into by Affiliates of either of the parties are independent agreements between the signatories thereto. IBM is not liable to Supplier or Supplier Affiliate for any actions or inactions of any Affiliate of IBM, nor shall any action or inaction by Affiliates of IBM constitute a breach of this Agreement between IBM and Supplier.
xv) In situations where Supplier will be providing Services or Deliverables to a Customer of IBM (whether directly or indirectly through IBM), references to IBM shall be deemed to include the Customer in the following sections of this SRA: Deliverables and Services; WA and Pricing (with respect to delivery and acceptance); Warranties, Intellectual Property; Indemnity; Supplier and Supplier Personnel; and Record Keeping and Audit Rights.
xvi) The following provisions shall survive termination or expiration of this SRA and shall remain in effect until fulfilled: Warranties; Taxes; Intellectual Property; Liability, Indemnification; Record Keeping and Audit Rights; Governing Law; Supplier and Supplier Personnel; and General. Without limiting the foregoing, all licenses under this Agreement will survive to the extent necessary to allow IBM to continue providing services to its Customers who are Supplier's licensees, notwithstanding the termination or expiration of this Agreement.

**IBM**

**Supplier Relationship Agreement**
# 4917011615.000

**ACCEPTED AND AGREED TO:**

By: International Business Machines Corporation

_____

Buyer Signature                    Date

_____

Maurice Torruella

_____

Printed Name

_____

SRM,Connectivity

_____

Title & Organization

2455 South Road
Poughkeepsie, NY,
12603

_____

Buyer Address:

**ACCEPTED AND AGREED TO:**

By: MATEK, Inc.                    6/27/17

_____

Supplier Signature                 Date

Chalfrantz Perry

_____

Printed Name

Director of Operations & Contracting

_____

Title & Organization

10320 Little Patuxent Parkway, #200
Columbia, MD 21044

_____

Supplier Address:

Page 5 of 8



**Supplier Relationship Agreement**

# 4917011615.000

**NonDeveloped Solutions Attachment #4917011617.000**

**to**

**SRA** # 4917011615

For purposes of the Deliverables and/or Services set forth in the Statement of Work that references the above SRA (the "SOW"), the following shall apply to those Deliverables and Services and shall be incorporated into the SRA. IBM may be referred to herein as either "IBM" or "Buyer." The Supplier Relationship Agreement (SRA) may be referred to as either the "SRA" or the "Base Agreement."

Supplier will not perform any development work (e.g., writing of computer code) for IBM or Customer under this Base Agreement. Should IBM require any development work from Supplier for a particular Customer engagement, the parties agree that the additional terms and conditions necessary to govern the development activity will be specified in the relevant SOW. If development work is conducted under this Agreement and the parties have not agreed to such additional terms and conditions, then IBM will own all products of the development work including code, copyrightable materials and inventions, whether made by Supplier Personnel solely or jointly with IBM Personnel. If such products of the development work are not works made for hire by operation of law, then Supplier hereby assigns all rights, title and interest, including copyright, to IBM in such products of the development work and shall assign all rights in such inventions (including any patents issuing thereon) to IBM.

**Definitions**
**"Deliverables"** also include Equipment and Programs that Supplier provides to IBM or Customer as described in the SOW.
**"Equipment"** means a machine, its features, elements, cables, or accessories, including the documentation required to install, support, use and maintain it.
**"Product"** may include Equipment.
**"Services"** may include maintenance, training, installation and support.

**Additional Program Provisions**
Customer will receive Supplier's license agreement from IBM or Supplier for Programs, to which IBM is not a party or liable for violations thereof. Notwithstanding the foregoing sentence, if a Program is available under an existing IBM agreement, the terms of that agreement will control distribution of that Program. Notwithstanding any terms to the contrary in Supplier's license agreement, IBM may install, configure, and test Programs for Customer without charge. For recurring charge licenses, IBM will notify Supplier when to begin invoicing Customer, if applicable.

For the purpose of supporting the Customer as specified in the relevant SOW, Supplier grants to IBM a nonexclusive, worldwide, perpetual, irrevocable, and paid-up license under any patents and patent applications licensable by Supplier to make, have made, use, have used, import, export, sell, and otherwise transfer the Deliverables and use the Services to the extent authorized in this Base Agreement and any relevant Statements of Work and Work Authorizations.

**Outsourcing License**
In the event IBM provides outsourcing services to a Customer that has licensed a Program from Supplier, IBM will not owe Supplier a fee for access to, or assignment of, such license or for transfer of the applicable Program to an IBM computer system which is of like configuration as the computer system for which the Program was licensed. The foregoing is subject to IBM providing Supplier notice of such Program to be managed by IBM and provided the Program will only be used on behalf of the Customer Upon expiration or termination of the agreement to provide outsourcing services to the Customer, IBM's right to use that copy of the Program will end.

For those Programs acquired directly by IBM from Supplier, IBM shall be free to continue to use such Program in support of its business needs, including in support of the provision of Services to IBM's Customers, at no additional fee. IBM shall have the right to assign the license it has acquired from Supplier hereunder to its Customer at no additional cost, provided that IBM gives Supplier thirty (30) days prior written notice of its intent to assign such rights, and provided further that IBM's Customer signs Supplier's license, and/or such other contractual document as may be reasonably required for such Product support.

**Additional Warranties**
In addition to those warranties set forth in the SRA, Supplier warrants that

- Deliverables are free from defects in design (except for written designs provided by IBM unless the defects in IBM's designs are based on Supplier's specifications);

- Deliverables are new and do not contain used or reconditioned parts;

- unless agreed to in writing by IBM and authorized by applicable government license or regulation, Supplier will not provide to IBM any articles, materials, services or any components thereof that Supplier knows or has reason to believe originated in, or was sourced from, a country subject to a comprehensive U.S. embargo as described in applicable export, embargo, and economic sanctions regulations (including, without limitation Cuba, Iran, North Korea, Sudan or Syria); and

- Deliverables do not include "conflict minerals" that are defined in any laws, including the Dodd-Frank Wall Street Reform and Consumer Protection Act, and that are sourced from any country specified in those laws, unless the conflict minerals have been sourced from smelters and refiners approved by the Conflict Free Sourcing Initiative's, Conflict Free Sourcing Program (or equivalent acceptable to IBM), in such countries. Supplier shall report to IBM (in a format to be specified by IBM) no less than annually (and whenever Supplier changes its upstream sources) any conflict minerals used in the production of any Deliverables provided to IBM.

All warranties set forth in the SRA, this Attachment and any applicable SOW shall be for the benefit of IBM's Customer and IBM's Customer may deal directly with Supplier under such warranty. In the event Supplier's standard warranty contains additional or more favorable warranties than the

Form title: Supplier Relationship Agreement (P-SRA)                                                                                    Revision: 0317



**Supplier Relationship Agreement**
# 4917011615.000

warranties in this Agreement, Supplier's standard warranty will apply. If Supplier is not the original manufacturer, Supplier will pass through to IBM or Customer all warranties provided by the original manufacturer.

**ACCEPTED AND AGREED TO:**
**By: IBM**
By:      Maurice Torruella

_____          _____
IBM Signature                                         Date

**ACCEPTED AND AGREED TO:**
**By: MATEK, Inc.**
By:  Chalfrantz Perry

_____          6/27/17
Supplier Signature                                   Date

*[Remainder of this page intentionally left blank]*

Form title: Supplier Relationship Agreement (P-SRA)                     Revision: 0317



**Supplier Relationship Agreement**
# 4917011615.000



**Superior Court of the District of Columbia**
**Civil - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**
**(202) 879-1133 | www.dccourts.gov**

**Case Number:** 2023-CAB-002097

**Case Caption:** Matek, Incorporated v. International Business Machines Corporation

### INITIAL ORDER

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 06/30/2023 | 9:30 AM | Remote Courtroom 200 |

**Please see attached instructions for remote participation.**

Your case is assigned to Associate Judge Carl E Ross.

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1)  This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2)  Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3)  Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4)  At the time stated below, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5)  If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6)  Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Anita M. Josey-Herring

**To Join by Computer, Tablet, or Smartphone:**

1)  Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb200

   Meeting ID: 179 813 6225

2)  When you are ready, click "Join Meeting".
3)  You will be placed in the lobby until the courtroom clerk gives you access to the hearing.

**Or to Join by Phone:**

1)  Call 202-860-2110 (local) or 844-992-4726 (toll-free)
2)  Enter the Webex Meeting ID listed above followed by "##"

**Resources and Contact Information:**

1)  For best practices on how to participate in Webex Meetings, click here https://www.webex.com/learn/best-practices.html.
2)  For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3)  For case questions, call the Civil Actions Branch Clerk's Office at (202) 879-1133.

## ACCESSIBILITY AND LANGUAGE ACCESS

### Persons with Disabilities:

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov . The D.C. Courts does not provide transportation service.

### Interpreting and Translation Services:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.

### Servicios de interpretación y traducción:

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

### የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች:

የዲ.ሲ. ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘሩትን የጽሕፈት ቤሮ (ክለርክ'ስ ኦፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.



## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

 202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

  Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.
- You can also find the list of legal services providers at dccourts.gov/coronavirus by clicking on the link that says, "List of Legal Service Providers for Those Without an Attorney."
- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.
- Witnesses: tell the judge if you want a witness to testify at your hearing.
- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## Tips for the Hearing



- Join the hearing a few minutes early!
- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.
- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.
- Say your name before you speak so the record is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).
- Speak slowly and clearly so everyone hears what you are saying.
- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.
- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.
- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.
- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.
- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them know that you are having technical issues.

## Special Tips for Video Hearings
## (Click here for more information)



- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.
- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.
- Look at the camera when you speak and avoid moving around on the video.
- Wear what you would normally wear to court.
- Sit in a well-lit room with no bright lights behind you.
- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.




# District of Columbia Courts

# Tips for Using DC Courts Remote

The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings.  The Courts are committed to enhancing access to justice for all.

There are six remote access sites throughout the community which will operate: **Monday – Friday, 8:30 am – 4:00 pm.**

### The remote site locations are:



| | |
|---|---|
| **Remote Site - 1**<br>Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | **Remote Site - 4**<br>Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |
| **Remote Site - 2**<br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Remote Site - 5**<br>Reeves Center<br>2000 14th Street, NW, 2nd Floor<br>Community Room<br>Washington, DC 20009 |
| **Remote Site - 3**<br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Remote Site - 6**<br>Reeves Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*** No walk-ins at this location*** |

If you want to use a remote site location for your hearing, call **202-879-1900** or email DCCourtsRemoteSites@dcsc.gov **at least 24 hours before your hearing to reserve a remote access computer station**.  If you require special accommodations such as an interpreter for your hearing, please call **202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements**.

**\*You should bring the following items when you come to your scheduled site location\***

1. Your **case number** and any **hyperlinks** provided by the Courts for your scheduled hearing.
2. Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.
3. Materials for notetaking, including pen and paper.
4. A facial covering will be required for entry into the remote hearing location; if you do not have a facial covering one will be provided.

**\*Safety and security measures are in place at the remote sites.**

**Contact information to schedule your remote access computer station:**
Call:  **202-879-1900**
Email:  DCCourtsRemoteSites@dcsc.gov




# Tu Tribunal, tu solución
## Consejos para usar los sitios de audiencia remota de los Tribunales de DC

Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay seis sitios de acceso remoto que funcionarán de l**unes a viernes, de 8:30 am a 4:00 pm**.

### Los centros de acceso remoto son:



| | |
|---|---|
| **Sitio Remoto - 1**<br>Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | **Sitio Remoto - 4**<br>Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |
| **Sitio Remoto - 2**<br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Sitio Remoto - 5**<br>Reeves Center<br>2000 14th Street, NW, 2nd Floor<br>Community Room<br>Washington, DC 20009 |
| **Sitio Remoto - 3**<br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Sitio Remoto - 6**<br>Reeves Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*No se puede entrar sin cita previa* |

Si desea usar un sitio remoto para su audiencia, llame al **202-879-1900** o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov **al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto. Si** necesita adaptaciones especiales, como un intérprete para la audiencia, llame **al 202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.**

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***

1. Su **número de caso** y todos los **hipervínculos** que le hayan proporcionado los Tribunales para la audiencia programada.

2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.

3. Materiales para tomar nota, como papel y lápiz.

4. Para ingresar al sitio de la audiencia remota deberá llevar una mascarilla facial; si no tiene mascarilla facial, se le proporcionará una.

**\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.**

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: **202-879-1900**
Correo electrónico: DCCourtsRemoteSites@dcsc.gov

eFiled
06/11/2023 8:06:25 PM
Superior Court
of the District of Columbia

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA - CIVIL DIVISION**

**Matek, Incorporated**

                              **Plaintiff**

                                                    **Case No.: 2023–CAB–002097**

                              *vs.*

**International Business Machines Corporation**

                              **Defendant**

## AFFIDAVIT OF SERVICE

I, Justin Cohen, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Initial Order; Notice of Remote Initial Scheduling Conference; Summons in English and Spanish; Complaint of Matek, Incorporated; Information Sheet; and Attachment  in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 06/05/2023 at 1:58 PM, I served International Business Machines Corporation c/o CT Corporation System, Registered Agent with the Initial Order; Notice of Remote Initial Scheduling Conference; Summons in English and Spanish; Complaint of Matek, Incorporated; Information Sheet; and Attachment  at 1015 15th Street NW, Suite 1000, Washington, DC 20005 by serving Reza Lustig, Intake Specialist, authorized to accept service on behalf of CT Corporation System.

Reza Lustig is described herein as:

Gender: Male    Race/Skin: White    Age: 30    Weight: 180    Height: 5'10"    Hair: Black    Glasses: Yes

I solemnly affirm under the penalties of perjury that the contents of this document are true to the best of my knowledge, information, and belief.

Sworn to before me on 06/08/2023

Angela H. Croson
Notary Public, District of Columbia
My Commission Expires: March 31, 2024

Justin Cohen

Client Ref Number:N/A
Job #: 1619104

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

**Case Caption:**   Matek, Incorporated v. International Business Machines Corporation

**To:**  Chalfrantz E E Perry                              **Case Number:**   2023-CAB-002097

### NOTICE OF REMOTE INITIAL SCHEDULING CONFERENCE

Your case is scheduled for a(n) **Remote Initial Scheduling Conference** on **06/30/2023** at **9:30 AM** in **Remote Courtroom 200**.

The remote hearing will be held via Webex. To join the hearing, follow the below instructions.

**To Join by Computer, Tablet, or Smartphone:**
1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb200

   Meeting ID: 179 813 6225
2) Click "**Join Meeting**". You may be placed in the lobby until the courtroom clerk gives you access to the hearing.

**OR To Join by Phone:**
1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)

   Enter the Webex Meeting ID shown above followed by "##"

**Resources and Contact Information:**
1) For best practices on how to participate in Webex Meetings, click here www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch at 202-879-1133.
4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.



Superior Court of the District of Columbia
Civil Division - Civil Actions Branch
500 Indiana Ave NW, Room 5000, Washington DC 20001
202-879-1133 | www.dccourts.gov

First Class Mail
U. S. Postage Paid
Washington, D.C.
Permit No. 1726

Chalfrantz E E Perry
505 Capitol Court NE
Suite 100
WASHINGTON DC  20002

You are named in a lawsuit filed in the Superior Court of the District of Columbia. If you cannot appear at the hearing, please contact the Clerk's Office immediately for more information. If Plaintiff does not participate, the case may be dismissed. If Defendant does not participate, default or judgment may be entered.

For case information, please contact the Civil Actions Branch Clerk's Office by phone at 202-879-1133 or by live chat at https://www.dccourts.gov/services/civil-matters/requesting-over-10k.

To access your case information online, please visit www.dccourts.gov/services/cases-online.

**Case Caption:**   Matek, Incorporated v. International Business Machines Corporation

**To:**  Chalfrantz E E Perry                              **Case Number:**     2023-CAB-002097

### NOTICE OF REMOTE INITIAL SCHEDULING CONFERENCE

Your case is scheduled for a(n) **Remote Initial Scheduling Conference** on **06/30/2023** at **9:30 AM** in **Remote Courtroom 200**.

The remote hearing will be held via Webex. To join the hearing, follow the below instructions.

**To Join by Computer, Tablet, or Smartphone:**
1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb200

   Meeting ID: 179 813 6225
2) Click "**Join Meeting**". You may be placed in the lobby until the courtroom clerk gives you access to the hearing.

**OR To Join by Phone:**
1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)
   Enter the Webex Meeting ID shown above followed by "##"

**Resources and Contact Information:**
1) For best practices on how to participate in Webex Meetings, click here www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch at 202-879-1133.
4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.



Superior Court of the District of Columbia
Civil Division - Civil Actions Branch
500 Indiana Ave NW, Room 5000, Washington DC 20001
202-879-1133 | www.dccourts.gov

First Class Mail
U. S. Postage Paid
Washington, D.C.
Permit No. 1726

Chalfrantz E E Perry
505 Capitol Court NE
Suite 100
WASHINGTON DC  20002

You are named in a lawsuit filed in the Superior Court of the District of Columbia. If you cannot appear at the hearing, please contact the Clerk's Office immediately for more information. If Plaintiff does not participate, the case may be dismissed. If Defendant does not participate, default or judgment may be entered.

For case information, please contact the Civil Actions Branch Clerk's Office by phone at 202-879-1133 or by live chat at https://www.dccourts.gov/services/civil-matters/requesting-over-10k.

To access your case information online, please visit www.dccourts.gov/services/cases-online.

**Case Caption:**    Matek, Incorporated v. International Business Machines Corporation

**To:**   International Business Machines              **Case Number:**    2023-CAB-002097
Corporation

### NOTICE OF REMOTE INITIAL SCHEDULING CONFERENCE

Your case is scheduled for a(n) **Remote Initial Scheduling Conference** on **06/30/2023** at **9:30 AM** in **Remote Courtroom 200**.

The remote hearing will be held via Webex. To join the hearing, follow the below instructions.

**To Join by Computer, Tablet, or Smartphone:**
1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

    Link: dccourts.webex.com/meet/ctb200

    Meeting ID: 179 813 6225

2) Click "**Join Meeting**". You may be placed in the lobby until the courtroom clerk gives you access to the hearing.

**OR To Join by Phone:**
1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)

    Enter the Webex Meeting ID shown above followed by "##"

**Resources and Contact Information:**
1) For best practices on how to participate in Webex Meetings, click here www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch at 202-879-1133.
4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.



Superior Court of the District of Columbia
Civil Division - Civil Actions Branch
500 Indiana Ave NW, Room 5000, Washington DC 20001
202-879-1133 | www.dccourts.gov

First Class Mail
U. S. Postage Paid
Washington, D.C.
Permit No. 1726

International Business Machines Corporation
1015 15th ST NW
Washington DC  20005

You are named in a lawsuit filed in the Superior Court of the District of Columbia. If you cannot appear at the hearing, please contact the Clerk's Office immediately for more information. If Plaintiff does not participate, the case may be dismissed. If Defendant does not participate, default or judgment may be entered.

For case information, please contact the Civil Actions Branch Clerk's Office by phone at 202-879-1133 or by live chat at https://www.dccourts.gov/services/civil-matters/requesting-over-10k.

To access your case information online, please visit www.dccourts.gov/services/cases-online.